UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
DR. LEONARD MORSE,

                     Plaintiff,

     -against-

ELIOT SPITZER, *et al.*,

                  Defendants.
-------------------------------------------------------X

REDACTED[1]
REPORT AND
RECOMMENDATION

07 CV 4793 (CBA) (RML)

LEVY, United States Magistrate Judge:

        By order dated May 20, 2010, the Honorable Carol Bagley Amon, United States

District Judge, referred the state defendants' motion for partial summary judgment[2] to me for a

report and recommendation.  I heard oral argument on August 5, 2010.  For the reasons stated

below, I respectfully recommend that the motion be granted in part and denied in part.

---

    [1]  To protect their privacy, all patient names have been redacted and replaced with initials, as agreed by the parties.

    [2]  The motion does not seek summary judgment on plaintiff's ninth, tenth, and eleventh causes of action, which are asserted against defendants Spitzer and Fusto only.  (See Memorandum of Law in Support of State Defendants' Motion for Summary Judgment, dated Nov. 23, 2009, at 1 n.1; Stipulation and Order, dated Apr. 7, 2010.)  Nonetheless, defendant Spitzer joins in the motion, on the ground that "if the movants' summary judgment motion is granted, it is almost certain that claims against Spitzer would be rendered academic."  (Id.)

Plaintiff Leonard Morse ("plaintiff" or "Morse"), a dentist, commenced this action in November 2007, alleging that defendants violated his civil rights by pursuing and participating in his arrest, indictment, and prosecution for Medicaid fraud. (See Complaint, dated Nov. 16, 2007 ("Compl.").) Morse was acquitted of the charges against him in June 2007. He seeks $25 million in compensatory damages and $50 million in punitive damages.

The state defendants now move for summary judgment under Rule 56(b) of the Federal Rules of Civil Procedure. Those defendants are Eliot Spitzer ("Spitzer"), sued for actions taken as Attorney General of the State of New York; John Fusto ("Fusto"), sued for actions taken as Special Assistant Attorney General in the Medicaid Fraud Control Unit ("MFCU"); Jose Castillo ("Castillo"), a Senior Special Auditor-Investigator in the MFCU; and Robert H. Flynn ("Flynn"), a former Senior Investigator in the MFCU. The complaint also named as defendants James A. Serra ("Serra"), a former Senior Investigator in the MFCU, and Levon Aharonyan ("Aharonyan"), a former Supervising Investigator for the New York State

---

[3] The following facts, upon which plaintiff's complaint is based, are undisputed or deemed admitted, unless otherwise noted. Both sides have served and filed Statements of Material Facts Not in Genuine Dispute, in compliance with Local Civil Rule 56.1(a). The rule states that upon any motion for summary judgment, "there shall be annexed to the notice of motion a separate, short and concise statement . . . of the material facts as to which the moving party contends there is no genuine issue to be tried." S.D.N.Y. & E.D.N.Y. Civ. R. 56.1(a). Rule 56.1(b) then requires the party opposing summary judgment to include "a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried." Under Rule 56.1(c), all "material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless specifically controverted by . . . the statement required to be served by the opposing party." See AAI Recoveries, Inc. v. Pijuan, 13 F. Supp. 2d 448, 449-50 (S.D.N.Y. 1998); Montalvo v. Sun Roc Corp., 179 F.R.D. 420, 421-23 (S.D.N.Y. 1998); see also T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009).

Department of Health and Chief Auditor for the New York State Medicaid system.  By

stipulation dated April 6, 2010, plaintiff discontinued the action with prejudice as against

defendants Serra and Aharonyan.

It is undisputed that plaintiff was a participating provider in the Medical

Assistance Program, also known as Medicaid (Compl. ¶¶ 17, 18), and that he submitted claims

for reimbursement under his own name and that of two corporations, 580 Dental, P.C. ("580

Dental") and Brook Medical, of which he was the sole owner, officer, and director (Deposition of

Leonard Morse, dated Aug. 7, 2009 ("Morse Dep."), at 10-12, 27-28; State Defs.' Statement

Pursuant to Local Rule 56.1, dated Nov. 23, 2009 ("Defs.' Rule 56.1 Statement"), ¶¶ 8, 9).  On

April 5, 2006, a Kings County grand jury indicted him on one count of Grand Larceny in the First

Degree,[4] a Class B felony, and eleven counts of Offering a False Instrument for Filing in the First

Degree,[5] a Class E felony.[6]  (Compl. ¶¶ 46, 47; Morse Dep. at 61-62.)  In August 2007, after a

bench trial, Kings County Supreme Court Justice John Walsh acquitted Morse of those charges.

(Compl. ¶ 101, Morse Dep. at 119.)

The criminal charges against Morse concerned his Medicaid billing for the years

---

[4]  A charge of grand larceny in the first degree requires that the stolen property's value
exceed one million dollars.  N.Y. Penal Law § 155.42.

[5]  A charge of offering a false instrument for filing in the first degree requires intent to
defraud the state or any political subdivision.  N.Y. Penal Law § 175.35.

[6]  By Decision and Order dated June 14, 2006, the court denied Morse's motion to
dismiss the indictment, holding that "the evidence presented before the Grand Jury was legally
sufficient to establish and support the finding(s) in all the count(s) of the indictment" and that
"the assistant district attorney correctly charged the Grand Jury with respect to the applicable
law."  (Decision and Order, annexed as Ex. N to the Declaration of Seth Farber, Esq., dated Nov.
20, 2009 ("Farber Decl.").)

2000–2002, during which his practice billed approximately $4.1 million to the Medicaid

program, including approximately $1.9 million for prosthetic dental services, or dentures.

(Defs.' Rule 56.1 Statement ¶¶ 16; Memorandum of Law in Support of State Defendants' Motion

for Summary Judgment, dated Nov. 23, 2009 ("Defs.' Mem."), at 3.)  In October 2002, Flynn and

Serra, who were conducting an audit on behalf of the MFCU,[7] subpoenaed Morse's patient

records to verify his billing for 2000–2002.  Morse had previously submitted to a routine

interview in August 2002,[8] and he complied with the subpoena, as well.  (See Declaration of

Robert Flynn, dated Nov. 20, 2009 (Flynn Decl."), ¶ 4; Declaration of Seth Farber, Esq., dated

Nov. 20, 2009 ("Farber Decl."), Ex. P;  Deposition of Robert Flynn, dated Apr. 30, 2009 ("Flynn

Dep."), annexed as Ex. A to the Declaration of Jon L. Norinsberg, Esq., dated Apr. 7, 2010

("Norinsberg Decl."), at 24, 30-31, 81; Morse Dep. at 36.)  Ultimately, the investigators seized

329 patient files from Morse's practice (Flynn Dep. at 89), many of which related to patients

treated by Morse's employee and associate, Dr. Brian Ketover.[9]

---

[7] Flynn was the lead investigator, and Serra was his regular partner.  (Declaration of Robert Flynn, dated Nov. 20, 2009, ¶ 2.)  Castillo replaced Auditor Timothy Johnson in 2004, and therefore was not involved in the early stages of the Morse investigation.  (Declaration of John Fusto, Esq., dated Nov. 20, 2009, ¶ 4.)

[8] Flynn described Morse's demeanor during the interview as "cooperative," "willing to answer questions," and "willing to assist in [the] investigation."  (Flynn Dep. at 30-31.)  He also stated that Morse did not appear nervous and did not seem to be hiding something or acting in a suspicious manner.  (Id. at 31.)

[9] Dr. Ketover treated roughly fifty percent of 580 Dental's patients each year.  (See Flynn Dep. at 28.)  Morse testified that, although Dr. Ketover had his own Medicaid provider number, Morse was solely responsible for submitting claims to Medicaid on behalf of 580 Dental.  (Morse Dep. at 23-24.)  He further explained that Dr. Ketover completed a billing summary for each office visit and gave it to Morse to submit to Medicaid electronically, but that Morse himself "wasn't physically in control of [Dr. Ketover's] patients' charts" and did not see them.  (Id. at

(continued...)

