AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| DR. LEONARD MORSE, | ) |
| _Plaintiff_ | ) ) ) |
| v. | ) |
| ELIOT SPITZER, et al. | ) ) |
| _Defendant_ | ) |

Civil Action No.  07 CV 4793 (CBA) (RML)

## Amended  SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Eliot Spitzer,
Special Assistant Attorney General John Fusto,
Senior Special Investigator, Jose Castillo
Senior Special Auditor Investigator Robert H. Flynn
c/o Office of Attorney General, Attn Seth Farber, Esq.
120 Broadway
New York, New York

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:      JON L. NORINSBERG
225 Broadway, Suite 2700
New York, N.Y. 10007

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____            _____

*Signature of Clerk or Deputy Clerk*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------X
DR. LEONARD MORSE,

               **SECOND AMENDED COMPLAINT**

        Plaintiff,      **07 CV 4793 (CBA) (RML)**

    -against-        **JURY TRIAL DEMANDED**

                 **ECF CASE**

ELIOT SPITZER, Individually, Special Assistant Attorney
General JOHN FUSTO, Individually, Senior Special
Investigator,  JOSE CASTILLO, Individually, and Senior
Special Auditor Investigator ROBERT H. FLYNN, Individually,

        Defendants.
---------------------------------------------------------------------------X

    Plaintiff, DR. LEONARD MORSE, by his attorney, Jon L. Norinsberg, complaining of

the defendants, respectfully alleges as follows:

## **PRELIMINARY STATEMENT**

    1.   Plaintiff brings this action for compensatory damages, punitive damages and

attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of his civil

rights, as said rights are secured by said statutes and the Constitutions of the State of New York

and the United States.

## **JURISDICTION**

    2.   This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the

First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

    3.   Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343 and 1367.

## **VENUE**

    4.   Venue is properly laid in the Eastern District of New York under 28 U.S.C.

§ 1391(b), in that this is the District in which the claim arose.

## JURY DEMAND

5.      Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

6.      At all times hereinafter mentioned, plaintiff DR. LEONARD MORSE  was a dentist duly licensed to practice dentistry in the State of New York, and was the sole proprietor of 580 Dental P.C., a company located at 580 Fifth Avenue, in the County of Kings, in the City and State of New York.

7.      At all times hereinafter mentioned, defendant ELIOT SPITZER ("SPITZER") was the Attorney General of the State of New York, and was directly  responsible for the policies, practices, procedures and guidelines of  the New York State Attorney General's Office, including but not limited to, its Medicaid Fraud Control Unit and its Press Release Division.

8.      At all times hereinafter mentioned, defendant JOHN FUSTO ("FUSTO") was a Special Assistant Attorney General working in the Medicaid Fraud Control Unit of the New York State Attorney General's Office, located at 120 Broadway, in the County, City and State of New York.

9.      At all times hereinafter mentioned, defendant JOSE CASTILLO ("CASTILLO") was a Senior Special  Auditor Investigator working in the Medicaid Fraud Control Unit of the New York State Attorney General's Office, located at 120 Broadway, in the County, City and State of New York.

10.      At all times hereinafter mentioned, defendant ROBERT H. FLYNN ("FLYNN") was a Senior Special  Investigator working in  the Medicaid Fraud Control Unit of the New York State Attorney General's Office located at 120 Broadway, in the County, City and State of New York.

11.     At all times hereinafter mentioned, the defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York and/or the New York State Attorney General's Office.

## FACTS

12.     Plaintiff, DR. LEONARD MORSE, was and is a dentist duly licensed to practice dentistry in the State of New York

13.     For thirty years, DR. LEONARD MORSE and his staff delivered high-quality dental care to patients in the Park Slope community from his office located at 580 Fifth Avenue, in the county of Kings, in the City and State of New York.

14.     For thirty years years, plaintiff DR. LEONARD MORSE was a lawfully authorized Medicaid provider, assigned New York State Medicaid Provider Identification Number 00294977.

15.     During this time, Dr. Morse treated over 30,000 dental patients through the medicaid program. All of Dr. Morse's patients came from referrals, and he never advertised or solicited for business.

16.     Dr. Morse's office handled approximately 6,000 dental patient visits annually, including adults and children, and he often treated several generations of the same family.

17.     Despite his large volume of patients, Dr. Morse had an impeccable and exemplary track record as a dentist.

18.     None of Dr. Morse's patients had ever filed a complaint against him.

19.     None of Dr. Morse's patients had ever filed a dental malpractice claim against him.

20.     Apart from his dental practice, Dr. Morse also served as the Assistant Director of the Dental Medicine Residency Program at New York Methodist Hospital in Park Slope, where he was

responsible for the teaching, training and supervision of dental residents affiliated with said hospital.

21.     Dr. Morse was also the Section Chief of the Restorative Dentistry Program at Methodist Hospital, and was inducted into the International College of Dentistry in 2006.

