UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
LEONARD MORSE,

               Plaintiff,

     -against-

JOHN FUSTO and JOSE CASTILLO,

               Defendants.
--------------------------------------------------------x

<u>NOT FOR PUBLICATION</u>
**MEMORANDUM & ORDER**
07-CV-4793 (CBA) (RML)

**AMON, Chief United States District Judge**:

      Plaintiff Leonard Morse brought this action pursuant to 42 U.S.C. § 1983 against Defendants Jose Castillo and John Fusto, former employees of the New York State Attorney General's Office.  Morse claimed the defendants fabricated evidence, which resulted in his being deprived of liberty.  The Court held a jury trial between February 4, 2013 and February 12, 2013.  On February 12, 2013, the jury returned a verdict in favor of plaintiff.  The jury awarded Morse $6,724,936 in compensatory damages and $1,000,000 in punitive damages.  Now pending before the Court is defendants' motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50 or, in the alternative, new trial pursuant to Fed. R. Civ. P. 59 or reduced damages.

### BACKGROUND

#### I.   Prior Proceedings

      In 2006, following an investigation by the Medicaid Fraud Control Unit of the New York State Attorney General's Office, Morse was indicted by a grand jury for Grand Larceny in the First Degree and Offering a False Instrument in the First Degree.  He was ultimately acquitted of all charges after a bench trial.  Morse subsequently commenced this action pursuant to 42 U.S.C. § 1983 against various current and former New York state employees, asserting claims of, <u>inter alia</u>, false arrest, malicious prosecution, and deprivation of liberty due to fabrication of

1

evidence.[1]  (DE 63.)

This Court granted summary judgment to defendants on Morse's false arrest and malicious prosecution claims and denied summary judgment on Morse's deprivation of liberty claim, Morse v. Spitzer, No. 07-CV-4793 CBA RML, 2011 WL 4625996 (E.D.N.Y. Sept. 30, 2011), as amended, 2013 WL 359326 (E.D.N.Y. Jan. 29, 2013) (hereinafter referred to by its docket entry number, DE 123), and adhered to its decision on reconsideration, Morse v. Spitzer, No. 07-CV-4793 CBA RML, 2012 WL 3202963 (E.D.N.Y. Aug. 3, 2012) (hereinafter referred to by its docket entry number, DE 124).  The Court found that Morse had presented evidence sufficient to raise a genuine issue of fact regarding whether defendants intentionally fabricated and/or altered billing summaries for use before the grand jury and whether such fabricated evidence was material in securing the indictment.  (DE 123 at 4.)  On reconsideration, defendants raised for the first time an absolute immunity defense.  The Court considered the argument and found that genuine issues of fact precluded a finding as a matter of law as to whether defendants allegedly fabricated records during the investigatory phase, when they were building a case against Morse, or only in preparation for presentation of evidence to the grand jury.  (DE 124 at 15-16.)  As fact issues precluded determining whether defendants were engaged in an investigatory or advocacy function, defendants' motion for reconsideration on absolute immunity grounds was denied.  The Court also granted summary judgment to defendants on Morse's claims relating to a press release issued by the Attorney General's office regarding his indictment.  (DE 108.)

Morse then proceeded to a jury trial on his one remaining claim—deprivation of liberty

---

[1] As the Court noted in its prior memorandum and order on summary judgment, courts in this Circuit have termed this right alternatively as a denial of the right to fair trial and a deprivation of liberty without due process of law. Morse v. Spitzer, No. 07-CV-4793 CBA RML, 2011 WL 4625996 (E.D.N.Y. Sept. 30, 2011), as amended, 2013 WL 359326, at *3 & n.1 (E.D.N.Y. Jan. 29, 2013).  The Court will refer to the claim as a deprivation of liberty without due process.

due to fabrication of evidence—against remaining defendants Jose Castillo, an audit-investigator in the Medicaid Fraud Control Unit, and Special Assistant Attorney General John Fusto, the prosecutor responsible for overseeing the investigation, grand jury proceedings, and prosecution of Morse.

## II. Evidence at Trial

According to the testimony elicited at trial, Morse, a dentist, practiced in the Park Slope neighborhood of Brooklyn for 30 years under the business name 580 Dental, P.C.  Ninety-five percent of his patient base was insured through the Medicaid program.  (Trial Tr. 834-36.)  In 2002, Morse came to the attention of the Medicaid Fraud Control Unit ("MCFU") of the New York State Attorney General's office.  (Trial Tr. 562-63, 689.)  MFCU suspected Morse of billing for denture repairs and services that were never rendered.  (Trial Tr. 691.)  In particular, it appeared that 580 Dental was billing for dentures and denture repairs for young patients.  (Trial Tr. 563-64, 691.)  Defendant Fusto was assigned to the case, along with investigator Robert Flynn and auditor Tim Johnson.  (Trial Tr. 487, 691.)  At some point in the investigation, in 2004 or 2005, auditor Jose Castillo replaced Tim Johnson on the case.  (Trial Tr. 174.)  Investigator James Serra was also assigned to the case to provide assistance to Flynn.  (Trial Tr. 443, 488-89.)

As part of its investigation, MFCU conducted an audit of Morse's billings for the years 2000, 2001, and 2002, based on patient charts obtained from Morse and invoices from the dental labs to which Morse sent out his denture repair work, Nu-Life and Design Dental.  (Trial Tr. 61, 693-94, 697-98, 841-42.)  The invoices obtained from Nu-Life and Design Dental were then analyzed to determine whether they substantiated Morse's Medicaid billings during the audit period of 2000-2002.  In addition to the invoice analysis, patient interviews were conducted by phone.  Flynn interviewed twelve of Morse's patients, all in their mid to late 20s.  (Trial Tr. 575.)

Some of these patients stated that they never had denture work done by Morse.  (Trial Tr. 592-93.)  Flynn memorialized these interviews in memos that were forwarded to Fusto. (Trial Tr. 572-74.)  Fusto also found suspicious the fact that Morse did not have any patient prescriptions for the audit period.  Fusto had requested these prescriptions in April 2004, and, under Medicaid regulations, a provider was required to keep such records for six years.  (Trial Tr. 700-01.)

The investigation spanned from about April 2002 until late 2005.  (Trial Tr. 689, 727.) Fusto testified that he had decided to seek a grand jury indictment in December 2005.  (Trial Tr. 729.)  Fusto sought an indictment charging Morse with one count of grand larceny in the first degree (alleging theft of $1.1 million from Medicaid) based on the invoice analysis (Trial Tr. 719) and eleven counts of offering a false instrument for filing (alleging the submission of a written false statement to a public office with the intent to defraud the State of New York) based on patient interviews (Trial Tr. 720-21).

The case was presented to a grand jury in March 2006.  In support of his case, Fusto called Castillo to testify about the invoice analysis and that the amount of fraud was $1.1 million. (Trial Tr. 61.)  Fusto also called several of Morse's patients for whom Morse had submitted bills for denture work.  (Trial Tr. 746.)  These patients testified that they had not had denture work done by 580 Dental.  (Trial Tr. 746-53.)  Fusto also presented to the grand jury billing summaries of eight of Morse's patients, designated as Grand Jury Exhibits 7 and 11 (Trial Exhibits 44 and 133, respectively).  (Trial Tr. 731.)  Grand Jury Exhibit 7 consisted of six sheets of paper, containing the information of the following six patients (one patient per sheet): Sawsan Suliman, Intisar Ahiri, Nassa Ahiri, Sara Charles, Stacy Rodriguez, and Asi Othman.  Grand Jury Exhibit 11 was identical to Grand Jury Exhibit 7 except that it included 2 more patients, Miriam Perez and Edwin Gonzalez.  (Trial Tr. 731.)  These billing summaries were arranged in the form of

4

spreadsheets that included the following fields:   (1) Client Identification Number ("CIN number," an identification number given to each Medicaid recipient), (2) patient last name, (3) patient first name, (4) amount paid, (5) date of service, (6) invoice number, (7) Julian date, (8) procedure code, and (9) procedure description.  The procedure descriptions described services such as "repair or replace broken clasp" and "add tooth to existing partial denture."  Using Grand Jury Exhibit 7, Fusto elicited testimony from Dr. Linda DeLuca, a dentist, as to her opinion of whether the billings made sense.  (Trial Tr. 753-54.)  Dr. DeLuca testified that the billings seemed unusual and excessive to her.  (Trial Tr. 651-667.)

On April 5, 2006, the grand jury returned an indictment on all twelve counts sought by Fusto: one count of grand larceny in the first degree and eleven counts of filing a false instrument.  (Trial Tr. 767, 847; Trial Ex. I.)  The eleven false filing charges were based upon billings submitted for the six patients listed in Grand Jury Exhibit 7:  Sawsan Suliman, Intisar Ahiri, Nassa Ahiri, Sara Charles, Stacy Rodriguez, and Asi Othman.  Morse's criminal trial began in June 2007.  (Trial Tr. 873.)  During the 15-month interval between the indictment and trial, Morse was under court supervision and made several mandatory court appearances.  (Trial Tr. 873-74.)  Morse was ultimately acquitted of all counts in August 2007.  (Trial Tr. 865, 887-88.)

Morse's theory at trial was that the investigation and criminal case against him were deeply flawed and that Fusto and Castillo fabricated some of the evidence against him.  The accuracy (or lack thereof) of Castillo's invoice analysis was vigorously contested, and much of the trial focused on the various shortcomings in Castillo's invoice analysis, including the fact that Castillo had arrived at several different numbers before determining $1.1 million to be the fraud amount and that the analysis did not account for several months for which invoices were

5

not produced.  (E.g., Trial Tr. 72-89, 222-32, 380-87, 705-18.)  The basis of the fabrication of evidence claim, however, was Grand Jury Exhibits 7 and 11, the billing summaries.  According to plaintiff, Fusto and Castillo, acting under the direction of Fusto, made or altered these billing summaries to create the false impression that Morse had billed repeatedly for the same services.  Morse argued that the documents were false in three distinct ways.  First, the billing summary for patient Stacy Rodriguez (one page of Grand Jury Exhibit 7) included nine lines purportedly representing a different service rendered on June 4, 2002, even though Morse submitted only three procedures to Medicaid for reimbursement ("triple billing claim").  Second, the billing summary for patient Edwin Gonzalez (one page of Grand Jury Exhibit 11), was actually a billing summary of three different patients, all named Edwin Gonzalez, whose records were merged and created to look like one "super patient" named Edwin Gonzalez ("super patient claim").  Third, for all of the patients listed in Grand Jury Exhibits 7 and 11, tooth number was not included as a field on the spreadsheet, creating the impression that Morse billed repeatedly for the same procedure instead of showing that the procedures were performed on different teeth.  According to plaintiff's theory, defendants had made a larger document that did include tooth numbers and then purposely omitted the tooth numbers in creating Grand Jury Exhibits 7 and 11.  (Trial Tr. 154-55.)

Defendants argued that they had had good reason to suspect Morse of Medicaid fraud and defended the methods and assumptions used in the invoice analysis, stating the difficulties caused by working with handwritten and incomplete records and that the investigative team had deliberated over the final figure.  Regarding Grand Jury Exhibits 7 and 11, defendants argued that they were generated by selecting certain data fields in the Department of Health claims database and contained only true and accurate information.  Fusto testified that he instructed

6

Castillo not to include the tooth numbers on the documents because he did not believe such information was relevant to the false filing charges.  (Trial Tr. 291-92, 741-42.)  He stated that because the theory in Morse's criminal case based on the patient testimony was that the denture repair work was not done at all (rather than just overstated), he did not think including tooth number was particularly important.  (Trial Tr. 741-42, 746-50.)

Also at issue at trial was the timing of the creation of Grand Jury Exhibits 7 and 11.  As noted above, the Court had previously found an issue of fact as to whether they were created during the investigatory phase of the case (for which defendants could assert only qualified immunity) or whether they were created in preparation for the grand jury presentation (for which defendants could assert absolute immunity).  This question was submitted to the jury as a special interrogatory.

## II. Jury Verdict

On the verdict sheet, the first question the jury was asked was whether plaintiff had proven by a preponderance of the evidence that defendants "created false or fraudulently altered documents, consisting of Grand Jury Exhibits 7 and 11, knowing that such information was false or fraudulent." (DE 139, Verdict Sheet.)  The Court instructed the jury that plaintiff had to show that defendants acted "knowingly or with reckless disregard."  The Court also defined "false" and "fraudulent" as follows:  "A document is false if it is untrue when made and was known to be untrue when made by the person making it or causing it to be made.  A document is fraudulent if it is falsely made with intent to deceive.  Deceitful half-truths or the deliberate concealment of material facts may also constitute false or fraudulent information."  (DE 141, Jury Instructions, at 9.)  The jury answered "yes" to this first question.  The next question was whether plaintiff had proven by a preponderance that "the false or fraudulent evidence was

material, meaning that it was likely to influence the grand jury's decision to indict, and that

[plaintiff] was deprived of liberty as a result of the false or fraudulent evidence."  The jury also

answered "yes" to this question.  The special interrogatory asked: "Have defendants, John Fusto

and Jose Castillo, proven by a preponderance of the evidence that the billing summaries (Grand

Jury Exhibits 7 and 11) were created in connection with the preparation for the presentation of

evidence to the grand jury, and not earlier as part of the investigation?"  The jury answered "no."