Nearly two years later, in April 2004, the investigators requested the practice's original prescriptions for prosthetic dental appliances that Nu-Life Dental Laboratories ("Nu-Life") and Design Dental Studio ("Design Dental") had filled[10] and the cost of which Morse had billed to Medicaid. Morse allegedly told the investigators that he had destroyed those records. (Flynn Decl. ¶ 5.) The investigators then obtained invoices directly from those two laboratories and compared the invoices to Morse's Medicaid claims for prosthetics for the same time period. (Declaration of John Fusto, dated Nov. 20, 2009 ("Fusto Decl."), ¶¶ 8, 9; Declaration of Jose Castillo, dated Nov. 19, 2009 ("Castillo Decl."), ¶¶ 5–6.) According to the state defendants, the forensic audit showed a large discrepancy between the laboratory invoices and Morse's Medicaid billing. (See Fusto Decl. ¶ 9; Castillo Decl. ¶¶ 6, 14, 17.)

Plaintiff acknowledges he was unable to produce original prescriptions or invoices for prosthetics for the years 2000 to 2002 (Morse Dep. at 20, 50, 90), despite Medicaid

_____

[9](...continued)
43.) When asked why he did not review every chart for patients Dr. Ketover treated, Morse responded that "[i]t would be a physical impossibility" given the number of patients both dentists treated on a daily basis, and that he had no reason to believe that Dr. Ketover's billing summaries were false. (Id. at 155-56.) Defendants did not interview Dr. Ketover as part of their investigation. (Flynn Dep. at 33.)

[10] Plaintiff named Design Dental as a defendant in this case, asserting claims against it for intentional infliction of emotional distress and prima facie tort. (See Compl. ¶¶ 13, 206-214.) That defendant has not filed an answer or otherwise moved with respect to the complaint. As explained infra, plaintiff has withdrawn his claim for prima facie tort. (See Transcript of Oral Argument, dated Aug. 5, 2010, at 45-46.) Defendants describe Design Dental as a laboratory "operated from the owner's basement" and note that the business's owner speaks little English. (See Declaration of John Fusto, dated Nov. 20, 2009, ¶ 8.) Morse testified in his deposition that, during the time frame at issue in this case, most of 580 Dental's laboratory work went to Design Dental because it "had a better fee schedule." (Morse Dep. at 46.)

regulations that require providers to maintain contemporaneous billing records for six years,[11] but he denies having engaged in fraud and he alleges that defendants' actions in arresting and prosecuting him were politically motivated. He contends that the state defendants needed a "high-profile medicaid fraud case" to prove that defendant Spitzer, who was running for governor, was "cracking down on medicaid fraud," and that they targeted him for prosecution because "he was one of the state's highest medicaid billers." (Compl. ¶¶ 39-45.) He also accuses defendants of conducting a shoddy investigation and "manufacturing" documents in an attempt to prove their case against him. (Id. ¶ 88.) Although he was acquitted of the charges,

---

[11] 18 N.Y.C.R.R. § 515.2(b)(6) states that it is "an unacceptable practice" for a provider to engage in "unacceptable recordkeeping," defined as:

> Failing to maintain or to make available for purposes of audit or investigation records necessary to fully disclose the medical necessity for and the nature and extent of the medical care, services or supplies furnished, or to comply with other requirements of this Title.

In addition, 18 N.Y.C.R.R. § 517.3(b)(1) states, in relevant part:

> All fiscal and statistical records and reports of providers which are used for the purpose of establishing rates of payment made in accordance with the medical assistance program and all underlying books, records, documentation and reports which formed the basis for such fiscal and statistical records and reports are subject to audit. All underlying books, records and documentation which formed the basis for the fiscal and statistical reports filed by a provider with any State agency responsible for the establishment of rates of payment or fees *must be kept and maintained by the provider for a period of not less than six years* from the date of filing of such reports, or the date upon which the fiscal and statistical records were required to be filed, or two years from the end of the last calendar year during any part of which a provider's rate or fee was based on the fiscal or statistical reports, whichever is later (emphasis added).

Morse contends that his reputation has been "permanently and irreparably harmed" by the accusations, and that his career has been destroyed because he has been unable to find work as a dentist since defendants publicized the charges against him. (See id. ¶¶ 102-108.)

## DISCUSSION

A. Standard for Summary Judgment

A court shall grant summary judgment if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and decide only whether there is any genuine issue to be tried. Eastman Mach. Co. v. United States, 841 F.2d 469, 473 (2d Cir. 1988). "[T]he court is not to weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact . . . . Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment." United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994) (internal citations omitted). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In other words, there must be more than "a scintilla of evidence" to support the non-moving party's claims, id. at 251; "assertions that are conclusory" will not suffice, Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004). I will address each of plaintiff's claims in turn.

B. 42 U.S.C. § 1983

Section 1983 imposes liability on "any person who, acting pursuant to state government authority or under the color of state law, abridges rights secured by the United States Constitution or by any federal law." Cespedes v. Coughlin, 956 F. Supp. 454, 464 (S.D.N.Y. 1997) (quoting Campo v. Keane, 913 F. Supp. 814, 818 (S.D.N.Y. 1996)). Section 1983 creates no substantive rights but merely provides the vehicle whereby federal rights elsewhere or otherwise conferred may be vindicated.[12] Graham v. Connor, 490 U.S. 386, 393-94 (1989); see also Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993) ("Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere"). In order to establish liability under section 1983, a plaintiff must prove that: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his or her federal statutory rights, or his or her constitutional rights or privileges. Annis v. County of Westchester, 136 F.3d 239, 245 (2d Cir. 1998).

Moreover, under the doctrine of qualified immunity, public officials are shielded from liability for civil damages if they establish that (1) their conduct did not violate clearly established rights of which a reasonable person would have known; or (2) it was "objectively reasonable" to believe that their acts did not violate clearly established rights. Anderson v. Creighton, 483 U.S. 635, 637-41 (1987); see also Smith v. Garretto, 147 F.3d 91, 94 (2d Cir. 1998) ("Qualified immunity protects a governmental official from suit for any actions that did not violate a clearly established constitutional right and those actions as to which the official had an objectively reasonable good faith belief that the action taken was lawful" (citations omitted)).

---

[12] For this reason, plaintiff's first cause of action, which simply alleges "deprivation of federal civil rights under 42 U.S.C. § 1983," does not state a claim.

The immunity accorded officials by this doctrine protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). This defense protects government officials from "the burdens of defending expensive but ultimately unsubstantial lawsuits and also guards against the risk that 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" Estate of Rosenbaum v. City of New York, 975 F. Supp. 206, 215 (E.D.N.Y. 1997) (quoting Anderson, 483 U.S. at 638); see also Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995). Qualified immunity is "*immunity from suit* rather than a mere defense to liability." Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (emphasis in original). If such immunity applies, then the plaintiff's claim must be dismissed.

### 1. Claims for False Arrest and Malicious Prosecution

Plaintiff's second cause of action asserts a claim for false arrest against defendants Flynn and Castillo. (Compl. ¶¶ 114-116.) To prove the elements of false arrest, a plaintiff must show that: (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged. See Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994). The existence of probable cause is a complete defense to an action for false arrest. Id. Moreover, the burden of establishing the absence of probable cause ordinarily rests on the plaintiff. See Campbell v. Giuliani, No. 99-2603, 2000 WL 194815, at *5 (E.D.N.Y., Feb.16, 2000) ("In the context of § 1983," federal courts "have held that the plaintiff bears the burden of establishing the absence of probable cause" (citing Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996))); see also Brown v. City of New York, 306 F. Supp. 2d 473, 479 (S.D.N.Y. 2004); Rennols v. City of

New York, No. 00-CV-6692, 2003 WL 22427752, at *2 (E.D.N.Y. Oct. 23, 2003).

Plaintiff's third cause of action asserts a claim for malicious prosecution against defendants Flynn and Castillo. (Compl. ¶¶ 117-134.) To prevail on a malicious prosecution claim, a plaintiff must show that: (1) the defendant commenced or continued a criminal proceeding against plaintiff, (2) the proceeding terminated in plaintiff's favor, (3) there was no probable cause for the criminal proceeding, and (4) the defendant initiated the criminal proceeding out of malice. Cook v. Sheldon, 41 F.3d 73, 79 (2d Cir. 1994). Malice "does not have to be actual spite or hatred, but means only that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996) (internal quotations and citation omitted). Moreover, "[a] lack of probable cause generally creates an inference of malice." Boyd v. City of New York, 336 F.3d 72, 78 (2d Cir. 2003).