22.     Over a thirty year period,  Dr. Morse was subjected to four  comprehensive  audits by the New York State Department of Health.

23.     None of the audits of Dr. Morse's dental practice  ever revealed any evidence of any impropriety or wrongdoing by Dr. Morse.

24.     In all of his years in practice, Dr. Morse had  never before been accused of any crime or misdemeanor.

**The Origins of Dr. Morse's Prosecution: A New York Times Investigation  Reveals Defendant Spitzer's Failure To Address Medicaid Abuse.**

25.     The origins of the prosecution against Dr. Morse may be traced back to an investigation conducted by the New York Times, which was as reported on  July 19, 2005  in an article  entitled "As Medicaid Balloons, Watchdog Force Shrinks ." <u>See</u> Exhibit A, annexed hereto.

26.     In this article, the New York Times noted that "New York's Medicaid program pays more than a million claims a day, feeding a $44.5 billion river of checks ... Yet the state, charged with protecting those dollars, has done little to stop them from draining away." <u>Id</u>.

27.     After documenting the decline in New York State's efforts to fight medicaid fraud, the article made it clear where the fault lies:  "The responsibility for prosecuting Medicaid fraud lies with the state Attorney General, Eliot Spitzer, who runs the Medicaid Fraud Control Unit",  and "*Mr. Spitzer's zeal in fighting corporate abuses has not been matched by his efforts in fighting medicaid fraud*." <u>Id</u>. (emphasis supplied).

**Spitzer's Failure To Address Medicaid Fraud Becomes A Campaign Issue**.

28.     As a result of the New York Times investigation, the issue of medicaid fraud – and more particularly, defendant's Spitzer's handling of this issue – began to receive significant coverage in the New York press.

29.     For example, on March 30, 2006, an article appeared in the New York Sun  entitled "Spitzer's Medicaid Boast." <u>See</u> Exhibit B.

30.     This article began by noting that "Eliot Spitzer has discovered the importance of cracking down on Medicaid fraud", and concluded by noting that "both candidates are fighting about who is or isn't doing the best job pursuing fraud cases."   <u>Id.</u>

31.     Similarly, on April 3, 2006,  an article appeared in the New York Post entitled "Spitzer on the Hunt for State's Top Health-care 'Criminals'."  <u>See</u> Exhibit C.

32.     This article noted  that "Attorney General Eliot Spitzer has launched a massive manhunt to find nine of New York's health-care monsters – fugitives who are accused of ripping off millions from taxpayers in bogus Medicaid billing scams ...."  <u>Id.</u>

33.     Then, on April 11, 2006, an article appeared in the New York Times entitled "POLICING MEDICAID FRAUD BECOMES CAMPAIGN ISSUE."  <u>See</u> Exhibit D.

34.     This article confirmed that Spitzer's handling of medicaid fraud as Attorney General had become an important campaign issue in the 2006  gubernatorial campaign:

> Trailing Attorney General Elliot Spitzer by 50 percentage points or more in polls for the Democratic nomination for governor, Thomas R. Suozzi has seized on medicaid fraud as an attention-getting issue, repeatedly telling audiences that *Mr. Spitzer has not done much to fight abuse of the program*.

<u>Id.</u>  (emphasis supplied)

35.     Several other articles appeared in local New York newspapers which similarly

highlighted the issue of medicaid fraud, and made it clear that Spitzer was becoming increasingly aware of the importance of this issue in the upcoming campaign.

**A Dormant 4-Year-Old Investigation Is Suddenly Revived By Defendant Spitzer**.

36.     As  a result of  the growing press coverage on medicaid fraud – and its potential impact on Spitzer's chances of winning the Democratic nomination for Governor – defendant Spitzer felt compelled to find a high-profile medicaid fraud case which would prove that he was, in fact, cracking down on medicaid fraud.

37.     The case chosen was that of DR. LEONARD MORSE, whose files had originally been subpoenaed by the Medicaid Fraud Control Unit four years earlier, on October 18,  2002.

38.     Dr. Morse was chosen as a target by defendants  because he was one of the state's highest medicaid billers, due to the fact that –  unlike most private dentists –  he readily welcomed medicaid recipients, and in fact,  95% of his practice consisted of  medicaid recipients.

39.     At the time of the audit in 2002, Dr. Morse – who had previously been subject to four comprehensive audits by the New York State Department of Health, and who had never been charged with any fraud or wrongdoing – readily agreed to provide all records subpoenaed by  the Medicaid Fraud Control Unit.

40.     The  Medicaid Fraud Control Unit  reviewed all of  the records submitted by Dr. Morse and once again – as with the previous four audits – found no evidence of any fraud or wrongdoing.

41.     In the next four years, from 2002 to 2006, the  Medicaid Fraud Control Unit took no legal action against Dr. Morse.

42.     In the Spring of 2006, however, just as defendant Spitzer's failure to crack down on medicaid fraud became a campaign issue, the long-dormant investigation into Dr. Morse was

suddenly revived.