The jury awarded Morse $6,724,936.00 in compensatory damages ($1,733,941 in past lost

earnings, $2,490,995 in future lost earnings, and $2,500,000 in mental and emotional pain and

suffering) and $1,000,000 in punitive damages ($750,000 against Fusto and $250,000 against

Castillo).  (DE 139, Jury Verdict Sheet.)

## DISCUSSION

## I.     Motion for Judgment as a Matter of Law

Defendants argue that they are entitled to judgment as a matter of law with respect to

liability on three grounds: (1) the documents in question were facially true and thus cannot

support a finding of fabrication or fraud, (2) defendants are entitled to qualified immunity as a

matter of law, and (3) defendants are entitled to absolute immunity as a matter of law.

### A.     Standard of Review

Rule 50 "generally imposes a heavy burden on a movant, who will be awarded judgment

as a matter of law only when 'a party has been fully heard on an issue during a jury trial and the

court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for

the party on that issue.'"  Cash v. Cnty. of Erie, 654 F.3d 324, 333 (2d Cir. 2011) (quoting Fed.

R. Civ. P. 50(a)); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000).

In making this determination, the court "should review all of the evidence in the record,"

8

"draw[ing] all reasonable inferences in favor of the nonmoving party" and "disregard[ing] all evidence favorable to the moving party that the jury is not required to believe."  Reeves, 530 U.S. at 150-51.  Where, as here, "'the jury has deliberated in the case and actually returned its verdict' in favor of the non-movant," the moving party's burden is especially heavy.  Cash, 654 F.3d at 333 (quoting Cross v. N.Y. City Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005)).  The court must, in these circumstances, "give deference to all credibility determinations and reasonable inferences of the jury" and may set aside a verdict only if there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise or conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]."  Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 133 (2d Cir. 2008) (internal quotation marks omitted); Kinneary v. City of New York, 601 F.3d 151, 155 (2d Cir. 2010).  In other words, a court may grant a Rule 50 motion only if, after "viewing the evidence in the light most favorable to the non-movant, [it] concludes that 'a reasonable juror would have been compelled to accept the view of the moving party.'"  Cash, 654 F.3d at 333 (quoting Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007)).

> B.  False / Fraudulently Altered Documents

"It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer."  Zahrey v. Coffey, 221 F.3d 342, 355 (2d Cir. 2000).  "A person suffers a constitutional violation if an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result."  Jovanovic v. City of New York, 486 F. App'x 149, 152 (2d Cir. 2012).  A prosecutor who fabricates evidence in

his investigative role, to whom it was reasonably foreseeable that such evidence would later be used in his advocacy role before the grand jury, is equally liable for an ensuing deprivation of liberty. Zahrey, 221 F.3d at 353-54.

Defendants contend that plaintiff has failed to make out this constitutional violation and that defendants are entitled to judgment as a matter of law because the documents at issue were facially true and accurate. First, they argue that although the Stacy Rodriguez page showed nine lines of services performed on June 4, 2002, six of those lines reflected adjustments made to Morse's billings and the total amount charged reflected only three procedures. The first three lines of the Stacy Rodriguez page show three charges of $87.00, the third of which is preceded by a minus sign, canceling out the second charge and leaving only one valid $87.00 charge. In similar fashion, the next three lines show three charges of $174.00, the last of which is preceded by a minus sign. The last three lines also consist of three charges of $174.00, the last of which is preceded by a minus sign. The total amount charged is $435.00, the sum of one $87.00 charge and two $174.00 charges. Second, they contend that the Edwin Gonzalez page accurately reflected the billings of three different patients, all named Edwin Gonzalez, and included each patient's unique Client Identification Number ("CIN number"), an identification number given to each Medicaid recipient. Finally, defendants argue that the exclusion of the tooth numbers from the billing summaries does not make the billing summaries false; rather, plaintiff's claim on this point at best amounts to an argument that defendants did not include information favorable to Morse, which defendants were under no obligation to do. Defendants argue that because the documents are facially true and accurate, such documents cannot form the basis of a fabrication of evidence claim.

Plaintiff responds that the record supports a finding that Grand Jury Exhibits 7 and 11

were not simply computer printouts of selected database fields but that (a) they were actually culled from a larger pre-existing document that did include tooth numbers, (b) Fusto specifically directed Castillo to merge the records of the three Edwin Gonzalezes into one document, and (c) the Stacy Rodriguez billing document was altered, as Morse's vendor statement shows only three procedures. Thus, all the documents at issue were in some form or another "altered" or "created" to produce a false and misleading picture of Morse's billing practices.

For the following reasons, the Court concludes that, as a matter of law, the Stacy Rodriguez page is not a "false" or "fraudulently altered" document that can support a fabrication of evidence claim. However, the evidence, as underwhelming as it was, was sufficient to support the jury's verdict that the Edwin Gonzalez page and the omission of tooth numbers from Grand Jury Exhibits 7 and 11 constituted false or fraudulently altered evidence. See AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC, 646 F. Supp. 2d 385, 407 (S.D.N.Y. 2009) ("Where there are multiple factual bases for liability on a single claim, one or more of which is found to be defective, but where special interrogatories as to each factual allegation are not requested, the general verdict must be upheld if the remaining evidence is sufficient to support it." (citing McCord v. Maguire, 873 F.2d 1271, 1274 (9th Cir. 1989))), aff'd, 386 F. App'x 5 (2d Cir. 2010).

i.   Stacy Rodriguez Triple Billing Claim

Despite the fact that the Stacy Rodriguez page includes minus signs and shows the proper total amount billed for three procedures, plaintiff argues that it is false because Morse's vendor statement – i.e., the remittance statement he received from New York state on a weekly basis reflecting services billed by Morse and reimbursements paid by Medicaid – shows only three services billed and reimbursed and does not include six additional lines reflecting adjustments. (Trial Tr. 899, 902-04.) Although Morse testified that from time to time he would manually

11

make adjustments or voids to his billings (Trial Tr. 1030-31), he denied that he made any adjustments to the Stacy Rodriguez billings for services rendered on June 4, 2002 (Trial Tr. 904-05, 1053).  Morse also testified that sometimes Medicaid program administrators would make adjustments to the billings.  (Trial Tr. 1031-32.)  Defendants put in evidence of a second remittance statement Morse received that included the adjustments made to the Stacy Rodriguez billings for services performed June 4, 2002.  (Trial Tr. 1032-35, 1052.)  Morse testified that he had no reason to believe that the adjustments reflected in the second remittance statement were not the adjustments reflected on the Stacy Rodriguez page included in Grand Jury Exhibit 7. (Trial Tr. 1113.)

On this record, "a reasonable jury would not have a legally sufficient evidentiary basis" to conclude that the Stacy Rodriguez page was somehow falsified or altered with intent to deceive by Fusto and Castillo.  The evidence showed (1) one remittance statement that showed three lines of billings for Stacy Rodriguez for services rendered June 4, 2002 and (2) a second remittance statement that reflected adjustments made to those claims that were identical to the adjustments shown on the Stacy Rodriguez page presented to the grand jury.  Morse made no allegation that Medicaid program administrators, or whoever generated the second remittance statement, fabricated or fraudulently altered the billings.  The only alleged fabricators in this case were Fusto and Castillo, and although Castillo testified that he accessed the Department of Health's Medicaid claims database to produce Grand Jury Exhibits 7 and 11 (Trial Tr. 149-153, 175-76), the record is devoid of any evidence that either Fusto or Castillo had control over generating remittance statements such that they could have gone into the claims system to input false adjustments.  On this record, there was simply no evidence from which a reasonable jury could conclude that Fusto and Castillo fabricated or fraudulently altered the Stacy Rodriguez

page to include six lines of adjustments and "could only have been the result of sheer surmise and conjecture."[2]  Brady, 531 F.3d at 133 (internal quotation marks omitted).  For this reason, the Court concludes that as a matter of law, the Stacy Rodriguez page cannot be the basis of Morse's fabrication of evidence claim.

The Stacy Rodriguez page was later presented to the grand jury in a misleading fashion. The transcript of the grand jury testimony (admitted into evidence at trial) shows that that it was used to convey to the grand jury that Morse billed for nine procedures rather than three.  Dr. DeLuca was asked the following questions and gave the following answers before the grand jury regarding the billings for Stacy Rodriguez:

Question: Now, on June 4th, how many times did those things occur or were indicated that they occurred?

Answer: I see that adding existing tooth to partial denture is listed three times. I see repair or replace broken clasp three times. And I see reline upper, partial denture three lines [sic].

Question: Does that make any sense to you?

Answer: No, it does not.

Question: Why wouldn't it?

Answer: Because I can't imagine that you would do each of these three times on the same day.

(Trial Tr. 610.)[3]  Although the use of the Stacy Rodriguez page in this manner was certainly misleading, any falsity occurred in how it was presented to the grand jury, a core prosecutorial

---

[2] The Court also notes that not only is such conclusion unsupported by any evidence, it is also puzzling, as it raises the question why Fusto and Castillo, if they intended to falsify this document, would leave the minus signs and a correct total amount billed on the document.

[3] At trial, both Fusto and Dr. DeLuca testified that they had not noticed the minus signs when examining the document at the grand jury proceedings.  (Trial Tr. 652, 755.)

function for which absolute immunity exists.[4]  For the reasons already stated, the Court finds no basis on which a jury could find that the page itself was false when it was created.

ii.     *Edwin Gonzalez Super Patient & Omitted Tooth Number Claims*

In contrast to the Stacy Rodriguez page, a reasonable jury was entitled to conclude that the Edwin Gonzalez page in Grand Jury Exhibit 11 and the omission of tooth numbers from both Grand Jury Exhibits 7 and 11 constituted fabrication or fraudulent alteration in that the documents omitted material information.  The Court understands defendants' contrary arguments to be that (1) as a legal matter, the constitutional tort at hand encompasses only information that is fabricated, or "made up," not information that is altered, and (2) as applied to this case, there is no basis from which to conclude that any information was fabricated or altered because the evidence shows that Grand Jury Exhibits 7 and 11 are facially true, accurately reflecting claims data submitted to the Medicaid program.  (Defs. Mem. at 10-13; see also Tr. of 2.1.13 Pretrial Conf. at 26-30.)

Defendants' first argument is simply a repeat of its position advanced at trial and rejected by the Court.  The knowing use, by police or prosecutors, of evidence that has been altered to be materially misleading is just as harmful to the "'truth-seeking function of the trial process,'" Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997) (quoting United States v. Agurs, 427 U.S. 97, 104 (1976)), as the knowing use of evidence that has been completely made up.  The Court sees no reasoned principle on which to make a distinction.  For example, a police report that accurately sets forth an account of an arrest may be made false by the omission of certain critical details; that the remaining details of the account are still accurate does not mean that the report as a whole also remains true.

---

[4] Indeed, plaintiff's closing argument indicates that his own theory as to why the Stacy Rodriguez page is false lies in how it was used before the grand jury.  (See Trial Tr. 1313 ("They [defendants] presented it [the Stacy Rodriguez page] to the grand jury deliberately in a way that's misleading.")).

Indeed, even cases that defendants cite in support of their proposition (Defs. Mem. at 11) treat made up evidence and misleading evidence in the same way.  In Manganiello v. City of New York, 612 F.3d 149, 162 (2d Cir. 2010), the Second Circuit upheld the district court's ruling that the evidence supported a jury finding that a police detective "misrepresented the evidence to the prosecutors, or failed to provide the prosecutor with material evidence or information, or gave testimony to the Grand Jury that was false or contained material omissions, and . . . knew that he . . . was making a material misrepresentation or omission or giving false testimony."  612 F.3d at 155.  In Nibbs v. City of New York, 800 F. Supp. 2d 574 (S.D.N.Y. 2011), the court allowed a denial of fair trial due to fabrication of evidence claim to go forward where plaintiff alleged that police officers "filed police reports containing false and misleading information about the circumstances surrounding his arrest."  800 F. Supp. 2d at 575 (emphasis added).  The Court also finds relevant other areas of law that make no legal distinction between misleading statements or omissions and affirmative falsehoods.  E.g., United States v. Vozzella, 124 F.3d 389, 392 (2d Cir. 1997) (in context of analyzing Brady claim, finding that certain records were "known to be partially false and were presented to the jury in a fashion so highly misleading as to amount to falsity regarding their veracity as a whole"); 18 U.S.C. § 1001 (prohibiting, inter alia, knowingly and willfully falsifying, concealing, or covering up by any trick, scheme, or device, a material fact in any matter within the jurisdiction of the three branches of the federal government); Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000) ("To state a claim under § 10(b) [of the 1934 Securities Exchange Act] and the corresponding Rule 10b–5, a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter . . . .").  Contrary to defendants' assertions, evidence that has been materially altered or evidence from

which material information has been omitted can be equally as "false" as evidence that has simply been made up.