Thus, the absence of probable cause is an important element of both causes of action. Defendants Flynn and Castillo benefit from qualified immunity on the false arrest and malicious prosecution claims if "it was objectively reasonable for [them] to believe they did have probable cause" to arrest and prosecute Morse for grand larceny in the first degree and offering a false instrument for filing. Zellner v. Summerlin, 494 F.3d 344, 369 (2d Cir. 2007); see also Savino v. City of New York, 331 F.3d 63, 72-76 (2d Cir. 2003). This standard is met "when a reasonable [law enforcement officer] in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law." Zellner, 494 F.3d at 369 (internal quotation marks omitted). In other words, "'arguable probable cause' will suffice to confer qualified immunity for the

arrest."  Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004).

Defendants Flynn and Castillo contend that they are entitled to summary judgment on the false arrest and malicious prosecution claims because they had arguable probable cause to arrest and prosecute plaintiff, and they argue that the indictment "was the consequence of Dr. Morse's own failure to maintain and produce required supporting records."  (Defs.' Mem. at 10.) Plaintiff argues that there is a genuine issue of material fact as to whether these defendants had probable cause to believe he committed the crimes with which they charged him, or whether they had political motives.  (See generally Pl.'s Mem.)

"Probable cause exists where 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution in the belief'" that the suspect committed the crime at issue.  Brinegar v. United States, 338 U.S. 160, 175-176 (1949) (quoting Carroll v. United States, 267 U.S. 132, 162 (1925)).  When determining if there is probable cause, courts must look to the "totality of the circumstances."  Illinois v. Gates, 462 U.S. 213, 233 (1983); see also Bernard, 25 F.3d at 102.  Defendants Flynn and Castillo are "entitled to qualified immunity as a matter of law if the undisputed facts and all permissible inferences favorable to the plaintiff show either (a) that it was objectively reasonable for the officers to believe that probable cause existed, or (b) that officers of reasonable competence could disagree on whether the probable cause test was met."  Bernard, 25 F.3d at 102.  In other words, even law enforcement officials who "reasonably but mistakenly conclude that probable cause is present" are entitled to immunity.  Anderson v. Creighton, 483 U.S. at 641; see also Bernard, 25 F.3d at 102 ("[P]robable cause can exist even where it is based on mistaken information, so long as the

-11-

arresting officer acted reasonably and in good faith in relying on that information").

With respect to the false arrest claim, defendants bear the burden of establishing that they had probable cause, since no arrest warrant was issued.[13]  See Flores v. City of Mount Vernon, 41 F. Supp. 2d 439, 442-43 (S.D.N.Y. 1999) (explaining that, while the plaintiff ordinarily bears the burden of establishing the absence of probable cause, the burden shifts to the defendant when no arrest warrant has been issued (citing Raysor v. Port Auth. of New York & New Jersey, 768 F.2d 34, 40 (2d Cir. 1985))); see also Brenner v. Heavener, 492 F. Supp. 2d 399, 402 (S.D.N.Y. 2007); Wu v. City of New York, 934 F. Supp. 581, 586 (S.D.N.Y. 1996).  To meet their burden, defendants Flynn and Castillo must show, "by admissible evidence, that they ha[d] a quantum of evidence 'more than rumor, suspicion, or even a strong reason to suspect'" that Morse had committed the crimes of grand larceny in the first degree and offering a false instrument for filing in the first degree.  Flores, 41 F. Supp. 2d at 443 (quoting United States v. Fisher, 702 F.2d 372, 375 (2d Cir. 1983)).

On the malicious prosecution claim, by contrast, "'indictment by a grand jury creates a presumption of probable cause.'"  Manganiello v. City of New York, 612 F.3d 149, 162

---

[13]  When an arrest is made pursuant to a facially valid warrant, there is a presumption that it was made with probable cause which "can be rebutted only by a showing of fraud, perjury, or the misrepresentation or falsification of evidence."  Martinetti v. Town of New Hartford Police Dep't, 112 F. Supp. 2d 251, 252-53 (N.D.N.Y. 2000) (internal quotation marks omitted).  Here, no warrant was issued for plaintiff's arrest; rather,  he surrendered voluntarily after learning of the charges against him.  (Compl. ¶ 51.)  Therefore, the presumption of probable cause does not apply to the false arrest claim.  Nonetheless, for the reasons discussed below, even if plaintiff had the burden of raising a material issue of fact with respect to probable cause on the false arrest claim, he would satisfy that burden.

(2d Cir. 2010) (quoting Savino, 331 F.3d at 72).[14]  A plaintiff may rebut that presumption only "by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'"  Id. (quoting Savino, 331 F.3d at 72). "[C]onjecture and surmise" that an indictment was tainted are insufficient to rebut this presumption of probable cause.  Savino, 331 F.3d at 73 (internal quotation marks omitted).

Defendants Flynn and Castillo based their finding of probable cause on the following evidence: (1) Morse's failure to produce prescriptions for prosthetic dental appliances and laboratory invoices for work performed by Nu-Life and Design Dental from 2000 to 2002 and billed to Medicaid; (2) a forensic analysis of documentation obtained from Nu-Life and Design Dental; and (3) telephone interviews with twelve patients of 580 Dental, eight of whom later testified before the grand jury that they did not receive prosthetic services that Morse's practice billed to Medicaid.

As to the failure to produce prescriptions and invoices for lab work, the state defendants cite no authority, and this court is aware of none, for their argument that a Medicaid provider's failure to maintain proper records, by itself, constitutes probable cause to believe that the provider committed fraud.  (See Transcript of Oral Argument, dated Aug. 5, 2010 ("Tr."), at 40; Reply Memorandum of Law in Further Support of State Defendants' Motion for Summary Judgment, dated May 17, 2010, at 18.)  Indeed, while a provider's violation of the record-keeping requirements can result in civil penalties, such as suspension or termination from the Medicaid

---

[14]  The presumption of probable cause arising from an indictment "'applies only in causes of action for malicious prosecution" and not to false arrest claims.  Savino, 331 F.3d at 75 (quoting Broughton v. State, N.E.2d 310 (N.Y. 1975)).

program[15] or an order of restitution for overpayments, see 18 N.Y.C.R.R. §515.3; Cestari v.

N.Y.S. Dep't of Health, 707 N.Y.S. 2d 397 (1st Dep't 2000); Koh v. Perales, 570 N.Y.S.2d 98

(2d Dep't 1991), it is not a crime.

        In addition, Morse testified in his deposition that it was his "custom" to destroy

laboratory invoices as soon as they were paid, and to destroy prescriptions after keeping them in

a segregated file for one year. (Morse Dep. at 20, 50.) He maintains that this practice was in

compliance with the New York State Education Law, which states that a dental laboratory

prescription "shall be retained by the practitioner for a period of one year."[16]  N.Y. Educ. Law §

6611(1). He also faults defendants "for their failure to request these records in a timely manner."

(Pl.'s Mem. at 19.) Defendants question Morse's veracity on this issue and contend that the

invoices and prescriptions never existed. (See Fusto Decl. ¶ 12.) This presents a credibility

---

[15] In fact, Morse was excluded from the Medicaid program in May 2006. (See Notice of Immediate Agency Action, annexed as Ex. P to the Norinsberg Decl.) He was reinstated in the fall of 2007. (Deposition of Dr. Leonard Morse, dated Aug. 7, 2009, annexed as Ex. C to the Farber Decl., at 9.)

[16] It bears noting that at trial, the prosecution's expert witness, Dr. Richard Goliber, testified that, while a record of each prescription must be kept in the dentist's patient file, the original laboratory prescription need only be kept for one year. (See Excerpt of Trial Transcript, annexed as Ex. R to the Norinsberg Decl., at 18.) Dr. Goliber further testified that it is acceptable for a dentist to discard original prescriptions after one year. (Id. at 24.) Morse states that "each and every one" of the 329 patient charts he turned over to the investigators "had the dental prescriptions written in them," and that "if the MFCU investigators wanted to know what prescription [he] wrote for a given patient . . . all they would have to do would be to check the patients' charts." (Declaration of Dr. Leonard Morse, dated Apr. 7, 2010, annexed as Ex. Q to the Norinsberg Decl., ¶¶ 29-32.) In his deposition, defendant Fusto testified that he did not give the patient charts to the prosecution's expert to compare with Morse's Medicaid billing. (Deposition of John F. Fusto, dated Nov. 14, 2008, annexed as Ex. B to the Norinsberg Decl., at 350-51.)

question that cannot be resolved on a summary judgment motion.[17]  Rem, 38 F.3d at 644.