**Dr. Morse Is Charged With A Million Dollar Medicaid Theft**.

43.     Notwithstanding Dr. Morse's long and exemplary career as a dentist, on April 5, 2006, defendants suddenly – and without any warning – charged him with committing a million dollar medicaid theft.

44.     Specifically, defendants charged Dr. Morse with one count of Grand Larceny in the First Degree, a class "B" felony, carrying a maximum of 25 years, and 11 counts of Offering a False Instrument for Filing in the First Degree, a Class "E" felony.

45.     As discussed in more detail below, these charges were completely false, and were brought for the sole purpose of helping defendant Spitzer win the Democratic nomination for Governor of New York State.

**Dr. Morse Is Forced To Immediately Surrender.**

46.     After learning of these charges, Dr. Morse, who had just recently underwent surgery – and was still recovering – requested a brief period of time for him to convalesce prior to surrendering.

47.     Defendants refused to accommodate this request. Instead, defendant Serra threatened to forcibly remove Dr. Morse from his home at " 2:00 in the morning", and to "drag him to jail," if he did not voluntarily surrender to police.

48.     Dr. Morse agreed to surrender to police at the 72nd Precinct in the County of Kings, in the City and State of New York.

49.     On April 5th, 2006, defendants Serra and Flynn formally took Dr. Morse into custody and placed him under arrest.

50.     As a result of his unlawful arrest, Dr. Morse remained in jail for several hours prior

to being released on his own recognizance.

**Defendant Spitzer Issues A Press-Release Boasting About The Indictment of Dr. Morse.**

51.     The arrest of Dr. Morse initially went unnoticed by the press and by the public at large.

52.     There was no coverage of Dr. Morse's arrest by any  media outlet, including newspapers, radio stations, television networks or the Internet

53.     All of this changed, however, on April 11, 2006, when defendant Spitzer issued a press release announcing Dr. Morse's indictment for a "million dollar medicaid theft."  See Exhibit E.

54.     Spitzer's press-release boasted, in an all-capital letters headline, that: "BROOKLYN DENTIST  INDICTED FOR MILLION DOLLAR MEDICAID THEFT." Id.

55.     The press release went on to state that  "Attorney General Spitzer announced today that a grand jury has charged a Brooklyn dentist with *stealing more than $1 million from the Medicaid program*." Id. (emphasis supplied).

56.     To ensure maximum publicity, Defendant Spitzer  had this press release  translated into several foreign languages, including  Russian and Korean.  A copy of the Russian and Korean press releases, respectively, are annexed hereto as Exhibit F and Exhibit G.   As a result, the story was picked up and received widespread coverage on Russian and Korean websites. See, e.g., Exhibit H.

57.     Spitzer's motive for issuing the press release was entirely political, and  had nothing to do with carrying out his official duties, responsibilities or functions as Attorney General of the State of New York.

58.     As documented above, Spitzer needed a high-profile medicaid case to counter the accusations of his political opponent, Thomas R. Suozzi – and thus increase his chances of winning

the Democratic nomination for Governor – and so he chose Dr. Morse's case as a means of

convincing New York voters that he was "tough" on medicaid fraud.

**Spitzer's Press Release Causes An Avalanche of Bad Publicity For Dr. Morse.**

59.     As a result of Spitzer's multi-lingual press release, the story of Dr. Morse's arrest –

which had not received any media coverage up to that point – became the subject of extensive

coverage in the local press and media.

60.     For example, on April 12, 2006, the New York Post ran a story entitled "DENTIST

PULLED $ 1M FRAUD."   See Exhibit I.

61.     In this article, the Post  –  which immediately recognized the connection between

Suozzi's attacks on Spitzer, on the one hand, and the resulting indictment of Dr. Morse, on the other

–  reported as follows:

> With gubernatorial opponent Tom Suozzi nipping at his heels over Medicaid reform,
> state Attorney General Eliott Spitzer announced that he nabbed a Brooklyn dentist
> who allegedly stole more than $1 million from the program.  Spitzer, a Democrat
> considered the front-runner for governor, reported the indictment of Leonard Morse,
> charged with billing Medicaid for dentures that he never delivered and for procedures
> he never performed.

Id.

62.     Similar stories appeared in the New York Daily News, Newsday, and other local

publications.   See, e.g., Exhibit J.

63.     The story of Dr. Morse's indictment also received vast coverage on the Internet,

resulting in thousands of stories about Dr. Morse's "million dollar theft" across the world.  See, e.g.,

the internet results for stories relating to  "Dr. Leonard Morse", annexed hereto as Exhibit K.

64.     In fact, the story eventually received world-wide coverage, being translated into

Chinese, Japanese, Italian, French, German, Arabic, Swedish and Portuguese.