Defendants also argue that the grand jury exhibits were not false because "the evidence demonstrated that Castillo simply downloaded accurate claims data" and the exhibits reflected claims information that Morse himself submitted to the State. (Defs. Mem. at 10, 12.) They further argue that plaintiff's claim amounts to nothing more than a charge that they failed to present to the grand jury information favorable to Morse. (Defs. Mem. at 13-14.)

These arguments are similarly unpersuasive. First, defendants' contention that the documents were created simply by Castillo downloading accurate claims data was the argument made to and rejected by the jury. The relevant question on this Rule 50 motion is whether the jury verdict is supported by the record when all reasonable inferences are drawn in favor of plaintiff. Regarding the Edwin Gonzalez page, Castillo testified that he knew that three different people were on the page and that Fusto had specifically directed him to put "everybody named . . . Edwin Gonzalez on this spreadsheet." (Trial Tr. 130.) Further, Castillo also testified that he checked each patient's date of birth and address before he put them together on one spreadsheet. (Trial Tr. 132.) Based on this testimony, a reasonable jury could conclude that Fusto and Castillo knowingly merged three patients onto one spreadsheet to make the page look like the billings for one patient. Although defendants argue that the page showed each patients' unique Client Identification Number ("CIN number"), Fusto testified that he assumed that a person unfamiliar with the Medicaid system would not know what a CIN number is (Trial Tr. 278), and there is no indication that Fusto made clear to the grand jury the significance of these different CIN numbers.

Regarding the omitted tooth numbers, Castillo testified that he had previously created a

16

version of Grand Jury Exhibit 7 that had included tooth numbers (Trial Tr. 155), and Fusto

testified that when he asked Castillo to create the exhibits, he told him not to include tooth

number. (Trial Tr. 292.) Further, although Fusto testified that he did not believe tooth number

was relevant because the theory in Morse's criminal case was that the denture repair work was

not done at all (Trial Tr. 741-42), he nonetheless elicited testimony from Dr. DeLuca before the

grand jury as to whether she thought the billings seemed excessive. Dr. DeLuca's grand jury

testimony appears to indicate that she interpreted the exhibits as showing procedures for the

same denture clasp or tooth. Regarding patient Sawsan Suliman, she testified:

> Answer: On May 25th, 2000, the tooth was added to the partial denture, reline of
> the lower partial denture was done, also a repair or replace of a broken clasp twice
> on the same day. On June 19th, 2000, repair or replace broken clasp twice again,
> and reline upper partial denture as well.

> Question: Does that series of repairs or items make any sense to you from a
> dentist's standpoint?

> Answer: Well, it would seem to me if you send the product to the laboratory and
> got it back the same day, you still could not send it back out again the very same
> day, even if it was incorrectly done. It just seems very difficult to get it back,
> insert it in the mouth, check again and send back to the laboratory for what maybe
> indicated all in the same day, twice or three times.

(Trial Tr. 655.)

Regarding patient Nassa Ahiri, she testified,

> Answer: This is dated November 2nd, 2001. Yes, all of these dates are the same.
> There is a replace broken tooth, per tooth. This indicates that there is more than
> one tooth. And that is listed seven times in one day. There is a realignment of the
> upper partial denture for the same date, replace broken teeth again. One more
> time. And reline the lower partial denture. Same day.

> Question: Then, you expressed an opinion to the question, now again, same
> question, does that make any sense to you from a practitioner standpoint?

> Answer: It would be difficult to get all this done in one particular day. I don't
> know exactly why this is listed the way it is, because if there were six or seven
> teeth involved, it should list the teeth in the service once in my opinion. I don't

17

know why it is listed that way, it seems unusual to me, yes.

(Trial Tr. 659.)   Based on this record, a jury could reasonably find that Fusto and Castillo intentionally omitted tooth numbers and that the omission of the tooth numbers was materially misleading.

Defendants unpersuasively argue that the Edwin Gonzalez page and the rest of Grand Jury Exhibits 7 and 11 are facially true and any falsity or fraud occurred when witnesses misinterpreted the documents before the grand jury.  (Defs. Mem. at 22.)  The three Edwin Gonzalezes and omission of tooth numbers are distinct from the adjustments that appeared on the Stacy Rodriguez page because there is evidentiary support for a conclusion that (1) Fusto made the decisions to merge three Edwin Gonzalezes onto one page and to not include tooth numbers and that (2) the resulting documents themselves (and not simply the presentation of those documents) were misleading on their face.  Thus, there was evidence defendants knowingly engaged in affirmative acts that caused Grand Jury Exhibits 7 and 11 to be misleading as to the Edwin Gonzalez page and omission of the tooth numbers but not for the Stacy Rodriguez page.

Moreover, contrary to the State's argument, the Court's holding does not impose an obligation on the State to present exculpatory information to the grand jury.  (Defs. Mem. at 13-15.)  Defendants' reliance on United States v. Kasper, No. 10-cr-318S, 2012 WL 243609 (W.D.N.Y. Jan. 25, 2012), is misplaced.  In that case, the government had charged defendants with making false statements on their federal tax returns—specifically, failing to report certain corporate distributions as income over a period of three years.  Defendants moved to dismiss the indictment on grounds that, inter alia, the government had misled the grand jury.  They argued that the grand jury should have heard evidence of certain payments they had made during those three years and that those payments should have been considered in determining their reportable

18

income. Kasper, 2012 WL 243609, at *1. They contended that the prosecutor's failure to present evidence of these payments amounted to the presentation of false and misleading evidence to the grand jury. Id. at *3. The court disagreed, finding that whether the payments at issue affected defendants' reportable income was an issue of fact that the prosecutor was not required to resolve prior to seeking a grand jury indictment. Id. at *4. The court found that defendants' arguments essentially went to the inadequacy or incompetency of the evidence presented, which is not a ground on which to challenge an indictment, and noted the absence of any allegation that "the prosecutor deliberately presented perjury or engaged in prosecutorial misconduct." Id. at *4. Here, the allegation is not simply that Fusto and Castillo failed to present evidence tending to favor Morse but that they changed the nature of the evidence they had to make it look more incriminating. A prosecutor's presentation of evidence to the grand jury is (appropriately) one-sided, but the prosecution's side must be presented as it is, not in an altered form that presents an inaccurate picture of the character of the evidence.

Defendants also argue that because Morse's Medicaid provider profile, which included the tooth numbers, was submitted to the grand jury, they cannot be considered to have created false evidence. (Defs. Reply at 10.) Considering that the provider profile was 2,501 pages long (Trial Tr. 1208) (the reason, defendants argued, that they needed to make billing summaries in the first place (Trial Tr. 1351)), the jury in this case could still reasonably find that the omission of tooth numbers was nonetheless an intentional deception.

Lastly, the Court considers defendants' argument that the Edwin Gonzalez document and the omission of the tooth numbers cannot support plaintiff's claim because they were not material to securing the indictment. Defendants argue that the Edwin Gonzalez document was not material because there was no false filing charge associated with Edwin Gonzalez and the

total billings for all three Edwin Gonzalezes amounted to $2,327, an amount too small to be considered material to the grand larceny charge.  (Defs. Mem. at 15.)  They also argue that the tooth number omissions were not material to the indictment because Dr. DeLuca testified that her grand jury testimony would not have substantially changed even had Grand Jury Exhibit 7 included tooth numbers.  (Trial Tr. 654-667.)  Even though no false filing charge was associated with Edwin Gonzalez, defendants still presented those billing summaries as part of their case against Morse.   The jury could have reasonably concluded that the Edwin Gonzalez page enhanced the strength of the evidence against Morse and reinforced the appearance of fraud such that it persuaded the grand jury to indict.  The jury could also have reasonably found that despite Dr. DeLuca's assertion that her grand jury testimony would not have significantly changed, the lack of the tooth numbers nonetheless added to the incriminating nature of the evidence and was material to the indictment.  The Court declines to disturb the jury verdict on this ground.

      C.   <u>Qualified Immunity</u>

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).   When a defendant invokes the doctrine of qualified immunity, courts engage in a two-part inquiry: (1) whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right[ ]," and (2) whether that right was clearly established at the time of the defendant's alleged misconduct.  <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001), <u>overruled on other grounds by</u> <u>Pearson</u>, 555 U.S. at 236; see also <u>Taravella v. Town of Wolcott</u>, 599 F.3d 129, 133 (2d Cir. 2010).

Defendants argue that they are entitled to qualified immunity "in light of the novel, and indeed, unprecedented nature of the claims asserted in this case.  Simply stated, a reasonable officer could have believed that downloading true and accurate data from a Medicaid provider's own billings did not constitute a deprivation of constitutional rights."  (Defs. Mem. at 25.)  The problem with defendants' argument is that it relies on defendants' version of the facts.  Given the jury's finding that Fusto and Castillo created false or fraudulently altered documents, knowing that such documents were false or fraudulent, the jury necessarily rejected defendants' contention that defendants simply downloaded true and accurate data from a database.  And given the Court's ruling that the jury's verdict is supported by the evidence, the Court cannot find that defendants are entitled to qualified immunity.  As this Court observed in its prior order, "Ricciuti and its progeny undoubtedly establish that qualified immunity is unavailable on a claim for denial of the right to a fair trial where that claim is premised on proof that a defendant knowingly fabricated evidence and where a reasonable jury could so find."  (DE 124 at 9.)  See also Blake v. Race, 487 F. Supp. 2d 187, 216 (E.D.N.Y. 2007) (collecting cases denying qualified immunity where government officers were alleged to have fabricated evidence).  The jury has reasonably so found in this case; thus, judgment as a matter of law is denied on this ground.

  D. <u>Absolute Immunity</u>

Defendants also argue that they are entitled to judgment as a matter of law based on absolute immunity.  In determining whether a prosecutor is entitled to absolute immunity for a particular damages claim, courts employ a "functional approach, examining 'the nature of the function performed, not the identity of the actor who performed it.'"  Doe v. Phillips, 81 F.3d 1204, 1209 (2d Cir. 1996) (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1993)).  "A

prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity," while "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State" are entitled to its protections. Buckley, 509 U.S. at 273. The advocacy role of prosecutors "encompasses not only their conduct of trials but all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation, including presentation of evidence to a grand jury to initiate a prosecution, activities in deciding not to do so, and conduct of plea bargaining negotiations." Barrett v. United States, 798 F.2d 565, 571-72 (2d Cir. 1986) (citations omitted). "The official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question, and the ultimate question is whether the prosecutors have carried their burden of establishing that they were functioning as advocates when they engaged in the challenged conduct." Simon v. City of New York, -- F. 3d --, 2012 WL 4257724, at *4 (2d Cir. Aug. 16, 2013) (alterations, citations, and internal quotation marks omitted).

Defendants argue that they are entitled to judgment as a matter of law on absolute immunity grounds because all of the evidence adduced at trial regarding the timing of the creation of Grand Jury Exhibits 7 and 11 establish that they were made shortly before going to the grand jury, after the decision to indict had been made. Plaintiff cites to portions of Castillo's testimony, arguing that such testimony supports a conclusion that Grand Jury Exhibits 7 and 11 were created during the course of the investigation. (Pl. Mem. in Opp. at 17-18.) Defendants correctly point out that Castillo's testimony refers to the creation of documents other than Grand Jury Exhibits 7 and 11:

Q:  Was the schedule that you have in front of you [Grand Jury Exhibit 11] originally part of a much larger schedule that you prepared at Mr. Fusto's instructions?

A:  It's possible, yeah.

Q:   And if it was part of a larger schedule, when would you have created that larger schedule?

A:  Before this. When, I don't know.  During the course of the investigation.

(Trial Tr. 135 (emphasis added).)  Later, Castillo again testified,

Q:  Do you remember whether this document [Grand Jury Exhibit 7] was part of a larger document, a larger schedule that Mr. Fusto had asked you to create?

A:  Yeah, it's possible.

Q:  And if it were part of a larger schedule, do you know when that schedule was created?

A:  No.

Q:  So it could be 2004, 2005, 2006, right?

A:  Could have been, yes.

(Trial Tr. 154 (emphasis added).)   Defendants correctly assert that whenever these other documents were created is irrelevant.  The only documents that were alleged to be fabricated and later presented to the grand jury are Grand Jury Exhibits 7 and 11; thus, the relevant question is when Grand Jury Exhibits 7 and 11 were created.

The only evidence regarding when Grand Jury Exhibits 7 and 11 were created (understandably) came from Fusto and Castillo.  They both testified, consistent with each other, that Grand Jury Exhibits 7 and 11 were prepared a few weeks before the grand jury proceedings, even if they could not remember the exact year or date when the exhibits were made.  (Trial Tr. 134-35, 187-88, 730, 733.)  This testimony was undermined to some extent by other testimony from Castillo, which could be interpreted to support a reasonable inference that Grand Jury

23

Exhibits 7 and 11 were created during the course of the investigation.  Castillo, looking at Grand

Jury Exhibit 7 (Trial Exhibit 44) and the larger schedule that plaintiff's counsel referred to in his

questioning above (Trial Exhibit 130), testified that relative to each other, he believed the two

documents were created at the same time.  (Trial Tr. 190.)  As the jury is "free to believe part

and disbelieve part of any witness's testimony," <u>Zellner</u>, 494 F.3d at 371, a reasonable jury could

conclude that the larger schedule and Grand Jury Exhibit 7 were created at the same time and

that that time was during the course of the investigation.