As for the records Flynn and Castillo subpoenaed from Nu-Life and Design Dental, it is readily apparent that those documents were highly flawed.  Most of the invoices did not document the specific services ordered or performed (see Castillo Decl. ¶ 12; Fusto Decl. ¶ 8), and Fusto now describes the Design Dental invoices as "sloppy," "incomplete," "informal[]," "handwritten," and "lacking detail" (Fusto Decl. ¶¶ 8, 26).  Moreover, neither laboratory maintained prescriptions.  (See Fusto Decl. ¶ 7; Flynn Dep. at 65-67; Deposition of John F. Fusto, dated Nov. 14, 2008, annexed as Ex. B to the Norinsberg Decl. ("Fusto Dep."), at 71-73.) More importantly, for the thirty-six-month period at issue, Design Dental was missing eleven months of invoices and Nu-Life was missing eight months of invoices,[18] (see Castillo Dep. at 27, 49, 74-75, 142; Castillo Decl. ¶ 6; Fusto Dep. at 78-80; Flynn Dep. at 69), although Morse

_____

[17]  Indeed, Morse's testimony "is itself admissible evidence," and "he is entitled at this [summary judgment] stage to an assumption that the jury will believe him."  Richardson v. City of New York, No. 02 CV 3651, 2006 WL 2792768, at *4 (E.D.N.Y. Sept. 27, 2006).

[18]  Defendant Castillo states that these laboratory invoices "are best described not as 'missing', but as 'non-existent prescriptions and invoices[]'" as "[t]here is simply no evidence that they ever existed."  (Castillo Decl. ¶ 6.)  Nonetheless, he claims that one set of calculations "gave Dr. Morse full credit for his Medicaid claims for any months for which a Nu-Life or Design Dental invoice even existed, regardless of whether the services enumerated in Medicaid claims could be found on the invoices themselves," and that even under this "favorable" analysis, he concluded that Dr. Morse "had made fraudulent claims (or, in any event, made claims that he could not substantiate) to the Medicaid program for at least $275,026 (or $160,562 removing October through December 2002 from the analysis)."  (Id.)  As Castillo concedes, that analysis would not have supported a charge of Grand Larceny in the First Degree (id.), but at any rate, it assumes that 580 Dental's Medicaid claims for months without supporting laboratory invoices were fraudulent.  Whether or not that assumption was correct or objectively reasonable — in light of all the circumstances — is a question of fact that this court cannot answer on a summary judgment motion.  Cf. Brinegar, 338 U.S. at 176 ("Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part.  But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.")

testified in his deposition that he sent out laboratory work every month for the years 2000 to 2002 (Morse Dep. at 76). In addition, the laboratory invoices contained no identifying information other than patients' names, many of which were common. (Fusto Decl. ¶ 8; <u>see also</u> Farber Decl., Exs. F & G.[19]) The invoices were so unreliable that, at trial, the prosecution did not attempt to introduce into evidence the records from Nu-Life (Fusto Dep. at 358), and Justice Walsh ruled the Design Dental invoices inadmissible on the ground that they were untrustworthy.[20] (Fusto Dep. at 76-78.) In his summation, defendant Fusto conceded that, without the laboratory records, "the best that the Court can consider at this point [is] grand larceny in the third degree, in excess of $3,000.00" and that nine of the twelve counts in the indictment would "obviously have to be dismissed." (Transcript of Trial, dated July 16, 2007, annexed as Ex. R to the Norinsberg Decl. ("Trial Tr."), at 115-16.) Ultimately, Justice Walsh acquitted Morse on all counts. While there is obviously a substantial difference between

---

[19] Exhibits F and G are copies of the laboratories' invoices. In most instances, the only identifying information is the patient's last name, sometimes followed by a first initial. The Nu-Life records describe the type of work performed, but the Design Dental records do not. (<u>See</u> Farber Decl., Exs. F & G.)

[20] The prosecution attempted to introduce the Design Dental records into evidence through the testimony of the laboratory's owner, Nisan Yushvayev. Justice Walsh, in ruling the records inadmissible, stated:

> I just do not believe him [Yushvayev]. I do not believe him and it's hearsay. . . . And to let this in with this witness and for me to go home and say it's reliable enough to let this in, I just couldn't do it. So I'm not letting this in. . . . I just don't believe him. That's the bottom line. That's what it comes down to. . . . This is apparently the way these places operate. That's what it is. That's what you're stuck with.

(Norinsberg Decl., Ex. R at 77-78.)

probable cause and proof beyond a reasonable doubt, the fact that both the prosecutor and the judge found the laboratories' records inadequate calls into question whether reasonable officers, acting in good faith, would have relied on them in charging Morse with more than one million dollars of Medicaid fraud and filing false instruments.

Plaintiff also alleges that the investigators' calculations, based on those laboratory records, were deeply flawed and inaccurate. According to the report of plaintiff's expert statistician, Alan Salzberg, Ph.D., defendant Castillo's assumptions were erroneous, his methodology was invalid, and his analysis was riddled with errors. (See Statistical Evaluation of Estimates of Medicaid Overpayment, dated Apr. 2, 2010 ("Salzberg Report"), annexed as Ex. LL to the Norinsberg Decl.) Dr. Salzberg states that he evaluated the reliability of Castillo's conclusions "using common statistical methods for validating data and estimating errors" to determine whether Castillo arrived at his projections in a "statistically valid" manner. (Id. at 2.) He explains that, because there were "large gaps in the data," namely the laboratory invoices, the sampling of patient charts selected for review "cannot be considered to be either a statistical sample or a census of population as a whole." (Id. at 8.) He therefore concludes that "the statistical analysis performed in this case was fundamentally flawed." (Id.) Dr. Salzberg also states that, in addition to using an "inherently flawed sample," Castillo failed to, inter alia, (1) "perform a proper validation" by comparing the payment data "item by item" (id.), (2) "identify how Medicaid payments to Dr. Morse for dental prosthetics. . . were separated from other Medicaid payments" (id.), (3) give any credit for the nineteen months of missing laboratory invoices, rather than assuming the missing invoices averaged the same amounts as those that were reviewed (id. at 9), (4) assign any credit for 326 entries that he considered illegible (id. at

10), (5) explain his basis for excluding eighty-seven Nu-Life patients from his analysis (id.), (6) take into account the fact that 580 Dental's payments to the laboratories exceeded the total amount of the invoices, a discrepancy that allegedly calls into question "the integrity of the entire invoice database" (id. at 11, 14), (7) "cross-validate the results against known or approximate standards of billing," meaning he failed to consider that Medicaid reimbursement rates changed over time and to account for the fact that each amount on an invoice could represent multiple procedures (id. at 14-15), (8) account for the "inherent unreliability" of the data (id. at 16), and (9) consider "alternative reasons" for the discrepancies between the billing and the laboratory invoices, meaning he assumed that the discrepancies were due to fraud and not to "missing, incorrect, or illegible entries for properly performed and reimbursable items" (id. at 16-17.) Dr. Salzberg concludes that Castillo's analysis does not establish "*any* statistical evidence of fraudulent billing by Dr. Morse," and in fact "does not document a s*ingle* case of a Medicaid overpayment to Dr. Morse." (Id. at 17) (emphasis in original).

Defendants counter these assertions with claims that Castillo conducted a "painstaking and complex analysis" of the laboratory records (Fusto Decl. ¶ 12) and made numerous assumptions that were "favorable" to Morse (see Castillo Decl. ¶¶ 14-16). However, whether Castillo's analysis was in fact thorough and complete, and whether his methods and underlying assumptions were indeed reasonable,[21] are questions that must be resolved by a trier

---

[21] It is undisputed that the state defendants did not retain a statistician to analyze the laboratory records, although Fusto testified that he had done so in other cases. (Fusto Dep., annexed as Ex. B to the Norinsberg Decl., at 216, 215.) It is also undisputed that Castillo, who joined the MFCU upon his graduation from college in 2003, has a bachelor's degree in accounting but is not a CPA and did not receive any specialized training in auditing other than a six-month internship with the department. (Castillo Dep., annexed as Ex. D to the Norinsberg

(continued...)

of fact.  At the crux of the dispute is Castillo's assumption that 580 Dental simply sent no work to the labs in the nineteen months for which there are no invoices.  (See id. ¶ 6.)  Dr. Salzberg calls that assumption "nonsensical" in light of the evidence that 580 Dental had "a full schedule of patients" every month.  (Salzberg Report at 9-10.)  Whether that assumption was objectively reasonable is a question of fact that depends on Castillo's knowledge at the time.  See, e.g., Hill v. City of New York, No. 05 CV 9473, 2007 WL 4592000, at *3 (S.D.N.Y. Dec. 28, 2007) ("Because, as here, the existence of probable cause often turns on disputed issues of fact relating to the reliability of the information presented to the arresting officer and the reasonableness of his or her investigation, 'the issue of probable cause is not amenable to disposition by summary judgment.'") (quoting Williams v. City of New York, No. 05 Civ. 10230, 2007 WL 2214390, at *10 (S.D.N.Y. July 26, 2007)); Gomez v. City of New York, 05 Civ. 2147, 2007 WL 5210469, at *6 (S.D.N.Y.  May 28, 2007) (denying summary judgment on false arrest claim because "[p]robable cause may only 'be determin[ed] as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers.'") (citation omitted), report & rec. adopted, 2008 WL 3833811 (S.D.N.Y. Aug. 14, 2008).