**Dr. Morse Is Summarily Excluded From The Medicaid Program Without An Opportunity To Be Heard.**

65.     Apart from the damaging publicity, Dr. Morse also suffered severe economic losses when he was summarily excluded from the Medicaid program.  See "Notice of Immediate Agency Action", dated May 19, 2006, annexed hereto as Exhibit L.

66.     This decision was made without affording Dr. Morse the most basic and fundamental due process rights – as guaranteed by the 5th and 14th Amendments to the Constitution –  such as the opportunity to be heard, the right to confront adverse witnesses, the right to present witnesses and evidence on one's own behalf, etc.

68.     The immediate effect of this decision was that it forced Dr. Morse to completely  shut down his practice, since the vast majority of his patients were medicaid recipients, and  he was no longer authorized to perform any dental services on such patients.

**Dr. Morse Is Forced To Wait Fifteen Months Before He Can Contest The Charges.**

69.     After his arrest on April 5, 2006, Dr. Morse was required to make multiple court appearances to defend himself against the false charges which defendants had brought against him.

70.     It was not until June 26, 2007 – or approximately 15 months after his indictment – that Dr. Morse's case finally went to trial.

71.     The trial against Dr. Morse was presided over by the Honorable John P. Walsh,  at 320 Jay Street,  the County of Kings, in the City and State of New York.

**The Prosecution's Case Completely Falls Apart At Trial.**

72.     At Dr. Morse's trial, the glaring deficiencies in the prosecution's case were fully exposed.

73.     Despite having access to thousands of patient files from Dr. Morse –  and having seized 329 of these files for a comprehensive audit –  the prosecution called just three patients of Dr.

Morse.

74.     These patients were called to prove that Dr. Morse – while having provided *some*

dental services to these patients– had nonetheless billed medicaid for additional dental services

which he had not performed.

75.     In order to prove this point, the prosecution needed first to establish that these

medicaid recipients were, in fact, patients of Dr. Morse.

76.     At trial, however,  none of these "patients" even  recognized Dr. Morse, much less

testified that they had received any dental treatment from him.

77.     In fact,  one of the alleged "patients" of Dr. Morse, Intisar Ahiri, specifically denied

that he had ever been treated by Dr. Morse:

> Q: Do you recall when you went there what work you had done?
> A: Cavities and dental work, but *he wasn't my doctor.*
> Q: Do you recall who treated you there?
> A: No.
> Q: When you said "he", you pointed at someone?
> A: The one with the black suit, blue tie. I said *he was never my doctor.  He never even looked in my mouth.*  The other doctor that works with him, which is the next room, was my doctor.

See Trial Transcript, annexed hereto as Exhibit M,  at 36 (emphasis supplied).

78.     Another alleged "patient" of Dr. Morse called by  the prosecution, Miriam Perez,

similarly testified that she did not recognize Dr. Morse as the dentist who treated her:

> Q: And do you recall the dentist's name that treated you?
> A: No.
> Q: I'm going to ask you to look around this courtroom and ask you if      you recognize anyone?
> A: *Truthfully, I don't.*

Id.  at 88 (emphasis supplied).

79.     The third and final "patient" of Dr. Morse, Sawsan Suliman, also testified that she

could not positively identify Dr. Morse as the dentist who treated her:

> Q: Do you see that person in this courtroom today?
> A: Maybe he.
> Q: Well, if you're not sure.
> A: *I don't know.  I don't know.*

Id. at 95.

80.     Thus, none of the alleged "patients" called by the prosecution so much as *recognized* Dr. Morse, much less testified that they had received dental treatment from him.

81.     The reason for this was that all of these patients had been treated by Dr. Ketover – who had worked with Dr. Morse for 25 years, and whose dental work was lawfully billed under Dr. Morse's medicaid provider number – and so these patients could not have given *any* testimony regarding what dental work Dr. Morse had, or had not, performed on their behalf.

82.     Despite having four years to investigate Dr. Morse – and having  full access to all of Dr. Morse's patient charts – the prosecution did not produce a single witness at trial who was actually a *real* patient of Dr. Morse.

**The Lab Invoices Are Deemed Untrustworthy and Inadmissible At Trial**

83.     Apart from the testimony provided by these  "patients", there were other glaring deficiencies in the prosecution's case.

84.     For example, the prosecution had based a large portion of its case on certain alleged "invoices"  belonging to defendant Design Dental Studio, Inc.

85.     These "invoices" –  which defendant Fusto would later concede were "sloppy", "handwritten",  "lacking detail" and "incomplete" –  were used by defendants as the primary basis for concluding that the Dr. Morse had stolen over $1,000,000.00 from Medicaid.

86.     At trial, however, it was revealed that these so-called  "invoices" contained *multiple* alterations, deletions, cross-outs and date changes, raising serious questions as to the origin and authenticity of such records.

87.     Further, there were almost one full year of invoices which were *completely missing*

from the Design Dental records, despite the fact that Dr. Morse had done business with this lab each and every month during the thirty six month audit period.