Further, even assuming Castillo's testimony is not a reasonable basis on which to draw

this conclusion, the jury was entitled to simply disbelieve Fusto's and Castillo's testimonies

regarding when they created Grand Jury Exhibits 7 and 11.  A jury is entitled to disbelieve even

the uncontradicted testimony of interested witnesses, particularly where credibility is at issue.

<u>See, e.g.</u>, Charles Alan Wright et al., 9B Fed. Prac. & Proc. Civ. § 2527 (3d ed.) ("Often it will

be for the jury to determine the credibility of uncontradicted and unimpeached testimony of an

interested witness . . . ."); <u>Reeves</u>, 530 U.S. at 151 (On a Rule 50 motion, "the court should give

credence to the evidence favoring the nonmovant as well as that evidence supporting the moving

party that is uncontradicted and unimpeached, <u>at least to the extent that that evidence comes from</u>

<u>disinterested witnesses</u>." (internal quotation marks omitted) (emphasis added)); <u>Broad. Music v.</u>

<u>Havana Madrid Rest. Corp.</u>, 175 F.2d 77, 80 (2d Cir. 1949) (finding "uncontradicted testimony"

rule inapposite if the witness has an interest); <u>Quintana-Ruiz v. Hyundai Motor Corp.</u>, 303 F.3d

62, 75 (1st Cir. 2002) ("Generally, a jury may not reject testimony that is uncontradicted and

unimpeached (directly, circumstantially, or inferentially) unless credibility is at issue . . . .");

<u>Kasper v. Saint Mary of Nazareth Hosp.</u>, 135 F.3d 1170, 1173 (7th Cir. 1998) ("The [defendant]

seems to assume that testimony that is not specifically contradicted must be believed; this is

incorrect.").  And "'[w]hen the testimony of a witness is not believed, the trier of fact may simply disregard it." Goldhirsh Grp., Inc. v. Alpert, 107 F.3d 105, 109 (2d Cir. 1997) (quoting Bose Corp. v. Consumers Union of the United States, Inc., 466 U.S. 485, 512 (1984)).  If Fusto's and Castillo's testimonies are disregarded, defendants are left with a lack of proof on when the documents were created.  As defendants have the burden to prove they were acting in an advocacy role at the relevant time, the jury could properly find that they failed to meet their burden.  "[Giving] deference to all credibility determinations and reasonable inferences of the jury," Brady, 531 F.3d at 133, the Court cannot conclude that "a reasonable juror would have been compelled to accept the view of" defendants, Cash, 654 F.3d at 333.

## II.      Motion for New Trial as to Liability

Defendants next move for new trial pursuant to Fed. R. Civ. P. 59.  Their arguments in favor of new trial consist in large measure of rearguing evidentiary points made in their motions in limine, which the Court considered both prior to the trial and again as issues were raised during trial, and objecting to purported errors in the Court's jury instructions that were not properly preserved.  These are not proper grounds for new trial, as "[i]t is well-settled that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'" Sequa Corp. v. GBJ Corp.,156 F.3d 136, 144 (2d Cir. 1998).  Nonetheless, the Court will review the issues that defendants raise.  Defendants' asserted grounds for new trial can be grouped into three categories: (1) plaintiff counsel's misconduct, (2) the Court's erroneous evidentiary rulings, and (3) the Court's erroneous jury instructions.

### A.      Standards of Review

Under Rule 59(a) of the Federal Rules of Civil Procedure, "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a).  Unlike under the standards governing a Rule 50 motion, a court "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 418 (2d Cir. 2012).  The court must, however, "exercise [its] ability to weigh credibility with caution and great restraint," and "'[w]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial.'"  Id. (quoting Metromedia Co. v. Fugazy, 983 F.2d 350, 363 (2d Cir. 1992)).  A motion for a new trial should ordinarily be denied "'unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'"  Atkins v. New York City, 143 F.3d 100, 102 (2d Cir. 1998) (quoting Lightfoot v. Union Carbide Corp., 110 F.3d 898, 911 (2d Cir. 1997)); accord Tesser v. Bd. of Educ., 370 F.3d 314, 320 (2d Cir. 2004).

B.  Plaintiff Counsel's Conduct

Defendants assert that they were prejudiced when plaintiff's counsel: (1) improperly introduced evidence from Morse's criminal trial, (2) improperly questioned Fusto about Eliot Spitzer's 2006 gubernatorial campaign, (3) improperly instructed the jury about the import of the special interrogatory on immunity, and (4) repeatedly asked objectionable questions and described documents not in evidence.  None of these purported improprieties justify new trial.

i.  *Evidence from Morse's Criminal Trial*

26

Plaintiff's counsel attempted to prove that the criminal case against Morse fell apart at trial. He sought to establish that Fusto was ultimately able to prove only around $3,000 in fraud at the criminal trial, that two patients who testified before the grand jury that they did not wear dentures later testified at Morse's criminal trial that they did not know what a denture was, and that a third patient who testified before the grand jury that she did not wear dentures later testified at the criminal trial that she did. (Trial Tr. 335-45.) As to the relevance of such testimony, plaintiff's counsel explained that Fusto knew the case against Morse was weak from the start, which provided a motive for defendants to fabricate evidence against Morse. (Trial Tr. 21-23.) Defendants sought to exclude this evidence as irrelevant and distracting, explaining that the decrease in the fraud amount was a result of the trial judge excluding the Design Dental invoices from evidence (Trial Tr. 343) and that the third patient's testimony at the criminal trial was very muddled, as she first stated that she didn't have dentures and then stated that she did (Trial Tr. 342). The Court allowed plaintiff to reference the criminal trial in his opening on the theory he articulated (Trial Tr. 23) but later, concerned that the trial at hand was getting far afield of the central issue of whether the allegedly false evidence was material in light of the other evidence that was before the grand jury, ruled that it was not going to retry the criminal case and that counsel could not introduce any testimony from the criminal trial (Trial Tr. 344-45). Plaintiff's counsel, however, was later able to properly reference patient testimony from Morse's criminal trial for impeachment purposes, when he asked Fusto about an affidavit Fusto had submitted in connection with prior summary judgment proceedings in this case in which he attested to certain facts that plaintiff's counsel believed to be inconsistent with what happened at the criminal trial. (Trial Tr. 389-96.)

Defendants now argue that plaintiff's counsel repeatedly made improper references to Morse's criminal trial to their great prejudice. Defendants cite two specific instances of this misconduct.[5] In questioning Fusto, plaintiff's counsel improperly brought up the fact that Fusto could not substantiate $1.1 million in fraud:

> Q: Sir, you told us that you were comfortable with the $1.1 million; is that correct?
>
> A: Eventually, yes.
>
> Q: But, in fact, you couldn't even prove $3,000, true?

(Trial Tr. 822.) The Court sustained an objection to this question. (Trial Tr. 822.) In summation, plaintiff's counsel referenced patient testimony from Morse's criminal trial, which had been allowed only for impeachment purposes, for its substantive truth:

> This is somebody who knows because he has talked to these people [Morse's Medicaid patients]. He talked to them before the grand jury. He knows that these people, several of them said they literally did not know what a denture was or whether or not they had false teeth.

(Trial Tr. at 1328.) The Court also sustained an objection to this part of plaintiff's counsel's summation. (Trial Tr. 1328.)

The Court concludes that these two comments do not warrant a new trial. "[A] court addressing a motion for a new trial based on trial counsel's misconduct must consider such a claim in the context of the trial as a whole, examining, among other things, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, and the manner in which the parties and the court treated the comments." Claudio v. Mattituck-Cutchogue Union Free Sch. Dist., No. 09-CV-5251 JFB AKT, 2013 WL 3820671, at *20 (E.D.N.Y. July 24, 2013) (internal quotation marks omitted).

---

[5] Defendants also reference a third instance, immediately following a sidebar conference on the issue (Trial Tr. 346), but the Court does not consider it in determining whether to grant new trial, as the line of questioning was cut off before any prejudicial information was elicited.

Although these comments at least arguably bore on relevant issues before the jury—defendants' credibility and motive to fabricate evidence—objections to both were sustained. The Court also gave the jury a curative instruction after counsel's inappropriate comment in summation, reminding them that they had "to consider the evidence, not as it may have developed later but the testimony as it was before the grand jury." (Trial Tr. 1328.) The Court once again reminded the jury in its final instructions that it had to consider the weight of the evidence before the grand jury "as it was presented to the grand jury at that point in time, not as the testimony and evidence may have been presented in subsequent proceedings such as Morse's criminal trial. The relevant question is the effect all the evidence would have had on the grand jury at the time of the grand jury proceedings and whether Grand Jury Exhibits 7 and 11 would have been material to the grand jury's finding of reasonable cause to indict." (DE 141, Jury Instructions.) The Court finds that plaintiff's counsel's misconduct was not excessive and that his misdeeds were sufficiently cured by the Court's subsequent instructions.

Defendants further contend that the Court erroneously allowed plaintiff's counsel to cross-examine Fusto about a witness he had called at Morse's criminal trial, Dr. Goliber. (Defs. Mem. at 30.) The issue pertained to rules governing recordkeeping. Defendants planned to put on evidence that Medicaid providers are required by Medicaid regulations to keep patient prescriptions for six years, to explain why Fusto found Morse's recordkeeping practices suspicious. For some reason, it was Fusto who elicited testimony from Dr. Goliber at Morse's criminal trial regarding a different state law (New York State Education Law) that required dentists to keep prescriptions for just one year. (Trial Tr. 368-70.) Plaintiff's counsel wished to read this testimony into evidence to show that Fusto actually believed that Morse had to keep his records for just one year. (Tr. of 1/28/13 Pretrial Conf. at 106-110.) The Court finds no error in

29

its ruling that if the six-year recordkeeping requirements came out in Fusto's testimony, he could be cross-examined on his decision to put Dr. Goliber on the stand at Morse's criminal trial.  Both sides questioned Fusto regarding Dr. Goliber, and Fusto was able to explain that he believed that for Medicaid providers, the Medicaid regulations controlled.  (Trial Tr. 369-70, 702-04.) Although the issue was potentially confusing, the Court does not find that it was particularly persuasive to either side, and it is certainly not grounds for new trial.

### ii.   Spitzer's 2006 Election Campaign

At the pretrial conference, the Court ruled that plaintiff could ask Fusto whether Spitzer's gubernatorial campaign influenced him in any way in pursuing Morse's investigation and prosecution but that any further questioning was improper.  (Tr. of 1/28/13 Pretrial Conf. at 86.) The Court has reviewed the portions of transcript cited by defendants in support of their argument that counsel overstepped this ruling and finds that, although plaintiff's counsel came right to the edge, he did not flout the Court's ruling.  The Court also allowed plaintiff to argue the import of the election in a limited way in his summation.  (Trial Tr. 1285.)

### iii.   Counsel's Comments on the Special Interrogatory

Defendants also argue that in summation, plaintiff's counsel improperly conveyed to the jury the import of the special interrogatory on immunity.  The Court reproduces the relevant parts of the summation here:

> MR. NORINSBERG:  Now, this one final question which Mr. Miller mentioned to you, this is the last question on the verdict sheet, and this is a question that's an extremely, extremely important question to get right.  You'll hear from the judge, the judge is going to charge you with respect to an immunity claim that these defendants are making, and the judge is going to decide that issue, the immunity, whether they get immunity.  Your role in this is to decide a factual question which decides essentially do they get immunity and get off the hook or not.  All the marbles are riding on this last question . . . . Ladies and gentlemen, everything is riding on that last question.  Now, the answer –

THE COURT:  Ladies and gentlemen, I'm sorry, you will just be called upon to determine the factual issue that that question asks.  That's all you're being required to do, and it's the burden of proof, as the question indicates, is on the defendant, but you're just being asked to answer that question.  The result of what happens as a result of that is a legal determination that you need not concern yourselves with.

MR. NORINSBERG:  Now, ladies and gentlemen, as you just heard from the judge, the last two questions, the defendants have to prove it, and all I would suggest to you, and again I put it back in your hands, they have not proven anything.  The questions here, the last two questions, the answer is "no," "no." They proved nothing . . . . What they have proven there are billing summaries that go back in time that look very similar all the way back to 2003 or 2005.  Our view is that these – whenever they created this, we don't care.  It's the fact that they created it and used it to fill in gaps in their case . . . . The answer to those questions should be "no."

(Trial Tr. 1370-73.)