Last, plaintiff contends that the investigators erroneously relied on telephone interviews with "a tiny fraction" of the patients treated at 580 Dental.  (Pl.'s Mem. at 36.) Plaintiff points out that, of the eight patients who testified before the grand jury,[22] only three were called to testify at trial, and none of the patients ever received treatment from Morse himself.

---

[21](...continued)
Decl., at 7-8.)

[22]  The eight patients were I.A., S.C., A.O., M.P., E.G., S.R., S.S., and N.A.  (See Farber Decl., Ex. E.)

(See Fusto Decl. ¶ 31).  The eight patients allegedly told the investigators, and later testified

before the grand jury, that they did not receive any dentures from 580 Dental, although records

showed that 580 Dental had billed Medicaid for prosthetic dental devices for patients with those

names.  Morse questions the credibility of those patients, stating that he had "no way of knowing

who these patients are" since "[t]here was no corroboration," "[t]here was no photo ID of the

patients," and "[s]ome of the patients have language problems" and "no language translation was

provided to any of these patients."  (Morse Dep. at 107-08.)

        In fact, a review of the patients' testimony makes it obvious that many of them

were confused or simply did not understand the questions.  Two of the patients, for example, did

not know what a "denture" was.[23]  As Morse argues, their confusion is understandable, "[g]iven

the vast array of dental prosthetic devices which would qualify as a 'denture' – including clasps,

bridges, and/or partial dentures involving only one or two false teeth."  (Pl.'s Mem. at 37.)

Moreover, evidence in the record strongly suggests that these patients were mistaken.  M.P.

testified before the grand jury that she did not wear any dentures (Farber Decl., Ex. E, Grand Jury

Tr. for Mar. 6, 2006, at 9), yet an examination by the State's dentist revealed that she did wear

---

[23]  I.A. testified as follows:
Q.  Do you know what a denture is?
A.  No.
Q.  False teeth?
A.  No.
(Trial Tr. at 37.)  Justice Walsh clearly was unpersuaded by Ms. A's trial testimony; at the
conclusion of her testimony, he commented, "[t]hat woman who testified certainly doesn't show
a larceny."  (Id. at 80.)

      Similarly, S.S. testified:
Q.  And do you know what false teeth are or dentures?
A.  No.
(Id. at 96.)

dentures.  (See Flynn Dep. at 128-29.)  The same is true for S.R.  (See Farber Ex. E, Grand Jury

Tr. for Mar. 8, 2006 (state expert Dr. Linda DeLuca stating that Ms. R "obviously" was "wearing

a partial denture."))  Morse states that "[a]ccording to the actual charts of the patients who

testified before the Grand Jury . . . all of these witnesses did, in fact, wear some type of

dentures."  (Pl.'s Mem. at 39; see also Declaration of Dr. Leonard Morse, dated Apr. 7, 2010,

annexed as Ex. Q to the Norinsberg Decl. ("Morse Decl."), ¶¶ 110-114.)

   In his deposition, defendant Fusto conceded that Medicaid patients can be

"extremely poor historians of their own services, particularly with dental work."  (Fusto Dep. at

329.)  For this reason, "[t]o derive a larceny case on patients' testimony is hazardous, because

they often will suddenly remember that, yes, maybe they did get more services than they

originally said they got . . . ."  (Id.)  He thus agreed that it is important to corroborate their

statements with other evidence.  (Id. at 330.)  Morse contends that "such corroboration was *not*

done" (Pl.'s Mem. at 36 (emphasis in original)), and evidence in the record supports that

contention.  Indeed, Fusto admitted that he did not ask his expert to examine the patient charts.

(Fusto Dep. at 350-51.)  It is also unclear whether all of the patients who testified before the

grand jury were examined by a dentist to confirm their statements.  In short, the credibility of

those patients must be weighed in determining whether the investigators reasonably relied on

their statements in reaching their probable cause finding.

   Viewing all of this evidence in the light most favorable to the plaintiff, as this

court must, I find that there are genuine issues of material fact that preclude summary judgment

on the false arrest claim.  Whether or not Flynn and Castillo reasonably believed that they had

probable cause to arrest Morse for grand larceny in the first degree and offering a false

instrument for filing in the first degree, based on their observations and the evidence they had at the time,[24] is a question that must be answered by a fact-finder. See Cotto v. Pabon, No. 07 Civ. 7656, 2008 WL 4962986, at *8 (S.D.N.Y. Nov. 20, 2008) ("While the basic facts appear largely undisputed, the inferences from those facts, whether the officers' observations . . . supplied probable cause is a factual issue that should be determined by the jury, not the Court on a summary judgment motion.") While a fact-finder could ultimately conclude from the record here that the officers had probable cause to arrest Morse, or that it was objectively reasonable for them to believe that they did, that conclusion would require the weighing of evidence and assessments of credibility, which go beyond the sorts of determinations that the court may make in ruling on motions for summary judgment. See, e.g., Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997).

As explained, for the malicious prosecution claim to survive defendants' motion, plaintiff must produce evidence sufficient to raise a material question of fact as to whether the indictment was procured by fraud, perjury, the suppression of evidence, or other conduct undertaken in bad faith. In support of this claim, Morse contends that defendants showed documents to the grand jury that were "manufactured," "altered," "falsified," and "incomplete."

---

[24] In fact, Flynn testified in his deposition that he did not personally see any evidence that would support the charges of grand larceny in the first degree or filing a false instrument. (Flynn Dep. at 222-23.) Rather, he relied on information he received from Castillo and Fusto. (Id. at 224.) While an officer may rely on mistaken information, so long as it is reasonable to do so, "'the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.'" Manganiello v. City of New York, 612 F.3d 149, 161 (2d Cir. 2010) (quoting Colon v. City of New York, 455 N.E.2d 1248 (N.Y. 1983)). Here, whether a reasonable officer in Flynn's position would have conducted a further inquiry into Castillo's analysis and underlying assumptions is a question of fact.

(Morse Dep. at 72-73.)  Specifically, he focuses on Grand Jury Exhibit 7, which was a "billing summary" Castillo created concerning the patients who testified before the grand jury.  For each patient, the billing summary lists the person's full name, identification number, a description of dental procedures, and dates of service.  (See Farber Decl., Ex. H.)  Morse objects to the document because it fails to include information regarding tooth and quadrant numbers, provider names or numbers, or patients' birth dates, addresses, or social security numbers.  (Morse Dep. at 92; see also Morse Decl. ¶¶ 60-63.)  He thus claims defendants used this document to misrepresent to the grand jury that 580 Dental "repeatedly billed Medicaid for the same work."[25] (Pl.'s Mem. at 7; Morse Dep. at 105-06.)  He also argues that defendants "merged the billing records of three separate patients," all named E.G., "into one 'super patient' to support the prosecution's claim of over-billing."[26]  (Pl.'s Mem. at 7, 21; Morse Decl. ¶¶ 65-68.)  As a result, Morse contends, the billing summaries were "false, misleading, and highly prejudicial."  (Morse Decl. ¶ 70.)

Morse also contends that the laboratory invoices were "manufactured," as evidenced by the fact that they "are in sequential numbering order, even though the time frame is

---

[25]  For example, plaintiff's expert, Harvey Joel Rosen, DDS, explains that the billing summary concerning patient S.R. was "misleading" because it showed nine billing lines for June 4, 2002, while Morse's actual vendor statement showed that the patient received only three procedures and Morse only billed for those three procedures.  (Declaration of Harvey Joel Rosen, DDS, dated Apr. 6, 2010, annexed as Ex. KK to the Norinsberg Decl., ¶¶ 15-18; see also Morse Decl. ¶¶ 56-59.)  According to Dr. Rosen, "the State defendants presented to the Grand Jury 'evidence' of triple-billing for this patient which was unquestionably misleading."  (Rosen Decl. ¶ 18.)