88.     In attempting to explain the patent deficiencies with these lab "invoices", the owner of Design Dental Studio, Inc, Nisan Yushvayev, gave multiple and contradictory accounts regarding the origin of these records.

89.  After listening to Mr. Yushvyav's conflicting testimony,  Judge Walsh stated his views on the record about this witness' credibility:

> *"I don't believe him.  That's the bottom line.*
> That's what it comes down to."

Trial Transcript at 78 (emphasis supplied).

90.     Accordingly,  Judge Walsh  refused to allow into evidence any of the "invoices" of Design Dental Studio, finding that these records were not sufficiently reliable or trustworthy to  be considered a "business record" under New York State law.

**The Prosecution Acknowledges Its Failures During Summation.**

91.     At the close of the prosecution's case, both sides were given an opportunity to give a summation to the Court.

92.     Before starting, the prosecutor told the Judge that his summation  would be "very brief[]", and that he was giving one only  because he was "probably required by law" to do so.   Trial Transcript at 115.

93.     In his summation, Defendant Fusto immediately conceded that the prosecution had failed to prove its  "million dollar theft" claim, as alleged in the indictment:

> Obviously, this indictment needs to be adjusted for purposes of your consideration. I mean, I'll start off just by saying the indictment charges for count one grand larceny in the first degree.  *We obviously have not approached the statutory element of that of a million dollars ....*

Id. (emphasis supplied).

94.     Defendant Fusto further conceded that the most the Court could find Dr. Morse guilty

of would be a theft of *$3,000.00* – or approximately $997,000.00 less than the amount alleged in the indictment:

> [A]t this point[,] through the auditor's testimony combined with the patients [,]I believe that the *best that the Court can consider at this point [is] grand larceny in the third degree, in excess of $3,000.00.*"

Id. at 115-116  (emphasis supplied).

95.      Thus, the prosecution's case had gone from a  "million dollar medicaid theft" – as Spitzer had boasted in his multi-lingual press release on April 11, 2006 – to a $3,000.00 claim, *at best*.

96.   Defendant Fusto also conceded that nine of the twelve counts in the indictment would "obviously have to be dismissed", as the prosecution had not produced any of the patients relating to these counts. Id. at 116.

**Dr. Morse Is Acquitted of All Charges By Justice Walsh.**

97.      Notwithstanding the fact that the prosecution had lowered its charges to Grand Larceny in the Third Degree –  and that as a result, it needed only to prove that Dr. Morse had defrauded medicaid of  $3,000.00 – Judge Walsh *still* found that the prosecution had not proved its case.

98.      Specifically, Judge Walsh found that the prosecution had failed to make out a *prima facie* case against Dr. Morse, and thus declared Dr. Morse not guilty of all charges.

99.      On August 2, 2007, all charges against plaintiff LEONARD MORSE were thus dismissed.

**The Irreparable Harm To Dr. Morse's Reputation And Career.**

100.      Notwithstanding his acquittal, Dr. Morse's reputation has been permanently and irreparably harmed by defendants' false accusations.

101.      There are literally thousands of postings on the Internet which still mention Dr. Morse's name in connection with medicaid fraud.  See, e.g., Exhibit K.

102.   There are no Internet postings which mention Dr. Morse's acquittal.

103.   Dr. Morse has been shunned by friends, neighbors and relatives in his own community as a result of the false charges brought against him.

104.   Dr. Morse was terminated from his position as an Assistant Director of the Dental Medical Residency Program at Methodist Hospital as a result of the false charges brought against him.

105.   Most importantly, Doctor Morse's career as a dentist has been permanently and irreparably destroyed as a result of the false charges brought against him.

106.   Since his acquittal, Dr. Morse has tried repeatedly to find work as a dentist, but the notoriety of his case – and in particular, of being known as the dentist who committed a "million dollar medicaid theft" – has made it impossible for him to find work.

**The Nature Of This Action**.

107.   This action seeks redress against defendants for their unlawful and egregious conduct in: (1) falsely accusing Dr. Morse of committing Medicaid fraud, when they knew that these allegations were completely untrue; (2) manufacturing false billing "summaries" which, inter alia, materially altered the *actual* vender statements submitted by Dr. Morse to Medicaid and thereby misled and deceived the Grand Jury (see ¶137, infra.); (3) giving false and misleading testimony before the Grand Jury to secure an indictment (see ¶118, infra.); (4) publicizing Dr. Morse's indictment solely for the purposes of advancing the political and personal ambitions of defendant Spitzer; and (5) causing severe and irreparable harm to Dr. Morse's reputation, and permanently destroying his ability to make a living as a dentist.

**FIRST CLAIM FOR RELIEF**
**DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983**

108.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "107" with the same force and effect as if fully set forth herein.

109.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct which constituted a violation of the Constitution of the United States.

110.    All of the aforementioned acts deprived plaintiff DR. LEONARD MORSE of the rights, privileges and immunities guaranteed to citizens of the United States by the Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. §1983.