Plaintiff's counsel came very close to asking the jury to answer "no" regardless of what the evidence established, in violation of their oaths.  This was clearly improper.  Although defendants did not object to this statement, the Court called plaintiff's counsel to task for making this argument.  Nonetheless, the Court does not find that it resulted in a "seriously erroneous result" or "miscarriage of justice," Atkins, 143 F.3d at 102, since the Court cured whatever prejudice ensued from the remark.  In instructing the jury on the special interrogatory, the Court stated the following:

You must also decide a factual issue that bears on whether defendants are entitled to an immunity defense . . . . Defendants contend that they created Grand Jury Exhibits 7 and 11 in connection with the preparation for the presentation of evidence to the grand jury, and not earlier as part of the investigation.  Plaintiff contends that these exhibits were created during the investigatory stage of the proceedings, while defendants were still building a case against Morse, and not in preparation for the presentation of evidence to the grand jury.  Accordingly, Question 6 on the verdict sheet asks if the defendants have proven by a preponderance of the evidence that they created Grand Jury Exhibits 7 and 11 in connection with the preparation for the presentation of evidence to the grand jury, and not earlier as part of the investigation.

31

(DE 141, Jury Instructions.)  This made plain to the jury which version of fact was argued by which side, whose burden it was to prove the issue, and that their answer to the question would bear on whether defendants received an immunity defense.

Lastly, with regard to defendants' objections regarding a string of improper questions by plaintiff's counsel, the Court has reviewed them and finds none to be grounds for new trial.

### C.  Court's Evidentiary Rulings

Defendants argue that the Court made the following erroneous evidentiary rulings: (1) allowing Castillo to be questioned regarding a $275,000 figure, (2) allowing certain testimony from James Serra, (3) limiting questioning of Dr. DeLuca, (4) allowing plaintiff to question the authenticity of Grand Jury Exhibits 7 and 11, (5) allowing Morse to testify about prior audits, (6) allowing Dr. Mantell to testify.

#### i.  *Questioning Castillo About the $275,000 Figure*

This issue came up in the context of discussing the admissibility of evidence pertaining to MFCU's consideration of a civil case against Morse, after he was acquitted in the criminal case. Plaintiff asserted that subsequent to the criminal case, Castillo recalculated his fraud figures in connection with the potential civil case and arrived at $275,000.  (Tr. of 1/28/13 Pretrial Conf. at 60-61.)  The Court precluded any questions about the civil case itself but found that Castillo could be asked about a different fraud amount he calculated in between the time of the grand jury and the contemplation of a civil case in terms of the credibility of his earlier assertion that the fraud amount was $1.1 million.  (Tr. of 1/28/13 Pretrial Conf. at 65.)  Defendants now contend that this questioning was unfair because the calculation that produced the $275,000 figure was based on only NuLife invoices, not Design Dental, which is why it was so much lower than the

$1.1 million figure presented to the grand jury.[6]  (Defs. Mem. at 31-32.)  The Court agrees that to the extent the $275,000 figure was the result of a different evidentiary basis than the $1.1 million, due to subsequent events that happened at Morse's criminal trial, such evidence was irrelevant and should not have been admitted.  However, at no point prior to these post-trial papers did defendants make clear that the $275,000 figure was a result of basing the calculation only on NuLife invoices.  Had they made this clear at the pretrial conference, the Court may well have ruled differently.  As it was, the Court did not see why questioning Castillo about this figure on credibility grounds should be limited to a particular period of time.  (Tr. of 1/28/13 Pretrial Conf. at 65-66.)

Further, the Court also notes that defendants, when examining Castillo and trying to counter plaintiff's reference to the $275,000 figure at trial, wholly failed to establish any explanation:

Q:  Okay. Do you recall Mr. Norinsberg asked you about having included -- done an analysis that showed a larceny amount of approximately $275,000?

A:  Yes.

Q:  Do you recall the circumstances of the calculation of the $275,000 number?

A:  I don't remember.

(Trial Tr. 184-85.)  Defendants' motion for new trial on this ground amounts to an attempt to get a "second bite at the apple" after their own failure to put relevant arguments before the Court, and the Court declines to grant new trial on this ground.  See, e.g., Charles Alan Wright et al., 11 Fed. Prac. & Proc. Civ. § 2805 (3d ed.) ("A principle that strikes very deep is that a new trial will not be granted on grounds not called to the court's attention during the trial unless the error was

---

[6] MFCU presumably did not use the Design Dental records to calculate the fraud figure for the potential civil action because the state court judge had previously determined those records to be unreliable and had not allowed them as evidence in Morse's criminal trial.  (Trial Tr. 343-44; Defs. Mem. at 31-32.)

so fundamental that gross injustice would result."); cf. Sequa Corp., 156 F.3d at 144 ("Were [plaintiff] merely ruing an oversight of its own in failing to introduce foreseeably relevant evidence . . . we would not be inclined to disturb the district court's decision [denying plaintiff's Rule 59 motion to reopen the trial record].").

### ii.   Testimony of James Serra

The Court did not err in its rulings with respect to the testimony of James Serra.  James Serra was an MFCU investigator who had worked on Morse's case.  (Trial Tr. 443.)  He had testified at his deposition that Castillo told him that Fusto had asked Castillo to recalculate the numbers in his fraud analysis.  Serra testified that he had advised Castillo that if Castillo testified to a different number on the stand, it could constitute perjury.  (DE 117-14, Serra Dep. at 96-98.) Defendants sought to preclude plaintiff from offering at trial Serra's interpretation that this might lead to perjury.  (DE 117-28, Defs. Mot. in Limine at 7.)  The Court took up this issue with the parties at the January 28 pretrial conference, at which the Court concluded there was a basis to question Serra about his conversation with Castillo.[7]   (Tr. of 1/28/13 Pretrial Conf. at 53.) Defendants' objections amount to complaints that the substance of Serra's testimony was damaging to them, rather than that any court ruling was specifically in error.  Further, defendants clarified in their questioning of Serra that Castillo told Serra he was being asked to change his fraud findings to a lower amount than Castillo had found, mitigating the potentially prejudicial effect of this testimony.  (Trial Tr. 466-67.)

### iii.   Testimony of Dr. DeLuca

The Court properly precluded defendants from cross-examining Dr. DeLuca using Morse's Medicaid provider profile, a document that she was not shown in the grand jury.  The

---

[7] At trial, the Court instructed the jury that Serra's testimony regarding this conversation could be considered only as to what Castillo said and could not be considered for any purpose as against Fusto.  (Trial Tr. at 445-46.)

point of the proposed testimony was to have her testify that having seen the tooth numbers as set forth in that document, she would not have changed her testimony before the grand jury. Throughout the trial, the Court emphasized that what the parties learned after the grand jury was not relevant to the central question of the nature and quality of the information before the grand jury. Nonetheless, the defendants can show no prejudice, much less manifest injustice, since the Court permitted the defendants to inquire of Dr. DeLuca whether the opinions she expressed before the grand jury would have substantially changed had she seen that the billed services were performed on different teeth. (Trial Tr. 632-33.)

### iv. Questions Regarding Authenticity of Grand Jury Exhibits 7 & 11

Similarly, the Court did not err in allowing plaintiff's counsel to question witnesses as to whether Grand Jury Exhibits 7 and 11 were copies of the original. The Court denied plaintiff's request for a spoliation charge but permitted inquiry as to whether the court exhibits were the original exhibits that went before the grand jury. (Tr. of 2/1/13 Pretrial Conf. at 52.) Plaintiff's counsel's questioning on the topic did not run afoul of that ruling. (Trial Tr. 314-17.)

### v. Morse's Testimony Regarding Prior Audits

The Court also finds no error in allowing Morse to testify regarding prior audits. And in any event, such testimony was a fleeting part of Morse's presentation, and plaintiff did not make reference to it again in his closing. The Court cannot find that such testimony constituted a "miscarriage of justice."

### vi. Dr. Mantell's Expert Testimony

Lastly, there was no error in allowing Dr. Mantell to testify. Defendants' arguments on this point repeat the same arguments made in their motion in limine to preclude Dr. Mantell from testifying at trial. (See DE 117-27, Defs. Mot. in Limine, at 12-17.) The Court has previously

considered those arguments and remains of the same opinion that defendants' objections went to the weight of the testimony rather than to its admissibility.  (See 1/28/13 Pretrial Conf. Tr. at 93-94.)

### D.  Court's Jury Instructions

#### i.  Court's Instruction on False Evidence

Defendants argue that the Court's instruction on liability—asking the jury to decide whether Morse had proven that defendants "created false or fraudulently altered documents consisting of Grand Jury Exhibits 7 and 11"—incorrectly defined the constitutional tort.  (Defs. Mem. at 41-43.)  This is basically a recasting of the same arguments defendants made in support of their motion for judgment as a matter of law—that a fabrication of evidence claim encompasses only evidence that is "made up" and cannot be premised upon facially true and accurate evidence.  Again, for the reasons articulated in the above discussion, the Court reiterates its view that a document can be made facially false or misleading by the omission of material information, even if the document does not contain an affirmative lie, and that evidence subject to such materially misleading alterations or omissions can be the basis of a fabrication of evidence claim.

Further, even if defendants were correct on this point, it would not merit new trial.  If defendants are correct on the law, they are entitled to judgment as a matter of law.  If they are incorrect, then the Court's jury charge correctly instructed the jury and is not grounds for new trial.

#### ii.  Court's Removal of Nominal Damages Instruction

Defendants next argue that the Court erred in removing a nominal damages charge in the jury charge and verdict sheet.  Although they included this provision in their proposed jury

instructions and verdict sheet (DE 112, 129), they did not preserve an objection to the Court's removal of it before the jury retired, thus waiving this objection.  See Lavoie v. Pac. Press & Shear Co., a Div. of Canron Corp., 975 F.2d 48, 55 (2d Cir. 1992) ("Failure to object to a jury instruction or the form of an interrogatory prior to the jury retiring results in a waiver of that objection.  Surely litigants do not get another opportunity to assign as error an allegedly incorrect charge simply because the jury's verdict comports with the trial court's instructions." (citing Fed. R. Civ. P. 51)).  In any event, the Court finds no error in failing to charge on nominal damages, much less plain error.

Defendants rely on Ricciuti v. N.Y.C. Transit Auth., 70 F. Supp. 2d 300, 331-32 (S.D.N.Y. 1999).  That case involved, inter alia, a fabrication of evidence claim that was rejected by a jury.  Finding the verdict supported by the record, the court denied plaintiffs' motion for new trial.  The court further observed that even assuming arguendo that the defendant police officers had fabricated evidence, the motion for new trial would be denied on the additional ground that plaintiffs failed to prove any actual damages stemming from the fabrication.  In that case, plaintiffs had been charged with assault in the second degree after their involvement in a fight.  Then, based upon a statement written by one of the police officers that indicated the incident may have been bias-related, which plaintiffs contended was fabricated, the district attorney decided to add a charge of aggravated harassment.[8]  Ricciuti, 124 F.3d at 126-27. Reasoning that there was no proof plaintiffs would not have suffered the same deprivation of liberty if the second degree assault charge (as to which there was no allegation of fabrication) had stood alone, the court found that plaintiffs had failed to show that the fabrication caused their

---

[8] The Court has taken these facts from the Second Circuit opinion that reversed in part the district court's grant of summary judgment, Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123 (2d Cir. 1997).  On remand, the district court held a jury trial, at which the jury found for defendants.  The case on which defendants rely is the district court opinion denying plaintiffs' motion for new trial, Ricciuti v. N.Y.C. Transit Auth., 70 F. Supp. 2d 300, 331-32 (S.D.N.Y. 1999).

damages.  Ricciuti, 70 F. Supp. 2d at 332.  In this case, defendants argue that because the jury could have concluded that the indictment would have issued anyway even without the fabricated evidence (on, for instance, the grand larceny charge, which did not depend on any fabricated evidence), the Court should have included a nominal damages charge to allow the jury to make a finding that even if evidence was fabricated, it did not cause any damages.  (Defs. Mem. at 43-44.)

Plaintiff argues that a nominal damages charge was properly excluded because "the Second Circuit has expressly held that where, as here, a deprivation of liberty has occurred, then as a matter of law, as charge on nominal damages is not appropriate."  (Pl. Mem. in Opp. at 54.)  Plaintiff cites to Kerman v. City of New York, 374 F.3d 93 (2d Cir. 2004) in support.

Before turning directly to the issue of nominal damages, the Court finds it useful to examine the contours of this particular constitutional violation.  In Zahrey v. Coffey, the Second Circuit made clear that "[t]he manufacture of false evidence, 'in and of itself' . . . does not impair anyone's liberty, and therefore does not impair anyone's constitutional right."  221 F.3d at 348.  The Court defined the constitutional right as "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity."  Id. at 349 (emphasis added).  This constitutional right thus appears to contain a causal element in the right itself.  However, as the Zahrey Court thoroughly examined, this causal element can be conceptualized as either (1) part of the right allegedly violated, or (2) as a separate issue of causation.  Id. at 349-50.  The Zahrey Court gave the following example:

> If . . . a prosecutor places into evidence testimony known to be perjured, . . . no deprivation of liberty occurs unless and until the jury convicts and the defendant is sentenced . . . .  If the trial was aborted before a verdict, it could be said either that the misconduct did not cause a deprivation of liberty or that no constitutional right was violated.

38

Id. at 350. The Court concluded that, conceptualized either way, it is still necessary to determine whether the deprivation of liberty is the legally cognizable result of the initial misconduct. Id. at 351.