[26]  Morse also claims that it is clear that the E.G. who testified before the grand jury had not received treatment since May 1998, and therefore, "any bills relating to his treatment were *outside* of the audit period and should never have been presented to the Grand Jury in the first place."  (Morse Decl. ¶ 68 (emphasis in original).)

over several years," and in many places "[t]he dates had been crossed out and new years had been provided." (Morse Dep. at 73, 104; <u>see also</u> Norinsberg Decl., Ex. EE (laboratory invoices showing altered dates); Deposition of Jose Castillo, dated Nov. 13, 2008 ("Castillo Dep."), annexed as Ex. D to the Norinsberg Decl., at 131-33 (acknowledging that some of the Design Dental invoices contain dates that are crossed out and written over); Flynn Dep. at 243-46 (same)).  He also points out that Design Dental's name did not appear on the invoices attributed to that laboratory.  (Morse Dep. at 104; <u>see also</u> Farber Decl., Ex. F.)  At a minimum, this evidence raises serious questions about the provenance of the invoices; i.e., when they were created and by whom.  Without an affidavit or deposition of the owner of either laboratory, it is impossible for this court to evaluate the trustworthiness of these documents.

In addition, Morse takes issue with Castillo's and Flynn's grand jury testimony. First, he contends that Castillo "gave false testimony to the Grand Jury that he, in effect, had reviewed all the dental records from the audit from 2000, 2001 and 2002, when he fully well knew that he did not have a complete three year set of records to make his projections."  (Morse Dep. at 89; <u>see also</u> <u>id.</u> at 93.)  In other words, Castillo did not disclose to the grand jury that Design Dental was missing eleven months of invoices and Nu-Life was missing eight months of invoices.[27]  (<u>Id.</u> at 147.)  Morse argues that "the absence of nineteen months [of laboratory

---

[27]  Castillo testified before the grand jury that he had conducted his analysis of the Nu-Life records by assuming that, for each procedure listed over the three-year period from 2000 to 2002, 580 Dental billed to Medicaid the maximum amount allowable for a prosthetic device, which was $600.  (Farber Decl, Ex. E, Grand Jury Transcript for Mar. 22, 2006, at 9-12.)  After eliminating procedures for individuals whose names he could not identify as Medicaid recipients, he multiplied the number of procedures listed by $600 and came up with $86,400 for Nu-Life. (<u>Id.</u> at 12-16.)  For Design Dental, Castillo testified that he substituted the Medicaid reimbursement amount for the amount the laboratory charged for each procedure, and concluded
(continued...)

invoices] was very significant" (Pl.'s Mem. at 4) and, therefore, the omission of that information was materially misleading. He also alleges that Castillo "excluded 87 patients randomly from [Nu-Life], and did not include them in the amount that [Morse] was legitimately entitled to bill Medicaid."[28] (Morse Dep. at 94.)

With respect to Flynn, Morse contends he deliberately misled the grand jury by testifying that Morse "personally saw each of the patients" and "personally supervised and had physical visual contact with those patients" when he knew that Morse did not. (Id. at 98.)[29]

---

[27](...continued)
that the most 580 Dental could have billed Medicaid for the procedures listed on the Design Dental invoices was $733,263. (Id. at 17-20.) Thus, according to Castillo's grand jury testimony, the maximum amount that 580 Dental could legally have billed to Medicaid for that three-year period, based on the laboratory records, was $819,663. (Id. at 22.) In fact, Medicaid paid 580 Dental $1,970,731 for dental prosthetics for that period, leading to a discrepancy of $1,151,068. (Id. at 23.) As Morse correctly observes, Castillo did not explain to the grand jury that, for the thirty-six-month period at issue, Nu-Life did not produce invoices for eight months and Design Dental did not produce invoices for eleven months. (See id. at 1-29.)

[28] Castillo testified that he "wasn't able to recognize 87 people" whose names were listed in the Nu-Life invoices because those names did not appear on the "provider profile" as Medicaid recipients. (Farber Decl., Ex. E, Grand Jury Transcript for Mar. 22, 2006, at 13-14.)

[29] Flynn testified before the grand jury that Morse "had one other dentist" but "maintains his own charts, signs off on everything" and "does all his own billing, does it electronically." (Farber Decl., Ex. E., Grand Jury Transcript for Mar. 9, 2006, at 6-7.) Morse apparently objects to the following colloquy:

> Q. Did he indicate whether he sees every patient that is treated at 580?
> A. Yes.
> Q. Did he indicate to you, regarding the charting, who maintains or does charts?
> A. He said he maintains all the charts at that location.
> Q. And when you talk about maintaining, did that – did you ask him the actual physical act of writing or –
> A. Yes. He – when he examines the charts, he signs off on the charts and does all the billings from the charts.

(Id. at 9.)

> Q. Did you ask him any questions about whether – I know you mentioned that he
> (continued...)

According to Morse, "this is an outright fabrication." (Morse Decl. ¶ 73.) Morse states that he "*never* made this statement to Mr. Flynn" (id.) because, "[a]s a practical matter" it would have been "impossible for [him] to do what Mr. Flynn suggests." (Id. ¶ 74.) He contends that Flynn's testimony to the grand jury was "absolutely, unequivocally false" and was "directly responsible" for the grand jury's decision to indict him on the false instrument charges, which required the prosecution to prove that Morse knew the invoices he submitted to Medicaid were false. (Id. ¶¶ 78-79.) Morse argues that, since it is undisputed that he did not personally treat any of the patients who testified before the grand jury, Flynn's testimony had the effect of persuading the grand jury that he intentionally submitted false invoices. (Pl.'s Mem. at 28-29.) Whether or not Morse made the statements that Flynn attributed to him is a question of fact.

In sum, whether the exhibits and testimony presented to the grand jury were deliberately misleading or constituted "conduct undertaken in bad faith" is an issue of fact sufficient to defeat summary judgment on plaintiff's malicious prosecution claim. See, e.g., Palmer v. Monroe County Deputy Sheriff, No. 00-CV-6370, 2004 WL 941784, at *5 (W.D.N.Y. Apr. 29, 2004) (denying defendant's motion for summary judgment on plaintiff's malicious prosecution claim where defendant provided inaccurate and incomplete information to the grand jury, leading to plaintiff's prosecution). I therefore respectfully recommend that the state defendants' motion be denied with respect to plaintiff's false arrest and malicious prosecution

---

[29](...continued)
> says he does the billing, but after the fact, is there a – did you ask him whether he checks the billings or reviews them in some way?
> A. Yes.
> Q. What was his responses [sic] to those?
> A. He says he checks and reviews every patient chart at the end of the day.

(Id. at 10.)

claims.

2. Claim for Denial of Constitutional Right
to a Fair Trial Due to Fabrication of Evidence

Plaintiff's fourth claim for relief asserts that defendants Fusto, Castillo, and Flynn deprived him of a fair trial by presenting "fabricated evidence." (See Compl. ¶¶ 135-143.) Specifically, plaintiff alleges that these defendants, "acting in concert with Nisan Yushvayev, the owner of defendant Design Dental Studio, Inc.[,] created completely false and misleading billing records to be used against Dr. Morse in his criminal prosecution." (Id. ¶ 138.)

The right to a fair trial free of fabricated evidence is basic to our Constitution and was clearly established at the time of Morse's trial. See Zahrey v. Coffey, 221 F.3d 342, 355-56 (2d Cir. 2000). "A claim under § 1983 for violation of the right to a fair trial lies where an officer 'creates false information likely to influence a jury's decision and forwards that information to prosecutors.'" Brandon v. City of New York, 705 F. Supp. 2d 261, 276 (S.D.N.Y. 2010) (quoting Ricciuti v. New York City Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997)).