111.    As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist.

## SECOND CLAIM FOR RELIEF
## FALSE ARREST UNDER 42 U.S.C. § 1983

(Defendant's Fusto,  Castillo and Flynn)

112.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "111" with the same force and effect as if fully set forth herein.

113.    As a result of defendants' aforementioned conduct, plaintiff DR. LEONARD MORSE was subjected to an illegal, improper and false arrest by the defendants and taken into custody and caused to be falsely imprisoned, detained, confined, incarcerated and prosecuted by the defendants in criminal proceedings, without any probable cause, privilege or consent.

114.    As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist.

## THIRD CLAIM FOR RELIEF
## MALICIOUS PROSECUTION UNDER 42 U.S.C. § 1983

(Defendants Castillo and Flynn)

115.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "114" with the same force and effect as if fully set forth herein.

116.   Defendants, individually and collectively, manufactured false evidence and forwarded this false evidence to prosecutors in the New York State Attorney General's Office.

117.   Defendants manufactured such false evidence for the sole purpose of securing an indictment against Dr. Morse.

118.   Defendants also gave false and misleading testimony before the Grand Jury.  In particular, defendants repeatedly and deliberately misled the Grand Jury regarding, inter alia: i) the amount of money actually received by Dr. Morse from Medicaid; ii) the methodology employed for making such false calculations; ii) the fact that there were  nineteen months of lab invoices missing out of a thirty six month audit period;  iv) the impossibility of  multiple-billing by Dr. Morse, due to inherent safeguards in the medicaid computer system; v) the impossibility of Dr. Morse submitting records to medicaid without specifying the exact tooth number and quadrant where the work was being performed; vi) the fact that there was another dentist working in Dr. Morse's office, Dr. Brian Ketover, whose dental work was lawfully being billed under the same medicaid provider number as Dr. Morse, and whose work accounted for a significant portion of the bills submitted by  Dr. Morse; vii) the fact that medicaid reimbursement rates had increased substantially over the time period covered by the investigation, and that the lower rates being used by defendants were outdated and inaccurate; and viii) the fact that defendants had analyzed only 4 months of Dr. Morse's records, and not 36 months of records, as they told the Grand Jury;

119.    In addition to the foregoing, defendant Castillo further misled the Grand Jury by testifying that there were certain documents "missing" from  Dr. Morse's dental charts – namely,

the prescriptions that Dr. Morse had given for the dental laboratory work to be performed – when in fact defendant Castillo knew this to be untrue.

120.     In so testifying, Defendant Castillo wilfully and deliberately created the false impression that Dr. Morse was *hiding* essential records from the auditor's review, when in fact defendant Castillo knew that such records were not required to be maintained after a one year period. See New York State Education Law, Article 133 § 6611 (requiring only that "one copy shall be retained by the practitioner of dentistry for a period of one year."), annexed hereto as Exhibit N.

121.     All of the foregoing false and misleading testimony by defendants was given for the sole purpose of securing an indictment against Dr. Morse.

122.     Apart from giving false and misleading testimony, Defendants also did not make a complete and full statement of facts to the Grand Jury, and intentionally withheld and concealed exculpatory evidence from the Grand Jury.

123.     Defendants were directly and actively involved in the initiation of criminal proceedings against Dr. Morse.

124.     Defendants lacked probable cause to initiate criminal proceedings against Dr. Morse.

125.     Defendants acted with  malice in initiating criminal proceedings against Dr. Morse.

126.     Defendants were also directly and actively involved in the continuation of criminal proceedings against Dr. Morse.

127.     Defendants lacked probable cause to continue criminal proceedings against Dr. Morse.

128.     Defendants acted with  malice in continuing criminal proceedings against Dr. Morse.

129.     Defendants misrepresented and falsified evidence throughout all phases of the

criminal proceedings.

130.    Notwithstanding the perjurious and fraudulent conduct of defendants, the criminal

proceedings were terminated in Dr. Morse's favor on August 2, 2007,  when the Honorable John P.

Walsh acquitted Dr. Morse of all charges.

131.    As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his

liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was

caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was

forced to incur substantial legal expenses, had his personal and professional reputation destroyed,

and lost his livelihood as a dentist.

**FOURTH CLAIM FOR RELIEF**
**DENIAL OF CONSTITUTIONAL RIGHT TO**
**FAIR TRIAL UNDER 42 U.S.C. § 1983 DUE TO FABRICATION OF EVIDENCE**
(Defendants Fusto and Castillo)

132.    Plaintiff repeats, reiterates and realleges each and every allegation contained in

paragraphs numbered "1" through "131" with the same force and effect as if fully set forth herein.

133.    Despite having access to thousands of Dr. Morse's patient files – and seizing 329 of

these files – defendants could not find *any* evidence of criminal wrongdoing on the part of Dr.

Morse.