Interpreting Riciutti through this lens, the Court finds that although the Ricciuti Court termed the failure in proof as a failure to prove damages, the court's reasoning clearly indicates that plaintiff had failed to prove, in Zahrey's terms, that the deprivation of liberty was the legally cognizable result of the fabrication, as plaintiffs would have suffered the same deprivation even without the fabricated evidence. One could say either that they failed to prove any constitutional violation at all or that they failed to prove any of deprivation of liberty caused by the fabrication. Either way, the causal connection between the alleged fabrication and the deprivation in liberty was not established, and, in such a case, there is no need for a jury to consider damages.

Kerman stands for the proposition that once a deprivation of liberty is established, and there is no genuine dispute that defendants' unlawful conduct caused the deprivation, the plaintiff is entitled to compensatory damages for that loss of liberty, not just nominal damages. Kerman, 374 F.3d at 124. As the Kerman Court stated, "[W]here the jury has found a constitutional violation and there is no genuine dispute that the violation resulted in some injury to the plaintiff, the plaintiff is entitled to an award of compensatory damages as a matter of law." Id.

Applying these principles to the case at hand, the Court finds no error in its removal of the nominal damages charge. The Court properly instructed the jury that "plaintiff must prove by a preponderance of the evidence that false or fraudulent evidence resulted in a deprivation of his liberty." (DE 141, Jury Instructions, at 11.) Defendants could and did make the argument that the indictment would have issued anyway, even without the false evidence. (Trial Tr. 1357-

58.)  If the jury found for Morse on that issue, then according to <u>Kerman</u>, Morse is entitled to an award of some compensatory damages as a matter of law.  If the jury found against Morse on that issue, then Morse would have failed to make out his claim, and the jury would not have needed to consider damages at all.  In sum, the Court reiterates its view, stated when this issue was first discussed with the parties prior to summations (Trial Tr. 1186-87), that the question is really whether Morse has proven his case or not.  In either scenario, a nominal damages charge would not have been appropriate.

### iii.   Court's Failure to Include Qualified Immunity Interrogatory

Defendants also argue that the Court erred in failing to include their requested interrogatory on qualified immunity: "Could a reasonable officer believe that it was lawful to create Grand Jury Exhibit 7 in the manner in which it was created by one or both of the defendants?"  (Defs. Mem. at 44.)  Although defendants included this instruction in their first proposed verdict sheet (DE 112), they did not include it in their second proposed verdict sheet (DE 129) and made no objection to the lack of such an instruction in the Court's proposed instructions.  (Trial Tr. 1197-99.)  Thus, such objection is waived, and in any event, the Court finds no error.

As explained in Section I.C. <u>supra</u> denying defendants' motion for judgment as a matter of law on qualified immunity grounds, the Second Circuit has clearly established that a claim will lie under Section 1983 for deprivation of liberty as a result of evidence fabricated by an investigating government officer.  Thus, a jury finding against defendants on liability – that defendants created false or fraudulently altered documents, knowing that such information was false or fraudulent – would preclude a grant of qualified immunity.  A jury finding in favor of defendants (finding no liability) would obviate any need to assert a qualified immunity defense.

For these reasons, the Court finds, as it did in the pretrial conference held on January 28, 2013, that the factual issues as presented in this case warranted no qualified immunity interrogatory.

### III.   Motion for New Trial as to Damages, or for Remittitur

Defendants also move for new trial on damages or, in the alternative, for remittitur. They challenge the jury award of damages on several grounds: (1) plaintiff has failed to establish proximate cause for the damages claimed, (2) the award for lost earnings is excessive and not supported by credible evidence, (3) the award for mental and emotional pain and suffering is excessive, and (4) the award of punitive damages is excessive. The Court reviews the evidence on damages at trial and addresses each argument in turn.

#### A.   Evidence at Trial

Morse's damages case consisted of his own testimony and the testimony of Dr. Edward Mantell, Morse's expert economist who performed an analysis of the economic losses sustained by Morse due to the indictment. Post-indictment, Morse was suspended from the Medicaid program, effectively shutting down his practice because 95% of his patient base was insured through Medicaid. (Trial Tr. 852.) Morse appealed his suspension, asking that the suspension by stayed pending the outcome of his criminal case. Morse's appeal was denied, and he was terminated from the Medicaid program. (Trial Tr. 854.) Morse testified that because he was no longer able to provide services to most of his patients, he was forced to liquidate his practice. He sold his practice in August 2006 for $450,000 to Dr. Brian Ketover, with whom Morse had practiced at 580 Dental P.C. for twenty-five years. (Trial Tr. 836, 854-55, 870.) Morse testified that $450,000 was below the fair market value of his practice because the practice had been tainted by the news of the indictment. (Trial Tr. 870.) In addition, Morse lost his position at New York Methodist Hospital, where he had been teaching dentistry for seven years prior to the

41

indictment.  (Trial Tr. 858.)

Morse also introduced evidence that his indictment was widely publicized.  The Attorney General's office issued a press release on April 11, 2006 regarding the indictment, and the New York Post and New York Daily News picked up the story.  (Trial Tr. 859-61.)  The story was also picked up by the website dentistguide.com.  (Trial Tr. 866.)  He testified that the Attorney General's office kept the story of his indictment on their website for two years after his acquittal, even though he had requested numerous times that they take it down.  (Trial Tr. 889-91.)

Morse testified that he felt humiliated and debased by the news coverage and resulting social and professional disgrace.  (Trial Tr. 863, 868-69.)  During the 15 months in between indictment and trial, Morse stated feeling very distressed and withdrawn and mostly stayed at home and slept.  (Trial Tr. 873.)  He described the actual trial as "agonizing," as he was facing a substantial prison term if convicted.  (Trial Tr. 885.)  Morse did not seek any mental health treatment from a psychiatrist or other medical treatment for emotional distress, pain, suffering, or related issues.  (Trial Tr. 1004.)

After he was acquitted, Morse was unable to secure a position practicing dentistry despite his efforts to procure employment at various hospitals.  (Trial Tr. 889, 950.)  New York Methodist Hospital, however, rehired him.  (Trial Tr. 951, 1059.)  And although Morse was reinstated to Medicaid after his acquittal, he testified that he had lost his patient base and was foreclosed from practicing in his old neighborhood by an agreement with Dr. Ketover.  He also stated that starting a new practice was prohibitively expensive.  (Trial Tr. 893-94.)

Dr. Mantell performed an analysis of past lost earnings (from the time of the indictment until the end of 2012, Trial Tr. 1073-74) and future lost earnings (from 2013 through January 2022).  To calculate past lost earnings, Dr. Mantell first projected what Morse's income would

42

have been from the time of the indictment through the end of 2012 if he had not been indicted. (Trial Tr. at 1074.) He projected this figure by arriving at an annual average income of $296,834 based on Morse's tax returns for the four years preceding his indictment and then applying an annual increase based on a consumer price index ("CPI") to project how Morse's earnings would have increased from 2006-2012. (Trial Tr. 1077-79.) From this figure he subtracted Morse's actual earnings from 2006-2012, based on Morse's tax returns for those years, and also subtracted the $450,000 from the sale of the practice to Dr. Ketover. (Trial Tr. 1080-82.) The final figure for past lost earnings was approximately $1.7 million. (Trial Tr. 1082.)

To calculate future lost earnings, Dr. Mantell projected what Morse would have earned as a dentist from 2013-2022 if he had not been indicted. He ended the period of loss at January 2022 because in 2001, Morse had entered into a 20-year lease agreement with the owner of the building where 580 Dental P.C. was located that ended in January 2022. (Trial Tr. 1083-84.) Morse testified that he intended to practice until the end of that lease. (Trial Tr. 838-39.) To calculate Morse's projected future earnings had he not been indicted, Dr. Mantell began with the projected gross income for year 2012 from his lost past earnings calculation and applied an annual increase in earnings based on a CPI until January 2022. (Trial Tr. 1083-85.) Dr. Mantell then projected Morse's post-indictment future income based on his actual average income from 2006-2011, and subtracted it from the prior figure. (Trial Tr. 1086.) He then estimated what 580 Dental P.C. would have been worth in January 2022 and added that to the projected future earnings had Morse not been indicted. (Trial Tr. 1087-90.) Lastly, he discounted this total figure to the present value. (Trial Tr. 1090-91.) The final figure for future lost earnings was approximately $4.5 million. (Trial Tr. 1092.)

In their cross-examination of Dr. Mantell, defendants questioned the assumption that

Morse's income would increase every year and elicited testimony that Dr. Mantell had discussed the gentrification of the Park Slope area with Morse as a reason for a dip in his earnings from 2003-2004.  (Trial Tr. 1095-97.)  Defendants also questioned the assumption that Morse would continue to work full time until January 2022, when Morse would be 74½ years old.  (Trial Tr. 1100.)  Defendants also put on a rebuttal expert witness, Dr. Christopher Erath, to challenge certain assumptions and conclusions made by Dr. Mantell.  Specifically, Dr. Erath found the assumption that Dr. Morse would continue working full time until age 74½ to be unreasonable and stated that the duration of a lease was not a reasonable basis from which to conclude how long one would work, pointing out that a lease is an asset that can be sold when a practice is sold. (Trial Tr. 1222.)  He also challenged Dr. Mantell's assumption that, because of the indictment, Morse's future income through 2022 would be limited.  (Trial Tr. 1225-26.)  He discussed reasons why he believed Dr. Mantell's estimated annual average income of $296,834 if Morse had not been indicted was overstated, including a downward trend in Morse's earnings prior to the indictment and that Dr. Mantell's chosen CPI was not specific to Morse's type of practice. (Trial Tr. 1226-28.)  Dr. Erath also opined that the estimated figure for the value of Morse's practice in January 2022 was overstated based on the aforementioned downward trend in revenue, downward pressure on Medicaid reimbursement rates, and a goodwill value that was not supported by any data.  (Trial Tr. 1229-31.)  He also testified that Dr. Mantell's rate used to discount to the present value that did not encompass any risk.  (Trial Tr. 1231-32.)  Dr. Erath did not come up with his own projections regarding Morse's lost earnings.  (Trial Tr. 1233-34.)

The jury awarded Morse $6,724,936.00 in compensatory damages.  The compensatory damages were broken down as follows: (a) $1,733,941 for past lost earnings, (b) $2,490,995 for future lost earnings (substantially lower than the $4.5 million figure projected by Dr. Mantell),

and (c) $2,500,000 for mental and emotional pain and suffering.  The jury also awarded Morse

$1,000,000 in punitive damages, divided between Fusto and Castillo as follows: (a) $750,000

against Fusto and (b) $250,000 against Castillo.  (DE 139, Jury Verdict Sheet.)

B.   Standard of Review

As stated above, "[t]he court may, on motion, grant a new trial on all or some of the

issues . . . for any reason for which a new trial has heretofore been granted in an action at law in

federal court."  Fed R. Civ. P. 59(a).  "The trial judge has 'discretion to grant a new trial if the

verdict appears to [the judge] to be against the weight of the evidence . . . . This discretion

includes overturning verdicts for excessiveness and ordering a new trial without qualification, or

conditioned on the verdict winner's refusal to agree to a reduction (remittitur).'"  Kirsch v. Fleet

St., Ltd., 148 F.3d 149, 165 (2d Cir. 1998) (quoting Gasperini v. Ctr. for Humanities, Inc., 518

U.S. 415, 433 (1996)).  "If the plaintiff accepts the remitted amount and forgoes a new trial . . .

the district court's order may not be appealed."  Thomas v. iStar Fin., Inc., 652 F.3d 141, 146 (2d

Cir. 2011).

C.   Proximate Cause

Defendants first contend that the damages award must be set aside because plaintiff has

failed to specifically link his damages to the false evidence rather than to the indictment.  In

other words, defendants contend that while the causal connection between the indictment and

plaintiff's damages is clear, plaintiff has not shown a causal link between the false evidence and

damages.  (Defs. Mem. at 46.)

The Court rejects this argument.  As defendants do not (and cannot) seriously contend

that Morse's deprivation of liberty, lost earnings, and mental and emotional pain and suffering

were not a result of the indictment, in this case the key question was whether the false evidence

45

caused the issuance of the indictment.  Once that causal link is established, a jury would be entitled to find that all of Morse's claimed damages were the natural consequences of defendants' actions.  See Warner v. Orange Cnty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1996) ("[T]ort defendants, including those sued under § 1983, are 'responsible for the natural consequences of [their] actions.'" (quoting Malley v. Briggs, 475 U.S. 335, 344 n.7 (1986))).  Here, the record sufficiently supports the jury finding that Morse proved by a preponderance of the evidence that "the false or fraudulent evidence was material, meaning that it was likely to influence the grand jury's decision to indict, and that he was deprived of liberty as a result of the false or fraudulent evidence."  (DE 139, Verdict Sheet.)