While, as discussed above, there are triable issues of fact as to when the laboratory invoices were created and by whom, and whether the investigators reasonably relied on them in reaching their probable cause determination, I find no evidence from which a jury could conclude that defendants themselves falsified the Design Dental invoices. At any rate, since Justice Walsh found the Design Dental invoices inadmissible and did not consider them, ultimately reaching a judgment of acquittal, they could not have deprived plaintiff of a fair trial. See Morgan v. Gertz, 166 F.3d 1307, 1310 (10th Cir. 1999) ("Regardless of any misconduct by government agents before or during trial, a defendant who is acquitted cannot be said to have

been deprived of the right to a fair trial."); <u>Barmapov v. Barry</u>, No. 09-CV-03390, 2011 WL

32371, at *6 (E.D.N.Y. Jan. 5, 2011) ("'[W]hile there is no constitutional right to be free from

having evidence fabricated against an individual, the offense rises to a constitutional violation

[only] if one is deprived of his liberty[30] because of the fabrication.'" (quoting <u>Henry v. City of

New York</u>, No. 02-CV-4824, 2003 U.S. Dist. LEXIS 15699, at *12 (S.D.N.Y. Sept. 5, 2003)

(citing <u>Zahrey</u>, 221 F.3d at 348)); <u>Coakley v. 42nd Pct. Case 458</u>, No. 08 Civ. 6206, 2009 WL

3095529, at *8 (S.D.N.Y. Sept. 28, 2009) ("[A]s Coakley was ultimately acquitted of all charges,

it is clear that he was not deprived of his right to a fair trial as a result of the line-up."); <u>Gibbons

v. Lambert</u>, 358 F. Supp. 2d 1048, 1073 (D. Utah 2005) ("Because the only judgment the court

entered in Gibbons' criminal case was a judgment of acquittal, Gibbons cannot be said to have

been deprived of the right to a fair trial"); <u>accord</u> <u>Smith v. Almada</u>, 623 F.3d 1078, 1088 (9th Cir.

2010). I therefore respectfully recommend that this claim be dismissed.

### 3. <u>Malicious Abuse of Process</u>

Plaintiff's fifth claim for relief alleges malicious abuse of process against

defendants Flynn and Castillo. To prove such a claim, the plaintiff must prove that the defendant

---

[30] The complaint does allege, conclusorily, that Morse was "deprived of his liberty" as a result of the alleged fabrication of evidence (<u>see</u> Compl. ¶ 143), and case law in this circuit supports the view that, even where the accused was not convicted, the fabrication of evidence is a constitutional violation where it causes a deprivation of liberty. <u>See</u> <u>Zahrey</u>, 221 F.3d at 348 (upholding plaintiff's claim for manufacturing evidence where "[t]he liberty deprivation [wa]s the eight months he was confined, from his bail revocation (after his arrest) to his acquittal.") In the instant case, Morse was detained from the time of his surrender, at "approximately eight to nine in the morning" until his release "late in that afternoon." (Morse Dep. at 86-87.) To be sure, although plaintiff surrendered voluntarily, he was not free to leave for that period of time. Nonetheless, he does not argue in his Memorandum of Law that this approximately eight-hour detention forms the basis of his constitutional claim. (<u>See</u> Pl.'s Mem. at 52-53.) Regardless, as explained, I find no evidence from which a reasonable jury could conclude that Fusto, Castillo or Flynn personally fabricated the Design Dental invoices.

"(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse [or] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." Savino, 331 F.3d at 76 (citing Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994)). "A malicious motive alone . . . does not give rise to a cause of action for abuse of process." Id. at 77 (quoting Curiano v. Suozzi, 469 N.E.2d 1324 (N.Y. 1984)); see also Brandon, 705 F. Supp. 2d at 275 ("'If [one] uses the process of the court for its proper purpose, though there is malice in his heart, there is no abuse of process.'" (quoting Hauser v. Bartow, 7 N.E.2d 268 (N.Y. 1937))). Rather, "[t]he crux of a malicious abuse of process claim is the collateral objective element. To meet this element, a plaintiff must prove not that defendant acted with an improper motive, but rather an improper purpose—that is, 'he must claim that [the defendant] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution.'" Douglas v. City of New York, 595 F. Supp. 2d 333, 344 (S.D.N.Y. 2009) (quoting Savino, 331 F.3d at 76).

Plaintiff contends that Flynn and Castillo acted with the objectives of "curry[ing] favor with their superiors" and "sav[ing] their jobs at the [MFCU]." (Compl. ¶ 146.) These may be improper motives, but they do not indicate a collateral purpose "beyond or in addition to his criminal prosecution." Douglas, 595 F. Supp. 2d at 344 (allegation that plaintiff was arrested so that defendant officers could meet arrest quotas and thereby ensure the security of their jobs was insufficient to establish an abuse of process claim); see also Johnson v. City of New York, No. 06-CV-630, 2010 WL 2771834, at *10 (E.D.N.Y. July 13, 2010) ("doing the absolute minimum work possible" is not a collateral objective sufficient to warrant liability for abuse of process). The complaint contains no explicit charge of extortion, blackmail, retribution, or similar

extraneous harmful goal, see Abreu v. Romero, 08-CV-10129, 2010 WL 4615879, at *8 (S.D.N.Y. Nov. 9, 2010); nor does plaintiff put forth any facts from which such a purpose could reasonably be inferred.[31] I therefore respectfully recommend that summary judgment be granted with respect to this claim.

    4. <u>Inducement of False Testimony</u>

    Plaintiff's sixth claim for relief alleges that defendants Fusto, Castillo, and Flynn induced false testimony in violation of § 1983. "[T]he claim that one has been the subject of false testimony or false allegations may constitute a component of an action for malicious prosecution," but "such a claim, standing alone, [does not] implicate a constitutionally protected right." <u>Winn v. McQuillan</u>, 390 F. Supp. 2d 385, 392 (S.D.N.Y. 2005); see also <u>Murray v. Idaho</u>, No. 07-CV-168, 2010 WL 780211, at *5 (D. Idaho Mar. 10, 2010) ("a 'false testimony' constitutional claim does not exist under 42 U.S.C. § 1983."); <u>Criss v. Cosgrove</u>, Civil No. 04-2244, 2007 WL 542228, at *8 (D.N.J. Feb. 16, 2007) ("While the issue of whether there was false testimony or false allegations may be a component of a malicious prosecution claim . . . , such a claim standing alone does not implicate [a] constitutionally protected right, for purposes of § 1983.") At oral argument, plaintiff's counsel acknowledged that this is not "a separate claim" and agreed to withdraw it. (Tr. at 47.)

---

    [31] It is true, as plaintiff asserts, that "safeguarding one's own employment lies outside the legitimate goal of criminal process." <u>Hernandez v. Wells</u>, No. 01 CV. 4376, 2003 WL 22771982, at *9 (S.D.N.Y. Nov. 23, 2003). However, such a motive only crosses the line and becomes a "collateral purpose" when the officer's employment is actually in jeopardy due to earlier misconduct. See <u>id.</u> (claim that corrections officer fabricated assault charges after incident in order to save his job, having received notice that he would be fired if he violated any rules or regulations, met the "collateral purpose" standard). Here, plaintiff does not allege or put forth evidence to prove that either Flynn or Castillo was in danger of losing his job or believed he needed this particular arrest and prosecution in order to remain employed at MFCU.

5. Destruction of Exculpatory Evidence

Plaintiff's seventh claim for relief alleges that defendants destroyed exculpatory evidence in violation of § 1983. Specifically, plaintiff contends that he complied with defendants' subpoenas commanding him to produce complete dental charts for his patients (Compl. ¶¶ 156-157), but when his attorney later requested copies of those patient files,[32] defendants refused to turn them over, claiming that the patient records had been "lost" (Id. ¶¶ 159-160.) According to plaintiff, the records were not lost, but defendants refused to produce the copies in an effort "to impair Dr. Morse's ability to fully and adequately prepare for trial." (Id. ¶¶ 161-162.) In fact, the Attorney General's office has since produced to plaintiff several hundred pages of patient records in discovery in this action, although plaintiff states that he cannot confirm that the production is a complete set of copies of the records he turned over to the MFCU during its investigation. (Morse Dep. at 59-60.) The State defendants argue that plaintiff "was obliged to maintain copies" of his own patient records pursuant to 8 N.Y.C.R.R. § 29.2,[33] and at any rate, to the extent there were any prescriptions for prosthetic work or laboratory invoices documenting that work, those records were "destroyed *by Dr. Morse himself.*" (Defs.' Mem. at 20-21) (emphasis in original).

It is axiomatic that a criminal prosecutor has a duty to disclose exculpatory evidence to a criminal defendant under Brady v. Maryland, 373 U.S. 83 (1963). The

_____

[32] Morse testified in his deposition that he did not make photocopies of the patient records before turning them over to the investigators because they were too voluminous and "[i]t was a physical impossibility." (Morse Dep. at 54.)