134.    Rather than concede this fact, defendants Fusto and Castillo  manufactured evidence

against Dr. Morse in order to overcome the  deficiencies in their case,  and ensure that his

prosecution would move forward.

135.    Specifically, these defendants created completely false and misleading  billing

records to be used against Dr. Morse in his criminal prosecution.  See, e.g., Exhibit O.

136.    These records did not belong to Dr. Morse, nor to any of his laboratory vendors, but

instead,  were created solely by defendants for the purpose of securing an indictment against Dr.

Morse.

137.   Specifically, defendants manufactured evidence by, <u>inter alia</u>: (1) merging the billing records of three separate patients into one "super patient" to support the prosecution's claim of over-billing; (2) deleting material information from Dr. Morse's actual billing records to create the false impression that Dr. Morse had repeatedly billed Medicaid for the same work for several different patients, when in fact, Dr. Morse's *actual* vendor statements proved conclusively that this was not the case; and (3) creating a false "billing summary"– which listed multiple procedures which Dr. Morse had *never* actually billed Medicaid for – to support their claim of triple-billing by Dr. Morse.

138.   These false billing documents were created by defendant Castillo in accordance with the suggestions, input and guidance from defendant Fusto.

139.   After these false billing records were created, defendants used these same false records to make completely spurious accounting projections in order to reach their goal of creating a "million dollar medicaid theft" by Dr. Morse.

140.   These false billing records were used by defendants throughout all phases of the criminal proceedings.

141.   In creating false evidence against Dr. Morse, and in providing false and misleading testimony with respect thereto, defendants violated plaintiff's constitutional right to a fair trial under the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution.

142.   As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his liberty, was subject to onerous and restrictive bail conditions, was required to attend court proceedings for over one year, was denied fundamental constitutional rights, was publicly embarrassed  and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist.

**FIFTH CLAIM FOR RELIEF**
**DENIAL OF FAIR TRIAL UNDER 42 U.S.C. § 1983 DUE TO**
**EXTRAJUDICIAL STATEMENTS MADE BY SPITZER**

143.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "142" as if the same were more fully set forth at length herein.

144.    Defendant SPITZER made extrajudicial statements to the press regarding plaintiff Dr. LEONARD MORSE.

145.    Defendant SPITZER's extrajudicial statements were not made for the purpose of carrying out his officials duties, responsibilities, or functions as Attorney General of the State of New York.

146.    Rather, defendant SPITZER made such extrajudicial statements in order to create a "high-profile" medicaid fraud case that would advance his own career goals and help him secure the Democratic nomination for Governor of the State of New York.

147.    Defendant SPITZER  knew that his extrajudicial statements about plaintiff Dr. LEONARD MORSE were false and misleading.

148.    Defendant SPITZER knew that his extrajudicial statements about plaintiff Dr. LEONARD MORSE would be reported by various media outlets, including newspapers, radio stations and television networks, as well as on the Internet, where it would reach an audience of hundreds of millions of people.

149.    Defendant SPITZER knew that his extrajudicial statements about plaintiff Dr. LEONARD MORSE would create a highly prejudicial and inflamed atmosphere against plaintiff.

150.    As a  result of defendant SPITZER's extrajudicial statements to the press, plaintiff Dr . LEONARD MORSE was the subject of extensive and highly prejudicial news coverage.

151.    This extensive news coverage had a profound impact on both  the prosecution and defense.

152.    As a result of SPITZER's extrajudicial statements to the press, the prosecution

(defendants Fusto, Castillo and Flynn) felt compelled to continue their case against Dr. Morse –

despite knowing that there were enormous holes in their case, and that they would not be able to

obtain a conviction – out of concern that dismissing this "high-profile" case would be extremely

damaging to defendant Spitzer.

153. As a result of SPITZER's extrajudicial statements to the press, the defense was forced

to waive Dr. Morse's constitutional right to trial by jury, due to concerns that the extensive adverse

publicity would prevent a jury from being fair and impartial.

154. As a result of the foregoing, plaintiff Dr. LEONARD MORSE was deprived of his

liberty, was selectively and unfairly prosecuted, was denied fundamental constitutional rights, was

forced to waive his right to trial by jury, was publicly embarrassed and humiliated, was caused to

suffer severe emotional distress, was summarily excluded from the Medicaid program, was forced

to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost

his livelihood as a dentist.

## SIXTH CLAIM FOR RELIEF
## "STIGMA PLUS" CLAIM UNDER 42 U.S.C. § 1983 DUE TO
## EXTRAJUDICIAL STATEMENTS MADE BY SPITZER

155. Plaintiff repeats, reiterates and realleges each and every allegation contained in

paragraphs "1" through "154" as if the same were more fully set forth at length herein.

156. Defendant SPITZER made extrajudicial statements to the press regarding plaintiff

Dr. LEONARD MORSE.