Defendants also appear to argue that the existence of probable cause to prosecute Morse cuts off the causal connection between the false evidence and Morse's damages.[9]  This argument is without merit.  First, the Court clarifies that it found only "arguable probable cause" such that Fusto and Castillo were entitled to qualified immunity on Morse's malicious prosecution claim. (DE 124 at 11; DE 123 at 15.)  Second, the existence of probable cause or arguable probable cause to prosecute Morse is distinct from the issue of whether, notwithstanding the existence of probable cause to prosecute, false evidence caused the grand jury to issue an indictment.

    D.   Amount of Compensatory Damages

Defendants seek a new trial or conditional remittitur on the amount of compensatory damages.

> The district court [can compel] a plaintiff to choose between reduction of an excessive verdict and a new trial, in at least two distinct kinds of cases: (1) where the court can identify an error that caused the jury to include in the verdict a

---

[9] Plaintiff argues that probable cause is not a defense to a fabrication of evidence claim. (Pl. Mem. in Opp. at 71.) The Court agrees, as it made clear in its order on the parties' motions for reconsideration (DE 124). The Court, however, understands defendants' argument to be not that probable cause vitiates a fabrication of evidence claim but that it defeats the causal connection between the false evidence and Morse' damages.  For the reasons stated above, the Court rejects this argument.

> quantifiable amount that should be stricken . . . and (2) more generally, where the award is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error. Where there is no particular discernable error, . . . a jury's damage award may not be set aside as excessive unless the award is so high as to shock the judicial conscience and constitute a denial of justice. Where the court has identified a specific error, however, the court may set aside the resulting award even if its amount does not shock the conscience.

Kirsch, 148 F.3d at 165 (internal quotation marks and citations omitted). Defendants appear to challenge the award for lost earnings on the first ground and the award for emotional distress on the second ground. The Court will address their arguments in turn.

### i. *Lost Earnings*

The jury awarded plaintiff a total of $1,744,941 for past lost earnings (from the time of the indictment, 2006, through the end of 2012) and $2,490,995 for future lost earnings (2013-2022), for a total lost earnings award of $4,224,936. Defendants argue that Dr. Mantell's testimony was unreliable and unsupported and that consequently the entire lost earnings award lacks legal foundation and should be reduced to the nominal amount of $1 or a new trial should be granted.

As stated above in Section II.C., the Court declines to revisit its ruling regarding the admissibility of Dr. Mantell's testimony. Accordingly, this is not a ground to overturn the jury's damages award for lost earnings. The Court also notes that defendants had ample opportunity to draw out the perceived weaknesses in Dr. Mantell's analysis. Indeed, the expert testimony defendants presented apparently influenced the jury. The jury awarded around $2 million dollars less in future lost earnings than the amount calculated by Dr. Mantell.

### ii. *Emotional Distress Damages*

The jury awarded plaintiff a total of $2,500,000 for mental and emotional pain and suffering. Defendants argue that this amount "shocks the judicial conscience" and requires a

47

reduction to no more than $125,000.  While it is in the province of the jury to award damages as it deems appropriate, there is "an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable [persons] may differ, but a question of law." Mazyck v. Long Island R.R. Co. (LIRR), 896 F. Supp. 1330, 1336 (E.D.N.Y. 1995) (quoting Dagnello v. Long Island R.R., 289 F.2d 797, 806 (2d Cir. 1961)).  A verdict is excessive as a matter of law if it "shocks the judicial conscience." Id.

Although damages for pain and suffering or emotional distress "are, by their nature, not easily translated into a dollar amount," Sulkowska v. City of New York, 129 F. Supp. 2d 274, 308 (S.D.N.Y. 2001), the court does not operate in a vacuum in determining whether an award is excessive.  "Reference to other awards in similar cases is proper," Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir. 1990), "bearing in mind that any given judgment depends on a unique set of facts and circumstances," Scala v. Moore McCormack Lines, Inc., 985 F.2d 680, 684 (2d Cir. 1993) (internal quotation marks omitted).  District courts are to use the "least intrusive standard," reducing the verdict "only to the maximum that would be upheld by the district court as not excessive." Earl v. Bouchard Transp. Co., Inc., 917 F.2d 1320, 1330 (2d Cir. 1990).

Upon the Court's review of the relevant case law, the Court is firmly persuaded that an award of $2.5 million for mental and emotional pain and suffering is far outside the bounds of reasonable compensation in this case.  For the following reasons, the maximum amount that could be awarded without "shocking the judicial conscience" is $400,000.

First, the Court notes that this award was made specifically to compensate Morse for mental and emotional pain and suffering, in addition to the lost earnings award of $4,224,936.00 that the jury found would fully compensate Morse for the loss of his dental practice and decreased earning potential.  For this reason, the Court finds many of the cases cited by plaintiff

to be inapposite, as they involve damages for defamation.  Redress for a successful defamation claim can include non-economic damages in the form of "loss of reputation, which includes the loss of professional status and the ability to earn wages, as well as any humiliation or mental suffering caused by the defamation." Cantu v. Flanigan, 705 F. Supp. 2d 220, 227 (E.D.N.Y. 2010).  Subject to certain First Amendment constraints, these damages need not be specifically demonstrated, as "a defamatory statement that is a direct attack upon the business, trade or profession of the plaintiff is considered defamation 'per se' [under New York law,] and . . . . damages are presumed." Yesner v. Spinner, 765 F. Supp. 48, 52 (E.D.N.Y. 1991). See generally Gertz v. Robert Welch, Inc., 418 U.S. 323, 349 (1974).  These awards encompass presumed lost earning potential as a result of the defamation.  Here, Morse has already been compensated for lost earnings.  Thus, the Court does not find these cases to be particularly useful reference points.[10] E.g., Purgess v. Sharrock, 33 F.3d 134, 142 (2d Cir. 1994) (upholding compensatory damages award of $3.5 million because it was "not unreasonable for the jury to conclude that [plaintiff] would have earned substantially more in future years had he not been defamed"); Wellington Funding & Bus. Consultants, Inc. v. Cont'l Grain Co., 259 A.D.2d 323, 324 (N.Y. App. Div. 1999) ("Damage to business reputation is presumed, and the compensatory award [of $1 million] was not impermissibly speculative." (internal citation omitted)); Prozeralik v. Capital Cities Commc'ns, Inc., 222 A.D.2d 1020, 1021 (N.Y. App. Div. 1995) (upholding jury's awards of $6,000,000 for injury to reputation and $3,500,000 for emotional and physical injury). Plaintiff also cites Vitale v. Hagan, 132 A.D.2d 468 (N.Y. App. Div. 1987), which upheld an award of $750,000 for malicious prosecution claim, but it does not include a specific enough discussion for the Court to discern what injuries the compensatory damages awards were

---

[10] The Court also notes that although Morse had included a defamation claim in his complaint, the Court found no merit to it and granted defendants' motion for summary judgment on that claim.   (DE 108.)

intended to compensate (whether they included lost earnings, physical injuries, etc.) and is thus similarly unhelpful.

Second, cases that involve harm similar to that sustained by Morse have awarded emotional distress damages in amounts much lower than $2.5 million for injuries more serious and longer lasting than those suffered by Morse.  E.g., Martinez v. Port Auth. of N.Y. and N.J., 445 F.3d 158, 160-61 (2d Cir. 2006) (per curiam) (upholding district court remittitur of $1,000,000 award to $360,000 where plaintiff testified to sleeplessness, loss of appetite, anxiety, cessation of social activities, brief suicidal thoughts, and concerns about his immigration status and attended counseling and therapy); Stampf v. Long Island R.R. Auth., No. 07-CV-3349 SMG, 2011 WL 3235704, at *12-14 (E.D.N.Y. July 28, 2011) (upholding jury award of $300,000 for emotional distress where false accusation and ensuing criminal proceedings resulted in plaintiff's problems with alcohol, sleeplessness, and break-up of a committed relationship); Thorsen v. Cnty. of Nassau, 722 F. Supp. 2d 277, 292-95 (E.D.N.Y. 2010) (remitting jury award of $1.5 million for emotional distress to $500,000 where plaintiff testified to depression and anxiety and attending therapy as a result of being unlawfully denied a promotion and unlawfully subject to reduced job duties due to political affiliation and was falsely implicated in race and sex discrimination case); Ramirez v. New York City Off-Track Betting Corp., No. 93 CIV. 0682 (LAP), 1996 WL 210001, at *6-7 (S.D.N.Y. Apr. 30, 1996) (remitting pain and suffering award to $500,000 where "[d]ramatic evidence was admitted at trial demonstrating that the loss of employment, the loss of health insurance and benefits, and the emotional pain of being arbitrarily and summarily dismissed aggravated plaintiff's psychological problems to such an extreme extent that he ceased to be able to function in society."), aff'd in part, vacated in part on other grounds, 112 F.3d 38 (2d Cir. 1997).

Plaintiff cites to Osorio v. Source Enters., Inc., No. 05 CIV. 10029 (JSR), 2007 WL 683985 (S.D.N.Y. Mar. 2, 2007) and Shukla v. Sharma, No. 07-CV-2972 CBA CLP, 2012 WL 481796 (E.D.N.Y. Feb. 14, 2012), appeal dismissed (2d Cir. June 1, 2012), in support of the damages award. The Court has reviewed these cases but does not find them persuasive to the issue at hand. Shukla, for one, involved a jury finding of liability for forced labor. Shukla, 2012 WL 481796, at *1. Although Morse undoubtedly suffered mental and emotional distress due to his ordeal, it is not comparable to the indignities the jury found plaintiff to have suffered in the Shukla case. Osorio upheld compensatory awards of $4 million and $3.5 million on plaintiff's Title VII retaliation and state law defamation claims, respectively. These awards appear to include the "harm to reputation" damages that, as noted above, have already been accounted for in Morse's lost earnings award. Osorio, 2007 WL 683985, at *5, 10 (finding that "[p]laintiff . . . might reasonably have suffered, as she averred, substantial emotional distress and reputational harm [from unlawful retaliation]" and that "there was adequate evidence of damage to plaintiff's reputation in the hip-hop industry following the publication of the article containing [defendant's] defamatory statement"); see also Lore v. City of Syracuse, 670 F.3d 127, 154 (2d Cir. 2012) (noting EEOC guidelines that state that damages for Title VII violations can include "injury to character and reputation"). Further, the awards upheld in Osorio are much higher than what is generally awarded for emotional distress in this Circuit. See, e.g., Thorsen, 722 F. Supp. 2d at 293-95 (collecting cases); Stampf, 2011 WL 3235704, at *12 (collecting cases).

In coming to its remitted figure, the Court finds of particular relevance cases involving plaintiffs who experienced false criminal accusations and suffered emotional anguish as a result. Martinez v. Port Auth. of N.Y. and N.J., No. 01 Civ. 721(PKC), 2005 WL 2143333 (S.D.N.Y. Sept. 2, 2005), involved a plaintiff, Martinez, who was arrested for public lewdness upon

walking out of a men's bathroom.  When he denied the allegation, one of the arresting officers said to him, "Are you calling me a liar?  If you want, I can break your teeth."  Martinez, 2005 WL 2143333, at *17.  Martinez was arrested and not released until approximately 19 hours later. His criminal trial began almost 10 months later, and he was found not guilty.  Id. at *2-3. Martinez testified that after the arrest, he experienced sleeplessness, loss of appetite, anxiety, cessation of social activities, and brief suicidal thoughts.  He also stated that he did not visit his family in Cuba and that he let his immigration petition lapse for fear of legal trouble.  Id. at *18. He attended counseling and therapy, and his testimony was corroborated by his treating psychotherapist and domestic partner.  Id. at *22.  On Martinez's false arrest claim, the jury awarded $1,000,000 in emotional distress, mental anguish, and loss of liberty damages, which the court remitted to $360,000.  The jury also awarded Martinez $100,000 for emotional distress on his malicious prosecution claim, which the court did not disturb.  Id. at *22.

The Court finds Komlosi v. Fudenberg particularly close to the facts of this case. Komlosi v. Fudenberg, No. 88 CIV. 1792 HBP, 2000 WL 351414, at *1-2 (S.D.N.Y. Mar. 31, 2000) adhered to on reconsideration sub nom. Komlosi v. New York State Office of Mental Retardation, No. 88 CIV. 1792 (HBP), 2000 WL 554226 (S.D.N.Y. May 4, 2000) and aff'd, 99-9293(L), 2002 WL 34244996 (2d Cir. May 13, 2002).  Komlosi involved a psychologist employed by the New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD") who was falsely accused of sexually abusing patients by a co-worker, Melanie Fudenberg.  Komlosi, 2000 WL 351414, at *1-2.  While Komlosi's employer commenced an internal investigation, police arrested him and charged him with nine counts, including rape and forcible sodomy.  Id. at *3.  He remained in custody for fifteen days, and the accusations garnered press attention, including an article in the New York Post with the headline "SHRINK

HELD IN SEX ATTACKS ON PATIENTS." <u>Id.</u>  The grand jury indicted him on two counts of deviant sexual intercourse.  Komlosi's criminal trial began a year after the grand jury proceedings.  During the trial, the complaining witness recanted his accusations and the charges were dropped and case dismissed as a result.  <u>Id.</u>  Komlosi undertook psychiatric therapy and was diagnosed with post-traumatic stress disorder.  Although he was reinstated to his prior position, he was unable to continue working because both Fudenberg and the patient who accused him of misconduct were still at the facility and Komlosi feared a repeat experience. Komlosi attempted to find other work as a psychologist.  He was not hired for the first position because the employer found out about the past criminal charges.  He was terminated from the second position because he was unable to restrain a patient due to his fear that he would be accused of improper physical contact.  <u>Id.</u> at *4.  Komlosi's psychiatrist testified that Komlosi's "fear and anxiety of being falsely accused, criminally charged, jailed and prosecuted for sexually abusing a patient will forever prevent him from practicing as a psychologist."  <u>Id.</u>   The jury awarded $6.6 million in compensatory damages, of which $5.23 million were for non-economic loss.  <u>Id.</u>   Based on its review of other case law, the court remitted the non-economic compensatory damages to $500,000.  <u>Id.</u> at *15-*17.