[33] 8 N.Y.C.R.R. § 29 states that it is "unprofessional conduct" for a dentist to "fail[] to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient . . . for at least six years."

government's destruction of exculpatory evidence rises to a constitutional violation where three requirements are met: (1) the government must have acted in bad faith in destroying the evidence, Arizona v. Youngblood, 488 U.S. 51, 56-58 (1988); (2) the "evidence must possess exculpatory value that was apparent before it was destroyed," California v. Trombetta, 467 U.S. 479, 479 (1984); and (3) the defendant must be "unable to obtain comparable evidence by other reasonably available means," id. at 479-80. See also United States v. Rastelli, 870 F.2d 822, 833 (2d Cir. 1989). Whether to sanction the government for failing to preserve discoverable evidence depends on a variety of case-specific factors, including "the government's culpability for the loss . . . a realistic appraisal of its significance when viewed in light of its nature, its bearing upon critical issues in the case and the strength of the government's untainted proof." United States v. Grammatikos, 633 F.2d 1013, 1020 (2d Cir. 1980).

Here, defendants do not deny that they seized Morse's original patient files and did not return them upon request prior to trial. Nonetheless, even if their failure to return the documents constituted misconduct and it could be shown that the patient records contained exculpatory evidence, defendants' act had no effect on the outcome of the trial, as Morse was acquitted. See United States v. Coppa, 267 F.3d 132, 135 (2d Cir. 2001) ("[A] defendant is deprived of a fair trial only where there is a reasonable probability that the government's suppression affected the outcome of the case . . , or where the suppressed evidence 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'") (citing, inter alia, Kyles v. Whitley, 514 U.S. 419, 435 (1995)); United States v. Wilson, 159 F.3d 1349, 1998 WL 538119, at *3 (2d Cir. Mar. 13, 1998) (stating that while the government agent's "act of destroying the documents was terribly wrong," any prejudice was

mitigated by the effective exploitation of that act before the jury). I therefore respectfully recommend that this claim be dismissed.

### 6. Conspiracy to Violate Civil Rights

Plaintiff's eighth claim for relief alleges that defendants Fusto, Castillo, and Flynn "conspired and acted in concert" to deprive him of his civil rights. (See Compl. ¶¶ 164-168.) Plaintiff does not address this claim in his memorandum of law and appears to have abandoned it. Regardless, since the state defendants were acting within the scope of their employment for the MFCU, this claim is barred by the intra-corporate conspiracy doctrine. See Hartline v. Gallo, 546 F.3d 95, 99 n.3 (2d Cir. 2008) (Under the intracorporate conspiracy doctrine, "officers, agents and employees of a single corporate entity are legally incapable of conspiring together."); Simon v. City of New York, No. 09-CV-1302, 2011 WL 317975, at *14 (E.D.N.Y. Jan. 3, 2011) ("Simon claims three employees of the same entity – the Queens D.A.'s Office – conspired together to deprive her of her constitutional rights. This is the epitome of an intracorporate conspiracy claim, and it is therefore improperly pled."), report & rec. adopted, 2011 WL 344757 (E.D.N.Y. Feb 1, 2011). Thus, I respectfully recommend that this claim be dismissed.

### 7. Intentional Infliction of Emotional Distress

Plaintiff's twelfth claim for relief alleges that all of the defendants "engaged in extreme and outrageous conduct" with the intent of causing him "severe emotional distress." (Compl. ¶¶ 207-210.) Under New York law, a plaintiff claiming intentional infliction of emotional distress must show: (1) extreme and outrageous conduct, measured by the reasonable bounds of decency tolerated by society; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct

and the injury; and (4) severe emotional distress.  Conboy v. AT & T Corp., 241 F.3d 242, 258 (2d Cir. 2001); Howell v. New York Post Co., 612 N.E.2d 699, 702 (N.Y. 1993).  The conduct at issue "must transcend the bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community," Klinge v. Ithaca Coll., 652 N.Y.S.2d 377, 379-80 (3d Dep't 1997), and  "must consist of more than mere insults, indignities and annoyances." Leibowitz v. Bank Leumi Trust Co. of New York, 548 N.Y.S.2d 513, 521 (2d Dep't 1989).  Moreover, "[c]ourts are reluctant to allow recovery under the banner of intentional infliction of emotional distress absent a deliberate and malicious campaign of harassment or intimidation." Cohn-Frankel v. United Synagogue of Conservative Judaism, 667 N.Y.S.2d 360, 362 (1st Dep't 1998).  Finally, a court may decide whether alleged conduct is sufficiently outrageous as a matter of law.  Koulkina v. City of New York, 559 F. Supp. 2d 300, 324 (S.D.N.Y. 2008) (citing Howell, 612 N.E.2d at 702).

Here, as a matter of law, plaintiff cannot establish that the state defendants' actions were so outrageous as to be utterly intolerable in a civilized society.  Morse was detained for approximately eight hours for fingerprinting and processing (Morse Dep. at 86-87), and nothing in the record suggests that the officers failed to extend decency to him in effecting his arrest.  Indeed, the state defendants engaged only in the routine activities of their official positions.  "Even in the absence of probable cause, such activities are not so extreme and outrageous as to be considered atrocious or intolerable in civilized society." Armatas v. Maroulleti, No. 08-CV-310, 2010 WL 4340437, at *17 (E.D.N.Y. Oct. 19, 2010). See also Druschke v. Banana Republic, Inc., 359 F. Supp. 2d 308, 314 (S.D.N.Y. 2005) (dismissing claim for intentional infliction of emotional distress where plaintiff customer alleged no "deliberate falsehoods beyond the [store employees'] allegedly false accusations of fraud and larceny.")

Moreover, "state courts and federal district courts applying New York law have consistently held that the tort of intentional infliction of emotional distress may not be used as a substitute for an available traditional tort theory." Brewton v. City of New York, 550 F. Supp. 2d 355, 370 (E.D.N.Y. 2008); see also Yang Feng Zhao v. City of New York, 656 F. Supp. 2d 375, 405 (S.D.N.Y. 2009) (explaining that where "the alleged conduct fits well within the traditional tort theories of false arrest [and] malicious prosecution . . . the claim of intentional infliction of emotional distress will not fly."); Worytko v. County of Suffolk, No. 03-CV-4767, 2007 WL 1876503, at *5-6 (E.D.N.Y. June 28, 2007) (dismissing in part plaintiff's claims for intentional infliction of emotional distress as duplicative of her claims for false arrest to the extent that plaintiff alleged that she suffered emotional distress from the arrests and their aftermath). Because the conduct comprising Morse's intentional infliction of emotional distress claim is encompassed entirely within his claims for false arrest and malicious prosecution, I respectfully recommend that summary judgment be granted on this claim.[34]

8. Prima Facie Tort

Plaintiff's thirteenth claim for relief is for prima facie tort under New York law. At oral argument, plaintiff withdrew this claim. (Tr. at 45-46.)

---

[34] Plaintiff also alleges that he suffered "public humiliation" as a result of the "extensive and highly prejudicial news coverage [of the charges against him] in local tabloids and on the Internet (translated into several foreign languages)." (Pl.'s Mem. at 55-56.) To the extent Morse's complaint is that the accusations were false, this claim is duplicative of his claim against defendants Spitzer and Fusto for defamation and "extrajudicial statements." See Herlihy v. Metro. Museum of Art, 633 N.Y.S.2d 106, 114 (1st Dep't 1995) ("[P]laintiff's cause of action for intentional infliction of emotional distress must . . . fail because it falls within the ambit of other traditional tort liability which, in this case, is reflected in plaintiff's causes of action sounding in defamation").

## CONCLUSION

For the reasons stated above, I respectfully recommend that plaintiff's first, seventh, and eighth causes of action be dismissed for failure to state a claim, and that the state defendants' motion for summary judgment be granted with respect to plaintiff's sixth and twelfth causes of action. I further recommend that the state defendants' summary judgment motion be denied with respect to plaintiff's second and third causes of action, for false arrest and malicious prosecution.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with courtesy copies to Judge Amon and to my chambers, within fourteen (14) days. Failure to file objections within the specified time waives the right to review. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Respectfully submitted,

_____/s/_____

ROBERT M. LEVY
United States Magistrate Judge

Dated: Brooklyn, New York
March 15, 2011