157. Defendant SPITZER's extrajudicial statements were not made for the purpose of

carrying out his official duties, responsibilities, or functions as Attorney General of the State of

New York.

158. Defendant SPITZER made such extrajudicial statements in order to create a

"high-profile" medicaid fraud case that would advance his own career goals and help him secure

the Democratic nomination for Governor of the State of New York.

159.   Defendant SPITZER  knew that his extrajudicial statements about plaintiff Dr. LEONARD MORSE were false and misleading.

160.   Defendant SPITZER knew that his extrajudicial statements about plaintiff Dr. LEONARD MORSE would be reported by various media outlets, including newspapers, radio stations and television networks, as well as on the Internet, where it would reach an audience of hundreds of millions of people

161.   As a  result of defendant SPITZER's extrajudicial statements to the press, plaintiff Dr. LEONARD MORSE was the subject of extensive and highly prejudicial news coverage.

162.   As a result of SPITZER's extrajudicial statements to the press, plaintiff Dr. LEONARD MORSE's reputation was severely and permanently damaged.

163.   As a result of SPITZER's extrajudicial statements to the press, plaintiff Dr. LEONARD MORSE was summarily excluded from the medicaid program.

164.   Dr. Morse's summary exclusion from the medicaid program destroyed his dental practice, since  95% of Dr. Morse's patients were medicaid recipients.

165.   Dr. Morse was never afforded an opportunity for a name-clearing hearing prior to being summarily excluded from medicaid.

166.   As a result of SPITZER's extrajudicial statements to the press, plaintiff Dr. LEONARD MORSE was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was deprived of his right to a name-clearing hearing prior to said termination, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist.

167.   All of the foregoing acts by defendants deprived plaintiff DR. LEONARD MORSE of federally protected rights, including, but not limited to, the right:

A.   Not to be deprived of liberty or property without due process of law;

B.    To be free from seizure and arrest not based upon probable cause;

C.    To be free from unwarranted and malicious criminal prosecution;

D.    Not to have cruel and unusual punishment imposed upon him; and

E.    To receive equal protection under the law.

## SEVENTH CLAIM FOR RELIEF
## DEFAMATION UNDER NEW YORK STATE LAW

168.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "167" as if the same were more fully set forth at length herein.

168.    Defendant SPITZER made extrajudicial statements to the press regarding plaintiff Dr. LEONARD MORSE.

169.    Defendant SPITZER's extrajudicial statements were not made for the purpose of carrying out his official duties, responsibilities, or functions as Attorney General of The State of New York.

170.    Defendant SPITZER made such extrajudicial statements in order to create a "high-profile" medicaid fraud case that would advance his own career goals and help him secure the Democratic nomination for Governor of the State of New York.

171.    Defendant SPITZER  knew that his extrajudicial statements about plaintiff Dr. LEONARD MORSE were false and misleading.

172.    Defendant SPITZER acted with malice in making false and misleading statements about plaintiff Dr. LEONARD MORSE.

173.    Defendant SPITZER acted with a reckless disregard for the truth in making false and misleading statements about plaintiff Dr. LEONARD MORSE.

174.     Defendant Sptizer made such statements without privilege or authorization from plaintiff Dr. LEONARD MORSE.

175.    Defendant SPITZER knew that his extrajudicial statements about plaintiff

Dr. LEONARD MORSE would be reported by various media outlets, including newspapers, radio stations and television networks, as well as on the Internet, where it would reach an audience of hundreds of millions of people

176.    As a  result of defendant SPITZER's extrajudicial statements to the press, plaintiff Dr. LEONARD MORSE was the subject of extensive and highly prejudicial news coverage.

177.    As a result of SPITZERs extrajudicial statements to the press, plaintiff Dr. LEONARD MORSE's reputation was severely and permanently damaged, and his career as a dentist was permanently destroyed.

178.    Spitzer's extrajudicial statements about plaintiff Dr. LEONARD MORSE constitute defamation *per se*.

179.    As a result of the foregoing, plaintiff DR. LEONARD MORSE was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was summarily excluded from the Medicaid program, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his livelihood as a dentist

180.    As a result of all the foregoing unlawful actions of defendants, plaintiff Dr. LEONARD MORSE is entitled to compensatory damages in the sum of twenty-five  million dollars ($25,000,000.00), and is further entitled to punitive damages in the sum of fifty million dollars ($50,000,000.00).

**WHEREFORE**, plaintiff Dr. LEONARD MORSE demands judgment in the sum of twenty-five million dollars ($25,000,000.00) in compensatory damages, fifty million dollars ($50,000,000.00) in punitive damages, plus attorney's fees, costs, and disbursements of this action.

Dated:   New York, New York
         July 1, 2011

                              BY:    _____/S_____
                                     JON L. NORINSBERG
                                     norinsberg@aol.com
                                     Attorney for Plaintiff
                                     225 Broadway, Suite 2700
                                     New York, New York 10007
                                     (212) 791-5396