Using these cases as reference points, the Court finds that the remitted award of $400,000 is at the top of the range the Court would find permissible to compensate Morse for mental and emotional pain and suffering.  Both <u>Martinez</u> and <u>Komlosi</u> involved criminal prosecutions for sex-related offenses, which are more much more stigmatizing than fraud.  Further, the Court notes that certain additional aggravating elements appear to be present in both cases that would enhance the trauma of an unjustified arrest and prosecution.  The arrest in <u>Martinez</u>, in addition to being baseless, may have been motivated by sexual-orientation bias.  <u>See Martinez</u>, 2005 WL

53

2143333, at *17 (plaintiff testified that one of the arresting officers told the individuals in custody for public lewdness "oh, so why don't you go to the gay places, you faggot, you queer"). In <u>Komlosi</u>, the sex abuse allegations that gave rise to the criminal charges were preceded by numerous other false accusations of sexual misconduct against plaintiff, all perpetrated by Fudenberg, who kept instructing patients to falsely report such charges. Each of the prior investigations found the charges to be baseless, and a client's right's specialist who was assigned to investigate Komlosi even recommended that a formal letter of exoneration be put in Komlosi's personnel file and that all OMRDD employees be advised of Fudenberg's attempts to damage Komlosi's reputation.

Here, although certainly reasonable to conclude that Morse suffered emotional distress due to defendants' conduct, the Court does not find any particular elements that make the emotional distress suffered in this case "truly extraordinary and unique," as plaintiff asserts. (Pl. Mem. in Opp. at 82 n.20.) On the contrary, the Court finds the factors plaintiff lists as unique to his case to be common to many, if not almost all, cases involving an unjustified arrest and prosecution: damage to reputation, loss of career and other opportunities, indignities suffered during arrest, fear of mandatory jail sentence, and restrictions on liberty. (Pl. Mem. in Opp. at 76-81.) Further, Morse did not testify to any lasting psychological or emotional trauma, unlike the plaintiffs in the aforementioned cases. (Trial Tr. 1004.) Although the issuance of an award for emotional distress "may be based on testimonial evidence alone and is not preconditioned on whether the plaintiff underwent treatment, psychiatric or otherwise," <u>MacMillan v. Millennium Broadway Hotel</u>, 873 F. Supp. 2d 546, 560 (S.D.N.Y. 2012) (internal quotation marks and alteration omitted), the amount of the award should bear some rational relationship to the actual injuries suffered. After all, compensatory damages are those "damages grounded in

determinations of plaintiffs' actual losses." Memphis Community Sch. Dist. v. Stachura, 477 U.S. 299, 307 (1986) (emphasis added); see also State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003) ("Compensatory damages 'are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct.'" (quoting Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 432 (2001))); Trivedi v. Cooper, No. 95 CIV. 2075 (DLC), 1996 WL 724743, a *6 (S.D.N.Y. Dec. 17, 1996) ("A jury verdict cannot stand if it is the result of a miscarriage of justice and represents a windfall to the plaintiff without regard for the actual injury."). Considering that the total emotional distress awards (after remittitur) in Martinez and Komlosi amounted to $460,000 and $500,000, respectively, and involved injuries much more severe than those demonstrated here, the Court finds $400,000 to be the maximum the Court would uphold as not excessive in this case.

        E.    Amount of Punitive Damages

        The jury awarded Morse $1,000,000 in punitive damages, divided between Fusto and Castillo as follows: (a) $750,000 against Fusto and (b) $250,000 against Castillo. Defendants argue that this award must also be remitted as excessive or that they should be granted a new trial.

        Unlike compensatory damages, punitive damages "are aimed at deterrence and retribution." State Farm, 538 U.S. at 416 (citing Cooper Indus., 532 U.S. at 432). However, punitive damage awards may also be remitted as excessive. iStar Fin., 652 F.3d at 148. In BMW of N. America v. Gore, 517 U.S. 559, 568 (1996), the Supreme Court set aside a state court punitive damages award challenged on constitutional grounds as so excessive it amounted to a due process violation. To remit a punitive damages verdict in a federal case does not require a finding of a constitutional due process violation, as was the case with the verdict challenged in

Gore.  Thus, the level of excessiveness need not reach as high a threshold.  See Payne v. Jones, 711 F.3d 85, 97 (2d Cir. 2013).  The factors set out by Gore to guide the excessiveness inquiry are nonetheless relevant.  See Payne, 711 F.3d at 101 (reviewing punitive damages award in relation to Gore factors).  These guideposts are "[1] the degree of reprehensibility of the defendant's misconduct; [2] the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and [3] the difference between [the punitive damages awarded by the jury] and the civil penalties authorized or imposed in comparable cases."  Gore, 517 U.S. at 575.

The first Gore factor, the reprehensibility of the defendants' conduct, is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award."  Gore, 517 U.S. at 575.  Defendants argue that the punitive damages award is "wholly unsupported by the record in this case . . . insofar as defendants reasonably believed they were violating no constitutional rights in downloading Morse's accurate Medicaid claims data."  (Defs. Mem. at 54.)  This argument, however, is premised on their version of facts, not the facts as found by the jury.  The jury found that Fusto and Castillo created false or fraudulently altered documents, knowing that such documents were false or fraudulent, in order to secure Morse's indictment; such conduct is reprehensible.  As courts, state and federal, have repeatedly recognized, the duty of a public prosecutor is not only to seek convictions but to see that justice is done.  E.g., People v. Pelchat, 62 N.Y.2d 97, 105 (N.Y. 1984); Berger v. United States, 295 U.S. 78, 88 (1935).  As such, "he owes a duty of fair dealing to the accused and candor to the courts, a duty which he violates when he obtains a conviction based upon evidence he knows to be false."  Pelchat, 62 N.Y.2d at 105.

However, there are apparent "degrees of relative blameworthiness" under "the umbrellas

56

of punishment and its aim of deterrence," <u>Exxon Shipping Co. v. Baker</u>, 554 U.S. 471, 493 (2008), and although Fusto and Castillo's conduct was reprehensible, it was not so reprehensible as, for example, the creation of false evidence where the perpetrator knows without a doubt that the charge is baseless.  As the Court detailed in its prior memorandum and order, the defendants in this case possessed non-fabricated evidence that supplied a basis to suspect Morse of fraudulent billing.  (DE 123, at 12-13.)  Whether such evidence amounted to probable cause to prosecute was "a close question," and the Court granted defendants qualified immunity on the malicious prosecution claim.  (DE 123, at 13-15.)  Thus, although defendants were found to have created false or misleading evidence in this case, their actions were less blameworthy than one who goes after someone <u>knowing</u> that that individual is innocent.

The second <u>Gore</u> factor is the ratio of punitive to compensatory damages.  Prior to the remitter, the ratio was roughly 1:6.7.  If the plaintiff accepts the above remittitur, the ratio is roughly 1:4.6.  Neither is excessive in the abstract, but as the Second Circuit explained in <u>Payne</u>, a ratio by itself is of little use in determining whether a punitive award is excessive.  <u>Payne</u>, 711 F.3d at 103.

The third <u>Gore</u> factor considers the "difference between this remedy and civil penalties authorized or imposed in comparable cases."  517 U.S. at 575.  Plaintiff points to 18 U.S.C. § 1519, which provides: "Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both."  Plaintiff relies on <u>United States v. Ionia Mgmt.</u>

S.A., 2011 U.S. Dist. LEXIS 126089 (D. Conn. Oct. 28, 2011), in which the district court imposed a fine of $4,900,000 for, inter alia, defendant's violation of 18 U.S.C. § 1519.  The Court first observes that 18 U.S.C. § 1519 is a federal statute prohibiting falsifying records in a federal investigation.  Plaintiff cites no authority indicating how the state of New York might penalize such conduct.  Moreover, United States v. Ionia Mgmt. S.A has little relevance to the case at hand.  The fine was imposed against a corporate defendant, and such defendant was found guilty not only of 18 U.S.C. § 1519 but also of conspiracy, obstruction of justice, and thirteen counts under the Act to Prevent Pollution from Ships ("APPS").  See United States v. Ionia Mgmt. S.A., 555 F.3d 303, 306 (2d Cir. 2009).  The unlawful conduct consisted of "routinely discharge[ing] oily waste water into the high seas . . . ."  Id. at 305.  The ship's crew then "made false entries . . . to conceal such discharges, and obstructed a federal investigation . . . ."  Id.  Not only is the subject matter of entirely different, the case does not indicate how much of the fine went towards the pollution caused by the defendant's unlawful discharges versus the false entries.

Plaintiff also cites a string of cases upholding or remitting punitive damage awards ranging from $500,000 to $2,000,000.  (Pl. Mem. in Opp. at 88-89.)  Defendants rely on the Second Circuit's decision in Payne, which involved excessive force.  Once again, while the Court has reviewed those cases, it finds most relevant cases that are more factually similar to this one, involving false accusations.

Once again, the Court finds the decision in Komlosi instructive, where the court remitted the jury's $10 million punitive damages award to $500,000.  Komlosi, 2000 WL 351414, at *20. The court there reviewed punitive damages awards in other malicious prosecution cases and found the awards to range from $75,000 to $500,000.  Id. at *19.  The court remitted the award

to the high end of that range – $500,000 – due to the extreme nature of the conduct.  The court found the defendant's conduct to involve "the highest degree of reprehensibility" because of both (1) the extremely serious nature of the false charge against plaintiff, sexual assault on a developmentally disabled patient entrusted to plaintiff's care, and (2) the means she used to make the false charges, "manipulat[ing] a patient into doing her sinister deed for her."  Id.

The misconduct here is of much lesser magnitude than that in Komlosi.  As described above, defendants possessed non-fabricated evidence that gave them reason to eye Morse's billings with some suspicion, even assuming the quantum of evidence did not amount to probable cause.  Further, a charge of fraud is comparatively less serious than one of sexual assault.  See Komlosi, 2000 WL 351414, at *19 ("A mental health care professional may engage in a wide range of professional misconduct—from bill-padding to malpractice.  However, a charge of sexual misconduct with a developmentally disabled patient is qualitatively different and carries with it a stigma that is unlike that resulting from any other form of professional misconduct.").  Other cases involving fabricated evidence by government officers have imposed punitive damages awards in the range of $50,000 - $75,000.  Lee v. Edwards, 101 F.3d 805, 813 (2d Cir. 1996) (remitting punitive damages award of $200,000 to $75,000 where jury found police officer had beaten plaintiff and then filed a false incident report recording that plaintiff had assaulted a police officer and resisted arrest); Manganiello v. Agostini, No. 07 CIV.3644 HB, 2008 WL 5159776, at *19 (S.D.N.Y. Dec. 9, 2008) (upholding punitive damage award of $75,000 against one defendant (Agostini) where jury found that defendant to have knowingly misrepresented evidence to prosecutors and maliciously prosecuted plaintiff), aff'd sub nom.

Manganiello v. City of New York, 612 F.3d 149 (2d Cir. 2010); Robertson v. Sullivan, No. 07-CV-1416, 2010 WL 1930658, at *6 (E.D.N.Y. May 12, 2010) (upholding punitive damage award of $50,000 where jury found that police officers falsely arrested plaintiff and then initiated a malicious prosecution against him, claiming that they had seen plaintiff with marijuana and that he had resisted arrest, in order to camouflage their misbehavior).

Using these reference points, the Court concludes that remittitur to $100,000 is appropriate.  The Court will leave intact the jury's apportionment of blame as between Fusto and Castillo: $75,000 against Fusto and $25,000 against Castillo.  Morse may accept the remitted compensatory and punitive damage awards or elect a new trial on damages.

## CONCLUSION

For the reasons stated above,

Defendants' motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50 is DENIED;

Defendants' motion for a new trial on liability under Fed. R. Civ. P. 59 is DENIED;

Defendants' motion for a new trial on damages under Fed. R. Civ. P. 59 is GRANTED with respect to both the compensatory and punitive damage awards unless plaintiff elects to accept a remitted compensatory award for mental and emotional pain and suffering of $400,000 (for a total compensatory award of $4,624,936) and a remitted punitive damage award of $100,000.

SO ORDERED.

Dated: Brooklyn, New York
      August 27, 2013

                                              _____/s/_____

                                              Carol Bagley Amon
                                              Chief United States District Judge